## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| ALLONHILL, LLC, | Case No.: 14-10663 (KG) |
| Reorganized Debtor. | |

| | |
|---|---|
| ALLONHILL, LLC,<br>Plaintiff, | |
| v. | Adv. Pro. No.: 16-_____ (KG) |
| STEWART LENDER SERVICES, INC.,<br>Defendant. | |

### COMPLAINT (I) TO AVOID TRANSFERS PURSUANT TO 11 U.S.C. SECTIONS 544, 547(b) AND 548, (II) TO DECLARE ESTATE'S INTEREST IN PROPERTY PURSUANT TO 11 U.S.C. SECTION 541(a), (III) TO RECOVER PROPERTY PURSUANT TO 11 U.S.C. SECTION 550, (IV) TO DISALLOW CLAIMS PURSUANT TO 11 U.S.C. SECTION 502(d), (V) FOR DECLARATORY JUDGMENT AND (VI) FOR BREACH OF CONTRACT

Reorganized Allonhill, LLC, as Reorganized Debtor and Estate Representative in the above-captioned case, by and through its counsel, for its complaint against Stewart Lender Services, Inc. ("Stewart"), states as follows:

### Jurisdiction, Venue and Predicates for Relief

1.      The above-captioned adversary proceeding (the "Adversary Proceeding") arises in and is related to the above-captioned bankruptcy case (the "Chapter 11 Case"), which is currently pending under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b) and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. The parties have consented to this Court's jurisdiction pursuant to the *Agreement to Bankruptcy Court Jurisdiction* (the "SLS Jurisdiction Agreement"), dated as of February 12, 2015, by and between Allonhill and Stewart, approved by this Court's *Order Approving Agreement to Bankruptcy Court Jurisdiction between the Reorganized Debtor and Stewart Lender Services, Inc.* [D.I. 366] and this Court has retained jurisdiction pursuant to section 10.01 of the *Third Amended Plan of Reorganization of Allonhill, LLC* (the "Plan") [D.I. 551], confirmed by this Court's *Order Confirming Plan of Reorganization of Allonhill, LLC* [D.I. 593], dated December 17, 2015.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(b). This matter is a core proceeding within the meaning of 28 U.S.C. § 157 (b)(2).

4.      The statutory predicates for the relief requested herein are sections 502(b), 541(a), 544(a)(1), 547(b), 548 and 550 of the Bankruptcy Code.

5.      This Adversary Proceeding is brought pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

## Background

6.      Allonhill, LLC ("Allonhill") was a Delaware limited liability company with its principal place of business at 1200 17th Street, Suite 880, Denver, Colorado 80202. Allonhill was authorized to do and did business in the State of Colorado.

7.      On March 26, 2014 (the "Petition Date"), Allonhill filed with the Court a voluntary petition under chapter 11 of the Bankruptcy Code, commencing the above-

captioned Chapter 11 Case.  Allonhill, as debtor in possession, operated its business under sections 1107(a) and 1108 of the Bankruptcy Code.

8.    On December 17, 2015, Allonhill's Third Amended Plan of Reorganization under Chapter 11 (the "Plan") was confirmed by the Court's Order Confirming Third Amended Plan of Reorganization of Allonhill LLC (the "Confirmation Order").

9.    The Plan became effective on January 15, 2016.

10.    Pursuant to the Plan, all assets of the estate, including Causes of Action, were preserved and vested in Reorganized Allonhill, LLC (the creation of which the Plan authorized) (the "Reorganized Debtor"), and the Reorganized Debtor was appointed and was authorized as "estate representative" to pursue all such Causes of Action on behalf of, and for the benefit of, holders of claims and interests under the Plan.

11.    A full description of the Reorganized Debtor's business operations, corporate structure, capital structure, and reasons for commencing this case is set forth in the *Amended Declaration of Margaret Sue Allon in Support of Chapter 11 Petition and First Day Motions* [D.I. 3], which was filed on the Petition Date and which is incorporated herein by reference.  Additional facts in support of the specific relief sought are set forth herein.

12.    Defendant Stewart ("Defendant") is a "person" as defined in Section 101(41) of the Bankruptcy Code residing in and/or conducting business in the United States.  Upon information and belief, Stewart Lender Services, Inc. is a Texas corporation with its principal place of business at 1980 Post Oak Boulevard, Houston, Texas 77056.

Stewart Lender Services, Inc. is authorized to do and does business in the State of Colorado.

### The Asset Purchase Transaction

13.    Stewart is a provider of mortgage servicing and origination support services.

14.    In early 2013, Stewart approached Allonhill about a potential business undertaking between Allonhill and Stewart.

15.    Allonhill agreed to sell certain of its assets to Stewart.

16.    Continuing through 2013, Allonhill and Stewart formulated the terms of the sale of Allonhill's assets to Stewart, as well as the ongoing operations of the Business as a Stewart business entity.

17.    On August 28, 2013 (the "Execution Date"), Allonhill and Stewart, entered into an Asset Purchase Agreement, which was then amended on September 30, 2013 (the "SLS APA").  A copy of the SLS APA (as amended) is attached hereto as Exhibit A.

18.     At that time, both parties projected the revenue stream of the Business to be upwards of $50 million annually.

19.    The SLS APA provides for a $15 million cash payment, which was only partial consideration for the Business.  In addition to that up-front payment, Stewart was to pay Allonhill an earnout every year for three years, assuming certain revenue thresholds had been met, and was required to take certain actions intended to ensure the attainment of these thresholds.

**Stewart's Did Not Perfect its Interest in the Assets Transferred Pursuant to the SLS APA**

20.     The SLS APA provided for the sale by Allonhill to Stewart of certain business assets, including, *inter alia,* customer contracts, receivables and rights to payment.

21.     The Stewart Transaction was a "sign and close" transaction, meaning that the transaction documents were executed on the Execution Date, and many of the actions required to effectuate the transfer of assets and liabilities – including contracts, related rights and proceeds thereof – were to be taken by Stewart after the Execution Date.

22.     Stewart did not file a financing statement or take common law actions to perfect its interest in contracts, receivables or other assets and proceeds thereof that were to be transferred pursuant to the SLS APA, nor did Stewart perfect its interest in Allonhill's deposit accounts and proceeds credited to such accounts.

23.     Stewart did not obtain consents from all parties whose contracts were to be transferred pursuant to the SLS APA ("Clients") to the assignment and assumption of their contracts in a timely manner.

24.     Stewart did not provide Clients with updated payment information.

25.     After the Execution Date, Stewart caused invoices to be sent to Clients that continued to instruct that payment was to be remitted to Allonhill's general operating account (#XXXXXX4717) at UMB Bank (the "Allonhill Operating Account").

26.     The agreements between Stewart and Allonhill provided that Allonhill would continue to collect payments from Clients for two months after the Execution Date (*i.e.,* until October 31, 2013). Section 6.12 of the SLS APA, as amended, provides that:

Cash Collections. Notwithstanding anything in this Agreement to the contrary, from the date hereof through the term of the Employee Leasing Agreement, all cash and cash equivalents collected by the Seller or the Business from its customers (including checks and deposits in transit and wires initiated but not yet received) (the "Collections"), net of Permitted Payments, shall be paid by Seller to Purchaser in accordance with the terms of the Employee Leasing Agreement. In the event that the Collections, net of Permitted Payments, are insufficient to satisfy in full Seller's obligations under the Employee Leasing Agreement, then Purchaser (in its capacity as Lessor under the Employee Leasing Agreement) hereby agrees that any such shortfall shall be deemed satisfied and forgiven in all respects, and that Seller shall have no liability to Purchaser (in its capacity as Lessor under the Employee Leasing Agreement) for any such shortfall.

27.     The Employee Leasing Agreement, by and between Stewart and Allonhill, dated as of August 28, 2013, as amended (the "ELA"), was also amended as of September 30, 2013.  The ELA was amended to extend the term of the ELA (and consequently, by reference contained in section 6.12 of the SLS APA (quoted above), the term of the cash collection provision of section 6.12 of the SLS APA) until October 31, 2013.  A copy of the ELA (as amended) is attached hereto as Exhibit B.

28.     The ELA provided for the lease by Stewart of certain employees from Allonhill for a period of two months and for netting of the cost of such services as "Permitted Payments" from the Cash Collections due to Stewart under the SLS APA.

29.     The Amendment to the ELA specifically provides that no change was made to other original terms of the ELA. Paragraph 5 of the ELA defines the parties' relationship, and thus establishes the terms "in accordance with" which cash collections were - as stated in paragraph 6.12 of the SLS APA - to be paid by Allonhill to Stewart.

30.     Paragraph 5 of the ELA provides:

> Independent Relationship. Lessor shall provide the
> services of the leased employees as an independent
> contractor and not as an agent, joint venture, nor partner of
> Lessee, and nothing in this agreement shall be construed as
> creating any other relationship between Lessor and Lessee,
> or between any employee or agent of Lessor and Lessee.

31.     The SLS APA and ELA created an independent contractual relationship,

in which each party was the other's debtor as well as unsecured creditor.

32.     Subsequent to the Execution Date, and even after the ELA expired on

October 31, 2013, Clients continued to send payments by check and wire transfer to

Allonhill.

33.     The Reorganized Debtor recorded the following cash collections from

Clients in September, 2013 through and including March, 2014:

> September 2013 – $1,774,900
> October 2013 - $2,177,092
> November 2013 - $1,617,375
> December 2013 - $642,749
> January 2014 - $239,592
> February 2014 - $1,357,138
> March 2014 - $25,840

**Pre-petition Transfers Were Made to Stewart**

34.     Beginning in January, 2014, four or more months after cash collections

were initially received by Allonhill from Clients, two and a half months after the

expiration of the term of section 6.12 of the SLS APA, and within 90 days of the Petition

Date, the Allonhill made the following transfers to Stewart, totaling $6,608,309.15 (the

"Transfers"):

> 1.13.14 - $5,018,464.11 for payments received in 9.1.13 –
> 11.30.13
> 1.13.14 - $630,817.28 for payments received in 12.1.13 –
> 12.31.13

          1.24.14 - $11,932.07 for a payment received in December 2013  2.18.14 - $947,095.69 for payments received in 1.1.14 – 2.6.14

35.      Until the time of the Transfers, Stewart was an unsecured creditor with a general contract claim against Allonhill in the amount of the Transfers.

36.      The parties executed the amendments to the SLS APA and ELA in or about December of 2013, and the amendments were retrospective to their effective dates of September 30, 2013.  These amendments were made in order to clarify Allonhill's right to offset from the cash collections amounts owed by Stewart to Allonhill under the ELA, and to get current on the cash to Stewart by year end.  Stewart conditioned its execution of these amendments on the making of the Transfers.

37.      As a result of the amendments to the SLS APA and the ELA, Allonhill offset amounts owed by Stewart for employees provided under the ELA and, having netted those amounts, then made the Transfers to Stewart.

38.      Collections from Clients, totaling $675,474.75, continue to be held in the Reorganized Debtor's Operating Account.

**Stewart's Claims Filed in the Bankruptcy Case**

39.      Stewart filed its Proof of Claim (Claim #17) (the "SLS POC") with this Court on January 15, 2015, asserting a claim for $675,474.75 and other contingent, unliquidated amounts claimed to be due under the SLS APA and the Indemnity Agreement between Allonhill and SLS (the "Indemnity Agreement") dated as of August 28, 2013. True copies of the SLS POC and the Indemnity Agreement are attached hereto as Exhibit C and Exhibit D, respectively.

40.     In the SLS POC, Stewart alleges its claims to be secured by $2,000,000 (plus accrued interest) (the "Escrow Amount"), which was held in escrow pursuant to the Escrow Agreement by and between Allonhill and Stewart (the "Escrow Agreement") dated as of August 28, 2013.  The Escrow Amount was released to the Disbursing Agent (as defined by the Plan) pursuant to the Plan and Confirmation Order, subject to the terms of the Plan, which provide for payment as a secured claim of any losses proven by Stewart (other than losses resulting from claims released by the Plan) that would have been secured by the Escrow Amount prior to its release to the Disbursing Agent. A true copy of the Escrow Agreement is attached hereto as Exhibit E.

41.     The SLS APA and Indemnity Agreement define Stewart's rights to damages and indemnification.

42.     The SLS APA limits Stewart's right to indemnification of losses based on breach of that contract by excluding individual losses less than $50,000; only allowing for indemnification of losses in excess of that $50,000 threshold that aggregate more than $150,000, and excluding the initial $150,000 of aggregate losses.  *See* SLS APA, section 7.2.  In addition, section 7.2 of the SLS APA imposes caps on Stewart's rights to indemnification, as follows:

> (iii) in no event shall the aggregate liability of Seller under (A) Section 7.2(a), except in respect of a breach by Seller of the representations and warranties set forth in Section 4.10 (Material Contracts) or Section 4.11 (Intellectual Property), exceed One Million Five Hundred Thousand Dollars ($1,500,000) (the "General Cap") and (B) Section 7.2(a) in respect of a breach by Seller of the representations and warranties set forth in Section 4.10 (Material Contracts) or Section 4.11 (Intellectual Property) exceed Seven Million ($7,000,000).

43.    Pursuant to section 5.08 of the Plan, Claim Notices are deemed to have been given to Allonhill with respect to losses alleged by Stewart for which Stewart claims indemnification.  Section 5.08 of the Plan provides that:

> In consideration of the Releases set forth in Section 11.10 hereof and in the Confirmation Order, the Plan and the Confirmation Order are deemed (i) to be an Aurora Resolution Event as defined by the SLS APA for purposes of section 1.3 of the Escrow Agreement dated as of August 28, 2013, by and among SLS, Allonhill, and the Escrow Agent (the "SLS Escrow Agreement") authorizing the Escrow Agent to disburse the SLS Escrow to the Disbursing Agent for deposit in the Disbursement Account, (ii) to resolve and release SLS from all "Aurora Claims" as defined by the Indemnity Agreement, dated August 28, 2013 between SLS and Allonhill (the "SLS Indemnity Agreement"), (iii) to release the Reorganized Debtor from obligations relating to Aurora Claims under the SLS APA, the SLS Indemnity Agreement, and the SLS Escrow Agreement except as otherwise set forth in this Section 5.08 and (iv) to constitute, immediately prior to such Aurora Resolution Event, the delivery of (a) a "Claim Notice" by SLS under Section 3 of the SLS Indemnity Agreement to Allonhill, (b) a "Claim Notice" by SLS under Article VII of the SLS APA to Allonhill and (c) an "Escrow Agreement Claims Notice" by SLS of both an "Article VII Claim" and an "Aurora Claim" to Allonhill as well as an Escrow Agreement Claims Notice to the Escrow Agent by both SLS and Allonhill. SLS further agrees to the termination of SLS's rights under the SLS APA, the SLS Escrow Agreement, and the Indemnity Agreement and any other indemnification agreements between SLS and Allonhill to be indemnified for Aurora Claims (as defined in the SLS Indemnity Agreement) or any other indemnified Losses (as defined in the SLS Indemnity Agreement), other than Losses (a) that (x) are defined by part (ii) of the definition of "Aurora Losses" in Section 1(b) of the SLS Indemnity Agreement as incurred, resulting or arising from the "Excluded Litigation", or (y) result from a breach of section 4.17 of the SLS APA and (b) that are entitled to indemnification pursuant to the SLS Indemnity Agreement

and/or the SLS APA. The Confirmation Order shall constitute a direction to the Escrow Agent to deliver the funds held in the SLS Escrow to the Disbursing Agent for deposit to the Disbursement Account.  On the Effective Date, all of the Reorganized Debtor's right, title and interest in and to the funds received from the release of the SLS Escrow shall automatically be vested in the Reorganized Reorganized Debtor, provided, however, (and the Confirmation Order shall so provide) that in the event SLS establishes in a proceeding before the Bankruptcy Court that it is a Holder of an Allowed Claim for Losses that (x) are defined by part (ii) of the definition of "Aurora Losses" in Section 1(b) of the SLS Indemnity Agreement as incurred, resulting or arising from the "Excluded Litigation", or (y) result from breach of section 4.17 of the SLS APA and (b) that would be subject to indemnification pursuant to the terms of the SLS Indemnity Agreement and/or the SLS APA, such Allowed Claim shall be treated by the Plan as an Allowed Secured Claim up to the value of the SLS Escrow as of the date of delivery thereof by the Escrow Agent to the Disbursing Agent. Following the Effective Date, the Disbursing Agent will hold the SLS Escrow delivered to it and segregate the SLS Escrow from its other funds until such proceeding to determine whether SLS is a Holder of an Allowed Secured Claim for such Losses is (i) either resolved pursuant to a final and non-appealable order entered by the Bankruptcy Court or (ii) SLS and the Reorganized Debtor settle the proceeding pursuant to a compromise and settlement agreed to by both parties.

44.    The Indemnity Agreement obligates Allonhill to indemnify and hold harmless the Stewart Indemnified Parties against "Aurora Losses".  The Indemnity Agreement defines the "Aurora Losses" to which Stewart remains entitled to indemnification under section 5.08 of the Plan[1] as "Losses of the Stewart Indemnified

---

[1] Section 5.08 of the Plan limits Stewart's right to indemnification to "Losses (a) that (x) are defined by part (ii) of the definition of "Aurora Losses" in Section 1(b) of the SLS Indemnity Agreement as incurred, resulting or arising from the "Excluded Litigation", or (y) result from a breach of section 4.17 of the SLS

Parties incurred, resulting or arising from … (ii) the Excluded Litigation." The "Excluded Litigation" is the case styled *Allonhill, LLC v. Aurora Bank, FSB* (Case No. 12CV6381), currently pending, on remand from the Colorado Court of Appeals, in the District Court of Colorado for Denver County.

45.     Section 5(c) of the Indemnity Agreement excludes:

> consequential, incidental, indirect, special [and] punitive damages … including loss of revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to the breach or alleged breach hereof, and in particular, no "multiple of profits" or "multiple of cash flow" or similar valuation methodology shall be used in calculating the amount of any Losses.

46.     Section 7 of the Indemnity Agreement provides that indemnification under the Indemnity Agreement is the sole and exclusive remedy available to Stewart for Losses in respect of "an Aurora Indemnification Claim (or otherwise relating to the subject matter of [the Indemnity Agreement])". The term "Aurora Indemnification Claim" is defined in section 3(a) of the Indemnity Agreement by reference to the words "an actual, specific claim in respect of which indemnification may be sought under section 2 of this Agreement (an "Aurora Indemnification Claim")…".

47.     Section 7.3 of the SLS APA requires that each Claim Notice "shall be in writing and (i) shall specify the basis for indemnification claimed by the Indemnified Party, (ii) if such Claim Notice is being given with respect to a Third Party Claim, shall describe in reasonable detail such Third Party Claim and shall be accompanied by copies of all relevant pleadings, demands and other papers served on the Indemnifying Party, and (iii) shall specify the amount of (or if not finally determined, a good faith estimate of) the

---

APA and (b) that are entitled to indemnification pursuant to the SLS Indemnity Agreement and/or the SLS APA." *See* paragraph 43, *supra*.

Losses being incurred by, or imposed upon, the Indemnified Party on account of the basis for the claim for indemnification."    Section 3 of the Indemnity Agreement imposes identical requirements for Claim Notices to Allonhill.

48.    Stewart has not provided the information required to be included in a Claim Notice and has not otherwise specifically identified a loss as to which it is entitled to indemnification by Allonhill.    Allonhill requested this information by letter dated January 19, 2016, a true copy of which is attached hereto as Exhibit F.

### Stewart's Obligations After Execution of the SLS APA

49.    The SLS APA provided that the purchase of Allonhill's assets would be funded by (i) a cash payment of $15 million due at the closing of the SLS APA, and (ii) contingent, contractually-protected, earnout payments to be paid in accordance with the terms and conditions set forth in Article II of the SLS APA (the "Earnout Payments").

50.    Article II of the SLS APA provided that the Earnout Payments were to be paid yearly over a 3-year period.    The first Earnout Payment (the "Year One Earnout Payment") was based on the period beginning November 1, 2013 and ending October 31, 2014.    *See* First Amendment to SLS APA, Section 2.    The second Earnout Payment (the "Year Two Earnout Payment") was based on the period beginning November 1, 2014 and ending October 31, 2015.    *Id.*    The third Earnout Payment (the "Year Three Earnout Payment") is based on the period beginning November 1, 2015 and ending October 31, 2016. *Id.*

51.    According to Article II of the SLS APA, in order to be eligible for the Year One Earnout Payment and the Year Two Earnout Payment, the Business must have

achieved gross revenues of at least $17 million in the relevant year (the "Earnout Hurdle").

52.     Once the Earnout Hurdle is achieved, the Year One Earnout Payment and the Year Two Earnout Payment is based on a percentage of the Business' eligible revenue, as calculated in Section 2.2(a)(i) and (ii) of the SLS APA.  Specifically, the calculation is as follows for year one:  (i) the amount of gross revenue in excess of the Earnout Hurdle is multiplied by the Strategic Revenue Percentage for year one (as defined in the SLS APA), the product of which is then multiplied by 0.625, plus (ii) the amount of gross revenue in excess of the Earnout Hurdle multiplied by the Normal Revenue Percentage for year one (as defined in the SLS APA), the product of which is then multiplied by the Earnout Revenue Multiple for year one.

53.     The Earnout Revenue Multiple, which is a multiplier in the calculation of the Year One Earnout Payment and the Year Two Earnout Payment, is determined based in part on the Gross Margins of the Business.  In calculating the Gross Margins, Project Labor Costs are deducted.  Project Labor Costs include various expenses associated with generating revenue for the Business, such as direct labor costs, overtime, bonuses, benefit and insurance cost and sales commissions. *See* SLS APA Section, 11.1.

54.     To ensure that the Business would be protected from adverse changes that could impact reaching the Earnout Hurdle, the SLS APA required Stewart to

> cooperate in good faith to adjust the Earnout Hurdles, if necessary, to take into account the effect of any change in the recognition of revenues, the occurrence of acquisitions, divestitures or other Business Material Adverse Effect, that results in an adverse change to the Revenue or the Earnout Revenue Multiple for any portion of the Earnout Period.

SLS APA, Section 2.2(c).

55.    To ensure that Stewart did not interfere with or prevent the Business from reaching the Earnout Hurdle, the SLS APA expressly obligated Stewart during the period after the closing until 180 days after the end of the third earnout period (the "Lookback Period") to:

> use commercially reasonable efforts to operate the Business and use the Target Assets in a manner consistent in all material respects with [Allonhill's] ordinary course operation of the Business and use of the Target Assets prior to Closing.  Without in any way limiting the foregoing, [Stewart] shall not, directly or indirectly, take or permit to be taken any actions in bad faith that could reasonably be expected to cause the avoidance of payment of, or reduction in the amount of, the Earn-Out Amount or Lookback Adjustments.

SLS APA, Section 2.2(e).

### Stewart Fails to Perform

56.    Subsequent to Stewart's purchase of Allonhill's assets, Stewart repeatedly and consistently failed to abide by the terms of the SLS APA by (i) failing to conduct the Business consistently with Allonhill's ordinary course of pre-closing operations; (ii) taking actions in bad faith that could reasonably be expected to cause the avoidance of payment of the Year One Earnout Payment and the Year Two Earnout Payment; and (iii) failing to renegotiate the Earnout Hurdle in good faith when necessary, all of which negatively impacted the Business' sales and performance, and, in turn, its ability to reach the Earnout Hurdle that would trigger the Year One Earnout Payment and the Year Two Earnout Payment.

57.    Upon information and belief, the actions identified in Paragraph 56 include, but are not limited to, the following:  (a) Stewart engaged in business practices

that caused the failure of the Business' key sector—capital markets—including failing to bring on key capital markets employees, and instead filled key positions with employees with no securitization experience, which undermined the ability of that sector to satisfy clients of the Business and ultimately led to closure of that part of the Business; (b) instead of reinvesting initial profits from the Business in the Business, in good faith and in accordance with section 2.2(e) of the SLS APA, Stewart used those initial profits for other purposes; (c) Stewart purchased a competing business, Wetzl Traut, and shifted lucrative projects from the Business to Wetzl Traut; (d) Stewart failed to credit the Business for certain other revenues as well, including revenues from DiTech, Bank of America/SCRA (Servicemembers' Civil Relief Act), First Continental and  Fannie Mae matters; (e) Stewart maintained separate books for purposes of tracking the Year One Earnout Payment and Year Two Earnout Payment due to the Business and crediting expenses against the Business in its calculation of Project Labor Costs, even though such expenses are inconsistent with Allonhill's ordinary course of business; (f) Stewart did not maintain the employment of the Business' key sales staff, including Dan Gallery, Sue Allon and Mike Margolf, in a manner consistent with Allonhill's ordinary course of business; (g) Stewart implemented staffing approaches of non-key staff that led to an exodus of talented employees from the Business and negatively impacted the Business' revenues; (h) Stewart's practices of cost-cutting resulted in the loss of future business for the Business, including changing the Business' pricing structure, causing the Business to lose business, and cutting the Business' IT support, leaving it unable to maintain its technology and effectively to compete; and (i) Stewart physically moved employees from Stewart's PMH operations into Allonhill's offices, without revising the cost allocation for the space and

overhead attributed to the Business, which is relevant to the calculation of Project Labor Costs.

58.     Ms. Allon and other staff of Allonhill repeatedly raised concerns with Stewart about the foregoing practices, but Stewart refused to acknowledge, address, or remedy the concerns.

59.     Based on Stewart's conduct, the Earnout Hurdles for Year One, Two and Three should have been renegotiated.  At no time did Stewart consult Allonhill regarding a renegotiation of the Earnout Hurdle.

60.     Stewart's actions prevented the Business' revenues from meeting the Earnout Hurdle which would entitle Allonhill to receive the Year One Earnout Payment. On November 10, 2014, Stewart provided Allonhill with an Earnout Statement stating that "[d]ue to the fact that the Revenue for Year 1 did not exceed the Year 1 Hurdle Amount, no Year 1 Earnout Eligible Revenue exists and, therefore, no Year 1 Earnout Amount is due pursuant to the terms and conditions of the SLS APA, specifically the Earnout Payment calculation terms as set forth in Section 2.2(a)(i) of the SLS APA."

61.     The November 10, 2014 Earnout Statement lists the Business' gross revenue for Year 1 as $13,186,412, which is significantly less than the gross revenue projection for Year One of $34 million on which the parties based the SLS APA.

62.     Stewart's actions prevented the Business' revenues from meeting the Earnout Hurdle which would entitle Allonhill to receive the Year Two Earnout Payment. On November 16, 2015, Stewart provided Allonhill with an Earnout Statement stating that "[d]ue to the fact that the Revenue for Year 2 did not exceed the Year 2 Hurdle Amount, no Year 2 Earnout Eligible Revenue exists and, therefore, no Year 2 Earnout Amount is

due pursuant to the terms and conditions of the SLS APA, specifically the Earnout Payment calculation terms as set forth in Section 2.2(a)(i) of the SLS APA."

63.     The November 16, 2016 Earnout Statement lists the Business' gross revenue for Year 1 as $9,729,486, which is significantly less than the gross revenue projection for Year Two of $52 million on which the parties based the SLS APA.

64.     On information and belief, Stewart used the initial profits derived from the Business for purposes other than continuing the Business, and reduced overhead and services necessary to run the Business to avoid achievement of the Earnout Hurdle that would have triggered the Year One Earnout Payment and Year Two Earnout Payment (and will impact the ability to meet the Year Three Earnout Payment) in violation of Stewart's obligations under the SLS APA, including the obligations of good faith and fair dealing.

## Count I

## Avoidance of the Transfers (11 U.S.C. § 548(a))

65.     The Reorganized Debtor, as Estate Representative and as plaintiff, incorporates by reference the allegations contained in paragraphs 1 through 64 inclusive, as if fully set forth herein.

66.     Pursuant to sections 544(a)(1), (a)(2) and (a)(3) and section 1107(a) of the Bankruptcy Code and the provisions of section 5.09 of the Plan that preserve and revest Causes of Action owned by the Debtor as debtor in possession in the Reorganized Debtor, the Reorganized Debtor has the rights of a creditor that had extended credit to the Reorganized Debtor at the time of the commencement of the case, and that had obtained, at such time and with respect to such credit, a judicial lien on all property on which a

creditor on a simple contract could have obtained such a judicial lien, regardless of whether such a creditor existed at the Petition Date (a "Hypothetical Judgment Lien Creditor"), as well as the rights of  a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists (a "Hypothetical Execution Creditor"); and bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists (a "Hypothetical BFP").

67.     Section 101(54) of the Bankruptcy Code defines "transfer" as, "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the Reorganized Debtor's equity of redemption."

68.     The Transfers to the Defendant were transfers of property in which Allonhill had an interest.  But for the Transfers, Stewart would have been an unsecured creditor with a general contract claim in the net amount of Client funds, less amounts due to Allonhill under the ELA.

69.      To the extent that Stewart gave consideration for the Transfers, such consideration was significantly less than the value of the Transfers.

70.     Allonhill voluntarily or involuntarily:

(i) received less than a reasonably equivalent value in exchange for the Transfers; and

(ii)(I) was insolvent on the date that the Transfers were made or became insolvent as a result of the Transfers;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which its remaining property remaining was an unreasonably small capital; or

(III) intended to incur, or believed that the Reorganized Debtor would incur, debts that would be beyond the Reorganized Debtor's ability to pay as such debts matured.

71.     The Reorganized Debtor, as Estate Representative and as plaintiff, is entitled to an order and judgment under Section 548 of the Bankruptcy Code avoiding the Transfers.

## Count II

### Avoidance of the Transfers
### (11 U.S.C. §§ 544(a)(1), (a)(2), (a)(3) and 544(b)(1) and C.R.S.A. § 38-8-105)

72.     The Reorganized Debtor, as Estate Representative and as plaintiff, incorporates by reference the allegations contained in paragraphs 1 through 71, inclusive, as if fully set forth herein.

73.     The SLS APA provides in section 10.2 that "This Agreement shall be governed by and construed in accordance with Colorado law applicable to contracts made and performed in such state without giving effect to the choice of law principals [sic] of such state that would require or permit the application of laws of another jurisdiction."

74.      To the extent that Stewart gave consideration for the Transfers, such consideration was not a reasonably equivalent value.

75.     Allonhill made the Transfers without receiving a reasonably equivalent value in exchange for the transfer or obligation, and Allonhill:

(I) Was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction; or

(II) Intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

76.     The Transfers are avoidable by the Reorganized Debtor pursuant to section 544(a)(1) of the Bankruptcy Code and C.R.S.A. 38-8-105.

77.     At the time of the commencement of the case, the Debtor, as debtor in possession acting under section 1107(a) of the Bankruptcy Code, is empowered pursuant to section 544(b)(1) to avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law such creditors of the Debtor holding unsecured claims allowable under section 502 of this title or not allowable only under section 502(e) of this title.  The provisions of section 5.09 of the Plan preserve and revest Causes of Action owned by the Debtor as debtor in possession in the Reorganized Debtor.  The Reorganized Debtor, as Estate Representative and as plaintiff, is entitled to an order and judgment under Sections 544(a)(1), (a)(2), (a)(3) and 544(b)(1)  of the Bankruptcy Code and C.R.S.A. 38-8-105 avoiding the Transfers and granting remedies available under the Bankruptcy Code and C.R.S.A. 38-8-108.

## Count III

### Avoidance of the Transfers
### (11 U.S.C. §§ 544(a)(1), (a)(2), (a)(3) and 544(b)(1)  and C.R.S.A. § 38-8-106)

78.     The Reorganized Debtor, as Estate Representative and as plaintiff, incorporates by reference the allegations contained in paragraphs 1 through 77, inclusive, as if fully set forth herein.

79.     The Transfers were fraudulent as to Allonhill's creditor(s) whose claim(s) arose before the Transfers were made.

80.     Allonhill was insolvent at the time of the Transfers or became insolvent as a result of the Transfers, and Allonhill made the Transfers without receiving a reasonably equivalent value in exchange for the Transfers.

81.     The Transfers are avoidable by the Reorganized Debtor pursuant to section 544(a)(1) of the Bankruptcy Code and C.R.S.A. 38-8-106.

82.     The Reorganized Debtor, as Estate Representative and as plaintiff, is entitled to an order and judgment under sections 544(a)(1), (a)(2), (a)(3) and 544(b)(1)  of the Bankruptcy Code and C.R.S.A. 38-8-105 avoiding the Transfers and granting remedies available under the Bankruptcy Code and C.R.S.A. 38-8-108.

## Count IV

### Avoidance of the Transfers as Preferential (11 U.S.C. § 547 (b))

83.     The Reorganized Debtor, as Estate Representative and as plaintiff, incorporates by reference the allegations contained in paragraphs 1 through 82, inclusive, as if fully set forth herein.

84.    The Transfers were made on account of an unsecured obligation (or obligations) owed by Allonhill to Stewart under paragraph 6.12 of the SLS APA, which was antecedent to the Transfers.

85.    Certain of the Client funds – those that were received by Allonhill after the October 31, 2013 expiration of Section 6.12 of the SLS APA – were not received by Allonhill or transferred to Stewart by Allonhill pursuant to any contractual term.  These cash receipts and transfers were entirely outside the scope of the parties' agreement.

86.    The Transfers were made while Allonhill was insolvent, and/or rendered Allonhill insolvent.

87.    But for the Transfers, a creditor that had extended credit to the Reorganized Debtor at the time of the commencement of the case, and that had obtained, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien would have been able to obtain a lien on the cash collections held in the Reorganized Debtor's deposit account.

88.    The Transfers were made to the Defendant for the benefit of the Defendant, who was an unsecured creditor of Allonhill at the time of the Transfers, as the term "creditor" is defined by Section 101(10) of the Bankruptcy Code.

89.    As a result of the Transfers, the Defendant received more than it would have received if (a) the Reorganized Debtor's bankruptcy case was a case under chapter 7 of the Bankruptcy Code; (b) the respective Transfers had not been made; and (c) the Defendant had received payment on such debt owed to it by Reorganized Debtor to the extent provided by chapter 7 of the Bankruptcy Code.

90.     The Reorganized Debtor, as Estate Representative and as plaintiff, is entitled to an order and judgment under Section 547(b) of the Bankruptcy Code avoiding the Transfers.

## Count V

### Declaratory Judgment as to the Estate's Interest in Funds Held in Reorganized Debtor's Operating Account (11 U.S.C. § 541)

91.     The Reorganized Debtor, as Estate Representative and as plaintiff, incorporates by reference the allegations contained in paragraphs 1 through 90, inclusive, as if fully set forth herein.

92.     Pursuant to section 544(a)(1) and section 1107(a) of the Bankruptcy Code and the provisions of section 5.09 of the Plan that preserve and revest Causes of Action owned by the Debtor as debtor in possession in the Reorganized Debtor, the Reorganized Debtor has the rights of a creditor that had extended credit to the Reorganized Debtor at the time of the commencement of the case, and that had obtained, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, regardless of whether such a creditor existed at the Petition Date (a "Hypothetical Judgment Lien Creditor").

93.     A Hypothetical Judgment Lien Creditor would have had a claim with priority over Stewart's contract claim to the funds held in the Reorganized Debtor's Operating Account at the Petition Date.

94.     As the result of the rights conferred on the Reorganized Debtor, as Reorganized Debtor in possession pursuant to sections 544(a)(1) and 1107(a) of the Bankruptcy Code, the funds held in the Reorganized Debtor's Operating Account at the

Petition Date in the amount of $675,474.75 received by ACH Transfers from customers

are property of the estate as defined by section 541(a) of the Bankruptcy Code.

## Count VI

### Avoidance of the Transfer of the Escrow Account, the transfer of the Escrow Amount, the Business and the Target Assets Effected by the SLS APA (11 U.S.C. § 548(a))

95.     The Reorganized Debtor, as Estate Representative and as plaintiff, incorporates by reference the allegations contained in paragraphs 1 through 94 inclusive, as if fully set forth herein.

96.     Section 101(54) of the Bankruptcy Code defines "transfer" as, "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the Reorganized Debtor's equity of redemption."

97.     The transfers of the Escrow Amount, the Target Assets and the Business (each as defined in the SLS APA) made pursuant to the SLS APA to the Defendant were transfers of property in which Allonhill had an interest.

98.      To the extent that Stewart gave consideration for the transfers of the Escrow Amount, the Target Assets and the Business that occurred pursuant to the SLS APA, such consideration was significantly less than the value of the Escrow Amount, the Target Assets and the Business.

99.     Allonhill voluntarily or involuntarily:

(i) received less than a reasonably equivalent value in exchange for the transfers of the Escrow Amount, the Target Assets and the Business that occurred pursuant to the SLS APA; and

(ii)(I) was insolvent on the date that such transfers were made or became insolvent as a result of such transfers;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which its remaining property remaining was an unreasonably small capital; or

(III) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

100.     The Reorganized Debtor, as Estate Representative and as plaintiff, is entitled to an order and judgment under Section 548 of the Bankruptcy Code avoiding the transfers of the Escrow Amount, the Target Assets and the Business.

## **Count VII**

### **Avoidance of the Transfer of the Escrow Amount, the Business and the Target Assets Effected by the SLS APA**
### **(11 U.S.C. §§ 544(a)(1), (a)(2), (a)(3) and (b)(1) and C.R.S.A. § 38-8-105)**

101.     The Reorganized Debtor, as Estate Representative and as plaintiff, incorporates by reference the allegations contained in paragraphs 1 through 100, inclusive, as if fully set forth herein.

102.     The SLS APA provides in section 10.2 that "This Agreement shall be governed by and construed in accordance with Colorado law applicable to contracts made and performed in such state without giving effect to the choice of law principals [sic] of such state that would require or permit the application of laws of another jurisdiction."

103.      The transfers of the Escrow Amount, the Target Assets and the Business (each as defined in the SLS APA) made pursuant to the SLS APA to the Defendant were transfers of property in which Allonhill had an interest.

104.     To the extent that Stewart gave consideration for the transfers of the Escrow Amount, the Target Assets and the Business, such consideration was significantly less than the value of transfers of the Escrow Amount, the Target Assets and the Business.

105.     Allonhill made transfers of the Escrow Amount, the Target Assets and the Business without receiving a reasonably equivalent value in exchange for such transfer or obligation, and Allonhill:

> (I) Was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction; or

> (II) Intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

106.     The transfers of the Escrow Amount, the Target Assets and the Business are avoidable by the Reorganized Debtor pursuant to sections 544(a)(1), (a)(2), (a)(3) and (b)(1) of the Bankruptcy Code and C.R.S.A. 38-8-105.

107.     The Reorganized Debtor, as Estate Representative and as plaintiff, is entitled to an order and judgment under sections 544(a)(1), (a)(2), (a)(3) and (b)(1) of the Bankruptcy Code and C.R.S.A. 38-8-105 avoiding the transfers of the Escrow Amount, the Target Assets and the Business that occurred pursuant to the SLS APA and granting remedies available under the Bankruptcy Code and C.R.S.A. 38-8-108.

## Count VIII

### Avoidance of the Transfers of the Escrow Amount, the Target Assets and the Business Effected by the SLS APA
### (11 U.S.C. §§ 544(a)(1), (a)(2), (a)(3) and (b)(1)   and C.R.S.A. § 38-8-106)

108.    The Reorganized Debtor, as Estate Representative and as plaintiff, incorporates by reference the allegations contained in paragraphs 1 through 107, inclusive, as if fully set forth herein.

109.    The transfers of the Escrow Amount, the Target Assets and the Business (each as defined in the SLS APA) made pursuant to the SLS APA to the Defendant were transfers of property in which Allonhill had an interest.

110.    To the extent that Stewart gave consideration for transfers of the Escrow Amount, the Target Assets and the Business, such consideration was significantly less than the value of transfers of the Escrow Amount, the Target Assets and the Business.

111.    Allonhill was insolvent at the time of transfers of the Escrow Amount, the Target Assets and the Business that occurred pursuant to the SLS APA or became insolvent as a result of the transfers of the Escrow Amount, the Target Assets and the Business that occurred pursuant to the SLS APA, and Allonhill made transfers of the Escrow Amount, the Target Assets and the Business that occurred pursuant to the SLS APA without receiving a reasonably equivalent value in exchange for such transfers.

112.    The transfers of the Escrow Amount, the Target Assets and the Business that occurred pursuant to the SLS APA are avoidable by the Reorganized Debtor pursuant to sections 544(a)(1), (a)(2), (a)(3) and (b)(1)  of the Bankruptcy Code and C.R.S.A. 38-8-106.

113.    The Reorganized Debtor, as Estate Representative and as plaintiff, is entitled to an order and judgment under sections 544(a)(1), (a)(2), (a)(3) and (b)(1)  of the Bankruptcy Code and C.R.S.A. 38-8-105 avoiding the transfers of transfers of the Escrow Amount, the Target Assets and the Business that occurred pursuant to the SLS APA and granting remedies available under the Bankruptcy Code and C.R.S.A. 38-8-108.

## Count IX

### Recovery of Avoided Transfers and Remedies
### (11 U.S.C. § 550 and C.R.S.A. § 38-8-108 )

114.    The Reorganized Debtor, as Estate Representative and as plaintiff, incorporates by reference the allegations contained in paragraphs 1 through 113, inclusive, as if fully set forth herein.

115.    The Reorganized Debtor, as Estate Representative and as plaintiff, is entitled to avoid the Transfers under Section 547(b), 544(a)(1), (a)(2), (a)(3) and (b)(1) and/or 548 of the Bankruptcy Code, and to recover for the benefit of the Reorganized Debtor's estate, the proceeds or the value of the Transfers and of the transfers of the Escrow Amount, the Target Assets and the Business from the Defendant under Section 550(a)(1) of the Bankruptcy Code, and is entitled to remedies authorized by C.R.S.A. 38-8-108.

## Count X

### Disallowance of Claim Pursuant To 11 U.S.C. § 502(d)

116.    The Reorganized Debtor, as Estate Representative and as plaintiff, incorporates by reference the allegations contained in paragraphs 1 through 115, inclusive, as if fully set forth herein.

117.     The SLS POC (*see* Exhibit C, hereto) asserts a liquidated claim of $645,747.17 and certain unliquidated contract and indemnification claims against the Debtor. The Reorganized Debtor believes, and based thereon, alleges, that Stewart has or may assert claims against the Reorganized Debtor's estate.

118.     Pursuant to Section 502(d) of the Bankruptcy Code, the Reorganized Debtor, as plaintiff, requests that any claim asserted by Defendant Stewart be disallowed for the failure to repay the value of the Transfers and to pay the value of the transfers of the Escrow Amount, the Target Assets and the Business, upon determination that such value is recoverable under section 550 of the Bankruptcy Code.

## Count XI

### Breach of Contract

119.     The Reorganized Debtor, as Estate Representative and as plaintiff, incorporates by reference the allegations contained in paragraphs 1 through 118, inclusive, as if fully set forth herein.

120.     The SLS APA set forth contractual duties to be performed by both the Reorganized Debtor and Defendant Stewart.

121.     The Reorganized Debtor fully performed under the SLS APA.

122.     Defendant Stewart failed to perform under the SLS APA.

123.     Defendant Stewart's failure to abide by its contractual obligations has damaged the Reorganized Debtor in an amount to be determined at trial.

WHEREFORE, the Reorganized Debtor, as Estate Representative in possession and as plaintiff, respectfully requests that the Bankruptcy Court enter judgment in its favor and against Defendant Stewart as follows:

ON COUNT I:

Declaring that the Transfers identified herein are avoided and set aside as fraudulent transfers under section 548 of the Bankruptcy Code;

ON COUNT II:

Declaring that the Transfers identified herein are avoided and set aside as fraudulent transfers under sections 544(a)(1), (a)(2) and (a)(3) of the Bankruptcy Code and C.R.S.A. section 38-8-105;

ON COUNT III:

Declaring that the Transfers identified herein are avoided and set aside as fraudulent transfers under sections 544(a)(1), (a)(2) and (a)(3) of the Bankruptcy Code and C.R.S.A. section 38-8-106;

ON COUNT IV:

Declaring that the Transfers identified herein are avoided and set aside as preferences under Section 547(b) of the Bankruptcy Code.

ON COUNT V:

Declaring that the funds in the amount of $675,474.75 that are currently credited to and on deposit in the Reorganized Debtor's Operating Account are property of the estate under section 541(a) of the Bankruptcy Code;

ON COUNT VI

Declaring that the transfers of the Escrow Amount, the Target Assets and the Business that occurred pursuant to the SLS APA are avoided and set aside as fraudulent transfers under section 548 of the Bankruptcy Code;

ON COUNT VII:

Declaring that the transfers of the Escrow Amount, the Target Assets and the Business that occurred pursuant to the SLS APA are avoided and set aside as fraudulent transfers under sections 544(a)(1), (a)(2) and (a)(3)  of the Bankruptcy Code and C.R.S.A. section 38-8-105;

ON COUNT VIII:

Declaring that the transfers of the Escrow Amount, the Target Assets and the Business that occurred pursuant to the SLS APA are avoided and set aside as fraudulent transfers under sections 544(a)(1), (a)(2) and (a)(3)  of the Bankruptcy Code and C.R.S.A. section 38-8-106;

ON COUNT IX:

1.      Directing and ordering that the Defendant Stewart, or any immediate or mediate transferee of the Defendant, turn over to the Plaintiff (i) the full sum of the Transfers, (ii) the value the transfers of the Escrow Amount, the Target Assets and the Business that occurred pursuant to the SLS APA pursuant to Section 550 of the Bankruptcy Code, and (iii) granting remedies available under C.R.S.A. 38-8-108;

2.      Awarding judgment against the Defendant Stewart and in favor of the Reorganized Debtor, as Reorganized Debtor and plaintiff, in an amount of not less than

the value of the transfers of the Escrow Amount, the Target Assets and the Business that

occurred pursuant to the SLS APA, plus the Transfers of $6,608,309.15;

3.      Awarding pre-judgment interest at the maximum legal rate running from the time

of each of the Transfers and the transfers of the Escrow Amount, the Target Assets and

the Business that occurred pursuant to the SLS APA until the date of judgment herein;

4.      Awarding post-judgment interest at the maximum legal rate running from the date

of judgment herein until the date the judgment is paid in full; and

5.      Awarding fees and costs incurred by the Reorganized Debtor as Estate

Representative and plaintiff in this suit;

ON COUNT X:

Disallowing any and all claims of the Defendant Stewart against the Reorganized

Debtor's estate under section 502(d) of the Bankruptcy Code; and

ON COUNT XI:

Awarding judgment against the Defendant Stewart and in favor of the Reorganized

Debtor, as Reorganized Debtor and plaintiff, in an amount of damages to be determined

caused by Defendant Stewart's breaches of the parties' agreements;

3.      Awarding pre-judgment interest at the maximum legal rate running from the time

of each breach of contract until the date of judgment herein;

4.      Awarding post-judgment interest at the maximum legal rate running from the date

of judgment herein until the date the judgment is paid in full; and

5.      Awarding fees and costs incurred by the Reorganized Debtor as Estate

Representative and plaintiff in this suit;

 And, granting such other and further relief as is necessary proper.

Dated: March 25, 2016
       Wilmington, Delaware             BAYARD, P.A.

                                       */s/ Evan T. Miller*
                                       Neil B. Glassman (No. 2087)
                                       Evan T. Miller (No. 5364)
                                       222 Delaware Avenue, Suite 900
                                       Wilmington, DE 19801
                                       Email: nglassman@bayardlaw.com
                                                 emiller@bayardlaw.com

                                       - and -

                                       Peter A. Ivanick, Esq.
                                       Lynn W. Holbert, Esq.
                                       HOGAN LOVELLS US LLP
                                       875 Third Avenue
                                       New York, NY  10022
                                       Email: peter.ivanick@hoganlovells.com
                                                 lynn.holbert@hoganlovells.com

                                       *Counsel to Reorganized Debtor*

                                       - and –

                                       David D. Aufhauser, Esq.
                                       Stephen Andrews, Esq
                                       WILLIAMS & CONNOLLY
                                       725 Twelfth Street, N.W.
                                       Washington, D.C.  20005
                                       Email: daufhauser@wc.com
                                             sandrews@wc.com

                                       *Litigation Counsel to Reorganized Debtor*