## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| ALLONHILL, LLC, | ) | Case No. 14-10663 (KG) |
| | ) | |
| <u>      Reorganized Debtor.      </u> | ) | |
| ALLONHILL, LLC, | ) | |
| | ) | |
| Plaintiff and Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 16-50419 (KG) |
| | ) | |
| STEWART LENDER SERVICES, INC., | ) | |
| | ) | |
| <u>      Defendant and Counterclaimant.      </u> | ) | **Re:  D.I. Nos. 172 & 173** |

## OPINION

## INTRODUCTION

The Court is ruling after trial on the issues which the plaintiff and counterclaim defendant, Allonhill, LLC ("Allonhill"), and the defendant and counterclaimant, Stewart Lender Services, Inc. ("SLS") brought to the Court to decide.  The adversary proceeding presents interesting and difficult issues.  Allonhill was a business (the "Business") which had fared poorly with low profits. SLS purchased Allonhill with knowledge of Allonhill's performance history and after the purchase closed the Business dissipated.  The Court believes that if SLS had run the Business as it promised it would, the Business might have barely survived, but would it then have paid an earn out to Allonhill's principal, Margaret Sue Allon ("Ms. Allon")?  The Court is fully satisfied that the Business when sold to SLS did not have the value which Ms. Allon ascribed to it and Ms. Allon would have not received an earnout payment.

The parties filed motions *in limine* to exclude testimony of certain witnesses. The Court took the motions under advisement and they are denied, since they go to the weight of the evidence.

## FINDINGS OF FACT[1]

### I.   The Parties

1.    Allonhill is a Delaware limited liability company with its principal place of business in Denver, Colorado. (Undisputed Facts, ¶ 5.)[2]

2.    Ms. Allon founded Allonhill in 2008. Allonhill was in the business of providing mortgage due diligence and Credit Risk Management ("CRM") services. (*See, e.g.*, JX 7, AH00125900, AH00125905; Disclosure Statement in Support of Plan of Reorganization for Allonhill, LLC, filed August 7, 2015, D.I. 465 ("Disclosure Statement"), 8-9; Expert Report of James K. Finkel, June 28, 2018 ("Finkel Report"), ¶¶ 50-51, 125.) Ms. Allon was the predominant member of Allonhill (with a 47.3% membership interest), and the majority of the remaining interest (41.6%) was held by BHC Allonhill, LLC ("BHC"). (Disclosure Statement, 8.) Ms. Allon's husband, Harvey Allon ("Mr. Allon"), serves as the manager of BHC. (*Id.*)

---

[1] The references below to "JX", "PX" and "DX" mean the Joint Trial Exhibits, Plaintiff's Trial Exhibits and Defendant's Trial Exhibits, respectively. The Court has also attached as an appendix the abbreviated names and terms which appear throughout the Findings.

[2] References to "Undisputed Facts" are to the Statement of Facts Which Are Admitted and Require No Proof set forth in the parties' Proposed Final Pre-Trial Order, filed on October 10, 2018 ("PTO") and as entered by this Court on October 15, 2018 (D.I. 100).

3.      On March 26, 2014 (the "Petition Date"), Allonhill filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  (Undisputed Facts, ¶ 1.) On December 17, 2015, Allonhill became a reorganized debtor pursuant to the Court's Order Confirming Third Amended Plan of Reorganization of Allonhill, LLC (the "Plan"). (*Id.*, ¶ 2.)

4.      SLS is a Texas corporation with its principal place of business in Houston, Texas. (*Id.*, ¶ 4.)  SLS is a member of the Stewart family of companies, whose ultimate parent is Stewart Information Services Corp. ("SISCO"), a company publicly traded on the New York Stock Exchange. Day 3 Tr. at 13:13-24 (Nadeau). SISCO wholly owns Stewart Title Guaranty, a title insurance underwriter domiciled in Texas, which in turn wholly owns Stewart Title Company, which in turn wholly owns SLS. *Id.* at 13:8-14:24 (Nadeau).

5.      On January 15, 2015, SLS filed a Proof of Claim against the Debtor seeking $675,474.75, plus certain contingent, unliquidated claims. D.I. 23 Ex. C.

## II.      Allonhill's Formation and Initial Struggles

6.      Sue Allon and Harvey Allon (together, the "Allons") formed Allonhill in September 2008 in the wake of the financial meltdown after finding success in the mortgage services industry with their previous company, Murrayhill, LLC ("Murrayhill"). Day 1 Tr. at 38:10-14, 42:13-23, 45:5-14 (S. Allon). By 2008, the crash in the subprime mortgage market had caused the "private label" market for mortgage-backed

securitizations to all but disappear. JX10 at AH00126227; Gillen Decl. ¶¶ 17-18.[3] Private

label securitizations plummeted from a high in 2005 and 2006 of more than $700 billion

in issuances per year to less than $15 billion per year in 2009, 2010, and 2011. JX10 at

AH00126227; JX245 at p. 3; JX262 at p. 13.  The business thesis behind Allonhill was to

form a firm that could facilitate the return of private label securitizations and be well-

positioned to service that market as it rebounded. *Id.* at 38:15-39:2, 40:11 (S. Allon); *see also*

Gillen Decl. ¶ 25.

7.      After its formation, the economic realities of the market dictated that

Allonhill focus on services outside of securitizations. After the financial crisis, diligence

opportunities arose, many generated by the government sponsored entities ("GSEs"),

primarily Fannie Mae and Freddie Mac, from the high volume of foreclosures and

defaults. Day 1 Tr. at 62:22- 63:3 (S. Allon). Allonhill sought to provide due diligence

related services to banks and GSEs for default related or "look back" work that arose out

of the crisis.  *Id.* at 61:21-63:5, 155:17-156:8 (S. Allon). "Most" of Allonhill's work through

the sale to SLS in 2013 "related to non-performing loans or loans in default." *Id.* at 62:18-

63:1 (S. Allon).

8.      Although the GSEs continued to securitize mortgages at high dollar

volumes in the wake of the financial crisis (even higher than in the pre-crisis years), GSE

securitizations did not provide significant revenue-generating opportunities to third-

---

[3] Private label securitizations refer to the issuance of mortgage-backed securities by the private sector – predominantly investment banks. Gillen Decl. ¶ 16; *see also* Day 1 Tr. at 40:7-10 (S. Allon).

party loan due diligence firms like Allonhill. JX10 at AH00126227; JX245 at p. 3; Gillen Decl. ¶¶ 17-20.

9.      Allonhill's financial results in its first few years as a startup were poor. While it experienced growth by servicing the default related work that was available, it struggled to turn a profit and needed significant capital investment from the Allons. It was neither profitable in 2008, nor in its first full year of operations in 2009, posting a net loss from operations in excess of $4 million that year. Day 1 Tr. at 135:23-136:11 (S. Allon); JX2; JX3 at AH00001931. The Allons had to make capital contributions to the business of $4.5 million in 2009. Day 1 Tr. at 137:8-138:14 (S. Allon); JX247.

10.     The following year, in 2010, Allonhill increased revenue to $20 million, but barely broke even, posting a net income of less than $200,000. JX3; Day 1 Tr. at 138:19-23 (S. Allon). Mr. Allon had to make an additional capital infusion of $1.4 million in 2010, and loaned Allonhill another $550,000 in early 2011. JX247; Day 1 Tr. at 138:24-139:11, 145:6-12 (S. Allon).

11.     At trial, the Allons testified that by contributing capital to the company, they were "funding growth," but that conflicts with their deposition testimony, in which they acknowledged that capital contributions were necessary to sustain operations. Day 1 Tr. at 139:12-143:2 (S. Allon), 354:14-356:8 (H. Allon). As Ms. Allon eventually conceded on cross examination, "the business couldn't operate without" capital contributions. *Id.* at 145:19-146:2 (S. Allon).

### III.    Overview of Market for Due Diligence/CRM Services Post-Financial Crisis

12.    In the wake of financial crisis in 2007/2008, the demand for mortgage due diligence and CRM services increased and began to focus on three areas: "(1) a robust quality control function for loan origination, (2) post-purchase audits and forensic reviews relating to repurchase matters and put-back litigation, and (3) ongoing portfolio monitoring, including data management and servicer review." (Finkel Report, ¶ 88.)

13.    The demand for these services came from transactional activity relating to purchases and sales as well as ongoing surveillance, risk management, and litigation activities involving mortgages. (*Id.*, ¶ 124.)

### IV.    Allonhill's Mission and Business Model

14.    Prior to 2008, Ms. Allon had spent her entire career, since 1981, working on some facet of the mortgage finance and securitization markets. (*Id.*, ¶ 52.) In launching Allonhill, Ms. Allon relied on her previous experience as CEO of Murrayhill and as a board member of Clayton Holdings, Inc. ("Clayton"), the dominant firm in the mortgage loan due diligence space after it purchased Murrayhill in 2005. (Day 1 Tr. (S. Allon) at 87:1-88:13.)

15.    Murrayhill introduced the concept of third party credit risk management on mortgage securitizations to Wall Street in 1998 and it was named on over eighty-eight percent of the subprime private securitizations issued in 2004 (the year that Murrayhill was sold and merged into Clayton). (JX 7, AH00125899; *see also* Finkel Report, ¶ 52.)

16.     Allonhill's clients consisted of private banks, such as Goldman Sachs, Citibank, Credit Suisse, UBS, Nomura, and Barclays, as well as private, non-bank entities, including Quicken Loans, Pacific Union, Five Star, and Flagstar. (Day 1 Tr. (S. Allon) at 46:4-11.) Allonhill also performed work for GSEs (Fannie Mae and Freddie Mac) as well as for the FDIC and the U.S. Treasury. (*Id.*, 46:13-14; *see also Id.*, 45:17-19; Finkel Report, ¶¶ 23, 57-58.)

17.     As of February 2012, Allonhill noted that it was targeting additional work from the GSEs. (JX 7, AH00125914; *see also Id.*, AH00125934.

18.     For tracking purposes, Allonhill broke its services down into several different business lines, depending on the type, frequency and/or scope of work. As an example, an Allonhill presentation from April 2012 identified five lines of business: (1) loan file review ("LFR") (sometimes referred to as "due diligence"), consisting of (a) foreclosure; (b) conduit; (c) quality control ("QC"); and (d) transactional; (2) CRM; (3) staffing; (4) consulting; and (5) licensing. (JX 10, AH00126217.)

19.     With regard to the LFR business line, Allonhill acknowledged in the April 2012 presentation that the ongoing foreclosure review (which is described in more detail below) would begin to taper off in late 2012 and continue to decline in 2013. (*Id.*, AH00126213.)

20.     Instead, Allonhill anticipated — as of April 2012 — that the two drivers of the future LFR business would be QC and conduit. (*See Id.*, AH00126219-20.)  Conduit involves the review of files for loans that are originated by the seller and are then usually

(but not always) securitized by the purchaser, which tended to be Allonhill's customer. (*Id.*, AH00126219.) Allonhill stated that the conduit business depended on a return of the securitization market, which, as of April 2012, it believed would begin in 2013. (*See Id.*, AH00126219, AH00126226.) Allonhill described QC, also known as "flow," as "a high growth sector for the company, as banks increasingly understand the value of having a third party in place to review loans before they are shown for securitization, and before they are sold to Fannie/Freddie." (*Id.*, AH00126220.) QC accounted for $11 million of Allonhill's revenue in 2011, and the April 2012 presentation forecasted QC revenue of $19 million in 2012 and $26 million in 2013. (*Id.*, AH00126234.)

## V.      Allonhill's Activities and Growth from 2008-2011

21.      Allonhill's first major client was the U.S. Treasury, which retained Allonhill in 2009. (Day 1 Tr. (S. Allon) at 60:12-17; *see also* Finkel Report, ¶¶ 54, 58.) This was a prestigious engagement, which Allonhill won over competitors like Ernst & Young and Clayton. (Day 1 Tr. (S. Allon) at 60:20-61:12.) The U.S. Treasury engagement spanned Allonhill's various business lines and involved licensing, consulting, service performance management service ("SPM"), and loan file review. (*Id.*, 61:13-20.) In 2009, Allonhill also had its first GSE engagement when it was hired by Fannie Mae for loan foreclosure reviews. (JX 7, AH00125900.)

22.      In 2010 Allonhill secured a number of small transactions through hedge funds. (Day 1 Tr. (S. Allon) at 62:9-17.) Allonhill also continued to do work for Fannie Mae and Freddie Mac in 2010. (*Id.*, 62:18-21.) Around the same time, several banks hired

Allonhill to perform QC work and Allonhill also performed diligence in connection with several private label securitizations. (*Id.*, 62:9-17.)

23.    As noted in the Finkel Report, Allonhill also announced in 2010 the release of a securitization solution for issuers and underwriters of RMBS. "Allonhill's product incorporated (1) new requirements of major credit agencies, (2) scientific sampling methods, (3) tracking and reporting of loan errors and their resolution, and (4) a signed affirmation of Allonhill's review procedures, findings and their disclosure." (Finkel Report, ¶ 128.)

## VI.    The OCC Projects and 2011 Sale Efforts

24.    In the spring of 2011, consent orders administered by the OCC required mortgage servicers to retain outside firms to independently review certain foreclosure practices. *Id.* at 65:2- 15 (S. Allon). Allonhill was hired for two such projects (the "OCC Projects"), the larger as the independent consultant for Aurora Bank. *Id.* at 65:2-24 (S. Allon).

25.    Allonhill recorded $52 million in revenue in 2011, approximately half of which was attributable to the OCC Projects. JX4 at AH00001916; Day 1 Tr. at 144:8-17 (S. Allon). The OCC Projects also produced abnormally high profit margins. As a result of the OCC Projects, Allonhill posted positive EBITDA of approximately $15 million for 2011. JX32 at AH00001902. Allonhill's investment banker Ryan Abbe ("Mr. Abbe") later described 2011 as an "anomaly," driven by these two one-time projects with high profit margins. JX14 at AH00126726; Day 2 Tr. at 496:14-497:17 (Abbe); Day 1 Tr. at 144:8-145:5

(S. Allon) (testifying that revenues and profits in 2011 were largely driven by the OCC Projects).

26.    At the end of 2011, when Allonhill's financial results were at their height due to the OCC Projects, the Allons decided to explore the idea of either selling or seeking outside investment for Allonhill. Day 1 Tr. at 227:19-228:5 (S. Allon). As Ms. Allon testified, Mr. Allon and his colleagues at Braddock Financial thought that this would be a good time to cash out. *Id.*  They hired Mr. Abbe, of the investment bank JMP Securities, to assist them in the exploratory process. Abbe Decl. ¶¶ 1, 6. He suggested that the Allons explore a transaction with PriceWaterhouse Coopers ("PwC"). Day 2 Tr. at 484:18-485:13 (Abbe); Abbe Decl. ¶ 7.

27.    As the Allons engaged in talks with PwC, Mr. Abbe created a presentation for the Allons titled "Valuation Guidance," which explained what they could expect to see when engaging with potential buyers. Day 2 Tr. at 489:1-13 (Abbe); JX14. Mr. Abbe identified several factors that made Allonhill difficult to value, including: its dramatic growth in a short period, its high customer concentration with Aurora, and the uncertain timing of the return of the securitization market. JX14 at AH00126720, 725; Day 1 Tr. at 233:2-234:24 (S. Allon); Abbe Decl. ¶ 14; Day 2 Tr. at 489:14-24 (Abbe).

28.    The presentation also discussed the reality that the vast majority of Allonhill's revenue was from default related work, which would ultimately wind down as the market distanced itself from the 2008 financial crisis. JX14 at AH00126726. Per Mr. Abbe, Allonhill would have to convince a potential purchaser (like PwC) that the loan

securitization market would come back in sufficient volumes to allow Allonhill to replace the revenue it would lose from default related projects. As Mr. Abbe wrote, "more work needs to be done around selling Allonhill's growth prospects, financial projections and future value proposition," and that Allonhill should "stress [the] benefits of being at the forefront of an evolving" securitization market. JX14 at AH00126722, 725. Mr. Abbe indicated that the Allons should consider a transaction that would provide them with future consideration based upon the performance of Allonhill after the transaction in the form of an earnout, profit participation, employment agreement or stock. JX14 at AH00126720.

29.    In April 2012, Allonhill prepared financial projections to use in its discussions with PwC. JX12. The projections showed, even prior to issues surfacing with Allonhill's performance on the Aurora project, that Allonhill's default related work would rapidly decline by the middle of 2013 and that other lines of business would rapidly replace the lost default revenue. JX12 at JMP- Allonhill0001422. This set of Allonhill's projections assumed that private label securitizations would return to pre- crisis levels by the end of 2013, and that Allonhill would corner a significant portion of that market. *Id.*

## VII.    Allonhill's Post-OCC Operations and Financial Performance

### A.    Loss of the OCC Projects

30.    Allonhill performed work on the Aurora IFR for approximately a year. (Day 1 Tr. (S. Allon) at 68:24, 69:4-6.) In May 2012, Allonhill received a batch of loans in connection with a foreclosure review Allonhill was performing for Fannie Mae. The batch included loans that had been serviced at some time by Aurora. (*Id.*, 69:6-11.) Allonhill

11

determined that there was no conflict of interest in performing work on those loans simultaneously for Fannie Mae and for Aurora, but, out of an abundance of caution, Allonhill self-reported to the OCC that it had accepted the loan review project from Fannie Mae. (*Id.*, 69:11-19.)

31.    The OCC initially informed Ms. Allon that there was no conflict of interest, but in May 2012 the OCC ordered Aurora to terminate Allonhill's loan review work on the IFR to avoid the appearance of a conflict of interest. (*Id.*, 69:21-70:5.) The OCC ordered Wells Fargo to terminate Allonhill's loan review work on its IFR as well. (*Id.*, 70:6-10.)

32.    The OCC determined that Allonhill had failed to disclose significant conflicts of interest that compromised Allonhill's independence. JX250; Day 1 Tr. at 337:11-13 (H. Allon). Litigation ensued. JX250; Stip. Facts ¶¶ 21-28. Allonhill brought claims against Aurora for payment of $22 million in outstanding receivables; Aurora countersued, seeking the return of $24 million in fees it had already paid. Stip. Facts ¶¶ 21-28.

33.    Two years later, a Colorado trial court awarded Aurora more than $25 million in damages, $24 million of that for the fees Aurora paid to Allonhill for its work. JX208; Stip. Facts ¶ 28. The court found that (1) Allonhill's representations about its conflicts of interest were "false and reckless, and omitted significant, material information;" (2) that Allonhill was "reckless" in misrepresenting and omitting certain information to Aurora; and (3) that Allonhill's performance under the IFR contract was "abysmal" and "feckless," and that "Aurora paid Allonhill more than $24 million but

Allonhill never completed the review of a single foreclosure file." Stip. Facts ¶ 27. Ms. Allon acknowledged that the court in the Aurora trial "made negative findings about [her] credibility." Day 1 Tr. at 74:8-14 (S. Allon); JX250 at ¶ 165 (finding that Ms. Allon's "prevaricatory testimony" was "troubling" and "undermined" her "credibility").

**B.    Allonhill Cuts Costs and Exits Transactional and Conduit Work**

34.    Upon losing the OCC Projects in May 2012, Allonhill immediately laid off over 300 employees, reducing its workforce by half. Day 1 Tr. at 165:13-166:17 (S. Allon). In the following months, Allonhill laid off additional managers and administrative staff to better "right size" the company after the OCC layoffs. *Id.* at 166:18-167:6 (S. Allon). At the end of 2012 after Allonhill defaulted on its credit line. *Id.* at 152:19-153:15, 167:7-21 (S. Allon). Allonhill implemented a cost cutting strategy. *Id.* at 179:9-180:1 (S. Allon).

35.    As a result, in 2012, Allonhill essentially abandoned its securitization business as the volume of private label securitizations was insufficient to support the cost of the work. Day 2 Tr. at 434:18-435:11 (Margolf); JX24 at AH00131655, 668. It decided to "exit" the market for transactional work, which involved one-off review projects, typically of smaller volumes of loans, under short turnaround periods. JX24 at AH00131657; Gillen Decl. ¶ 45. Allonhill characterized this work as "short-term, labor intensive, low-margin" work "that has dragged down our margins more as activity has increased in this space." JX24 at AH00131668; Day 1 Tr. at 171:16-172:3 (S. Allon); Day 2 Tr. at 434:6-23 (Margolf). Exiting this line of work would help achieve Ms. Allon's objective of eliminating low margin projects and getting Allonhill to breakeven. Day 1 Tr. at 180:15-18 (S. Allon).

13

36.    Allonhill also announced to its existing conduit clients that it would not provide loan file review services in connection with securitizations unless the client agreed to pay a monthly retainer to Allonhill. JX24 at AH00131668; Day 1 Tr. at 173:18-23 (S. Allon). Conduit work was the backbone of loan due diligence in the private label securitization market, as conduit clients – mostly Wall Street banks – retained firms on a longer term basis to review loans as they flowed through various stages of the securitization process. Day 1 Tr. at 44:20-45:4, 188:23-189:15 (S. Allon); JX24 at AH00131655.

37.    In response to Allonhill's request for a monthly retainer, all but Goldman Sachs ultimately rejected the new payment structure. Day 1 Tr. at 176:12-177:1 (S. Allon). At the time of the Sale, Allonhill was doing no conduit business other than with Goldman Sachs, having practically withdrawn from the product line that in 2012 Allonhill had projected to be its primary driver of growth. Day 1 Tr. at 176:12-20, 188:23-191:2 (S. Allon).

38.    At the end of 2012, Allonhill laid off another 140 employees associated with the capital markets business. JX24 at AH00131669; Day 1 Tr. at 173:4-12 (S. Allon). The reductions meant that Allonhill would "turn[] down new business" in securitizations. JX24 at AH00131669.

39.    Allonhill pursued other cost cutting measures. It eliminated payment of commissions to its sales force, froze certain employee salaries, no longer matched employee 401(k) contributions, and dropped its paid bus pass program. Day 1 Tr. at 182:16-183:19 (S. Allon); Day 2 Tr. at 435:12-436:18 (Margolf); JX30.

14

40.     Even after these changes, Allonhill still struggled to deliver projects at the margins it priced. Day 1 Tr. at 267:22-268:12 (S. Allon). As Ms. Allon wrote in June 2013, "[Allonhill's] challenge is never going to be, nor has it ever been, signing deals above the lowest margins. Our challenge has been delivering them at the margins we priced." JX308 at SLS079987. In the spring and summer of 2013, Allonhill made changes to its pricing methodology and operations to better deliver projects at acceptable margins. *Id.*

41.     Allonhill also decided to temporarily shift its method of funding the extensive upfront investment required for private-label securitizations — business that was profitable only at high volume, by requiring its clients to pay the employee costs of the loan reviews as they were incurred rather than paying only on completion of a project. (*Id.*, 77:22- 78:18.)

42.     Although some clients were upset with Allonhill's change of its pricing model, Bank of America, Citibank, and Goldman Sachs agreed to the new structure. (*Id.*, 78:19-79:8.)

43.     In October 2012, Allonhill filed a lawsuit against Aurora (the "Aurora Litigation"), seeking payment of the outstanding receivable. *(Id.*, 71:23-72:3; Undisputed Facts, ¶ 23.)

44.     Despite the OCC's requirement that Aurora terminate Allonhill and the Aurora Litigation, Allonhill did not lose a single client as a result of the OCC termination. (Day 1 Tr. (S. Allon) at 74:18-21, 79:19-22; *see also* JX 111.)  Ocwen gave Allonhill work for the first time. (Day 1 Tr. (S. Allon) at 74:24-75:6; JX 111.) Ms. Allon disclosed the foregoing

facts regarding the effect of the OCC termination to SLS prior to the acquisition in August 2013. (*See, e.g.*, JX 111.)

45.    Even with these cost cutting measures and pricing and operational changes, Allonhill struggled financially. For each month in 2012 following the OCC termination, Allonhill posted negative EBITDA, even after excluding the company's costs associated with the Aurora litigation. JX55; Day 1 Tr. at 148:11-150:21 (S. Allon). Allonhill reported a net negative income of $299,580 for 2012, but that figure credits the business with half of the $22 million Aurora receivable; excluding that receivable in full, the company lost over $11 million in 2012. JX32 at AH00001900; Day 1 Tr. at 151:17-152:18 (S. Allon). By the end of 2012, Allonhill's bank called its working capital line of credit, necessitating the Allons to provide the company with an additional $2.4 million in capital before the end of the year. Day 1 Tr. at 152:19-153:15 (S. Allon).

46.    The company's financial troubles continued in 2013, as Allonhill's EBITDA was negative in every month preceding the August Sale to SLS, and total losses in the first eight months of the year amounted to $4.9 million. JX102; Day 1 Tr. at 150:22-151:16, 155:2-6 (S. Allon). Allonhill suffered these losses despite the fact that the Allons contributed an additional $3.2 million of capital into the business during the first half of 2013. JX247 at ¶¶ 4(d) & 5(a). Given the company's ongoing issues and capital needs, the business would have required additional capital contributions if the Sale did not close, as Allonhill's CFO noted two weeks before closing. DX6.

47. In the twelve months prior to closing the deal with SLS, nearly 70 percent of Allonhill's revenues were concentrated in three clients – Fannie Mae, Freddie Mac, and Flagstar. JX102; Day 1 Tr. at 157:9-158:5 (S. Allon). The vast majority of this work was default related. Day 2 Tr. at 441:18-447:1, 452:5-454:6 (Margolf).

48. In short, between 2008 and August 2013, Allonhill's only profitable period came in 2011 as a result of the revenue generated by the OCC Projects. The company required significant capital infusions each year and would have required more if not for the SLS acquisition. Day 1 Tr. at 161:13-162:9 (S. Allon); DX6. At the time of the Sale, a substantial portion of its trailing twelve-month revenue depended on three clients who provided it with work that arose from the financial crisis. *Id.* at 162:5-163:10 (S. Allon).

49. The OCC termination, two rounds of massive layoffs, and the mothballing of its securitization business severely damaged Allonhill's standing in the marketplace.

50. Following the OCC termination, certain client relations worsened upon Allonhill's "wind down [of] conduits," as "clients were very upset" when Allonhill reneged on existing payment arrangements. JX159 at SLS72942. In January 2013, a potential client reported to Allonhill that it had heard "bad things" about the company from Bank of America, Barclay's Capital and Citibank. JX37; Day 1 Tr. at 312:3-314:5 (S. Allon). As Ms. Allon characterized what the potential client reported, "we are slime for walking away from a commitment." *Id.* Bank of America "was particularly upset," vowing even five years later (in 2017) never to work again with Ms. Allon. Day 1 Tr. at 78:21-79:1 (S. Allon); Day 2 Tr. at 438:12-21 (Margolf).

17

## VIII.  Allonhill's Sale Efforts

### A.    Allonhill Rekindles Sale Efforts and Prepares Projections

51.    As Allonhill continued to generate losses month after month in the wake of the OCC termination, it became clear that the company "needed to do something." DX7 at JMP- Allonhill0018547. The Allons had invested over $5 million in capital into the business in late 2012 and early 2013 just to keep it afloat, and they were not willing to fund the company indefinitely. Day 1 Tr. at 356:22-357:2 (H. Allon). Allonhill and PwC briefly rekindled discussions in 2012, but talks ended, with Allonhill never receiving an offer or valuation in writing. Day 1 Tr. at 228:6-229:17 (S. Allon). In late 2012, as Allonhill exited the capital markets business, Ms. Allon asked Mr. Abbe to canvass the market for other potential purchasers. *Id.* at 229:18- 230:2 (S. Allon); Abbe Decl. ¶ 16.

52.    The loss of the OCC Projects meant that Allonhill's 2012 and 2013 financial results would be lower than the previous year. This reality, combined with the expected decline in other default related work, meant that Allonhill had to be even more focused with potential buyers on the promise of what its business could do in the future when the private label market returned, and not on what it had done in the past. Day 1 Tr. at 192:11-16, 193:12-23 (S. Allon). Thus, because Allonhill was focusing buyers on future performance, financial projections would play a "very important" part of the sale process. Day 1 Tr. at 193:24-194:5 (S. Allon); Day 2 Tr. at 501:20-502:10 (Abbe).

53.    As the sale process heated up, Allonhill focused on creating projections that Mr. Abbe could share with the numerous parties he was contacting. *See, e.g.,* JX31; JX34;

JX35; JX62. The evidence shows that the Allonhill team struggled over how best to project the business going forward as there were differences of opinion internally about how quickly and how much Allonhill could grow. *Id.*; Day 1 Tr. at 200:5-222:15 (S. Allon).

54.     Despite this uncertainty, efforts were made to prepare projections that showed significant upside. To that end, Ms. Allon worked closely with Ken Glickstein ("Mr. Glickstein"), a Braddock Financial employee not involved in Allonhill's day-to-day operations, to prepare the most aggressive set of projections possible. Day 1 Tr. at 195:18-196:5, 200:5-208:6 (S. Allon); JX31. They showed dramatic growth scenarios in conduit and SPM work – product lines tied to growth in the private label securitization market, the primary driver of Allonhill's future. Day 1 Tr. at 188:17-189:15, 200:20-203:23 (S. Allon); JX31.

55.     At the request of the deal team, Dan Gallery, ("Mr. Gallery") also prepared a set of projections, referred to as a "market opportunity analysis." Day 1 Tr. at 208:19-209:2 (S. Allon). On March 1, 2013, Mr. Gallery circulated these projections to the Allonhill team in which he set forth a view of various growth opportunities, and attached revenue projections for each business line based on expected future sales. JX303. Mr. Gallery's projections did not match the aggressive "top down" projections that had been prepared by Ms. Allon and Mr. Glickstein – Mr. Gallery's were too low. JX48; Day 1 Tr. at 211:12-216:20 (S. Allon). Accordingly, certain portions of Mr. Gallery's projections were adjusted upward before they were shared with buyers, including SLS, in order to show sufficient growth. JX49; Day 1 Tr. at 214:20-216:20 (S. Allon).

19

### B.    Allonhill Conducts a Robust Marketing Process

56.    Allonhill conducted a robust marketing process. In late 2012 and early 2013, Mr. Abbe tested the market by contacting over two dozen potential strategic and financial buyers, SLS among them. Day 2 Tr. at 511:13-523:14 (Abbe); Abbe Decl. ¶ 16; JX27; JX42; JX54; JX59.[4] In Mr. Allon's view, Mr. Abbe was "as good as you can do in terms of someone you could hire to test the market." Day 1 Tr. at 362:11-14 (H. Allon). Mr. Abbe testified that he did the "best job" he could to solicit buyers for Allonhill. Day 2 Tr. at 526:4-7 (Abbe). The only party to show any real interest was SLS. *Id.* at 524:11-525:11 (Abbe). No party other than SLS offered anything in writing, and at the time Allonhill executed a letter of intent with SLS in June 2013, Mr. Abbe did not have the "level of engagement where [he] felt comfortable that [Allonhill] would be able to move somebody forward." *Id.* at 520:8-10, 524:11- 525:11 (Abbe); Day 1 Tr. at 230:23-231:5 (S. Allon).

### C.    SLS

#### 1.    SLS's Management Team

57.    At the time of the Sale, SLS was led by a management team with expertise in mortgage services and related technology, and experience with successfully turning around a troubled business in the mortgage servicing industry.

---

[4]    The evidence shows that Mr. Abbe contacted at least the following potential strategic and financial buyers: Promontory Financial Group, Deloitte, BDO, FTI Consulting, RiskSpan, Fidelity Risk Management, Lender Processing Services, Verisk Analytics, EXL Service, Ernst & Young, Wolters Kluwer, Decision Insight, KPMG, FlexpointFord, LLC, McGladrey, FNC, Huron Consulting Group, Navigant Consulting, Duff & Phelps, The Williston Financial Group, Genpact, Bregal Sagemount, IBM, and Accenture. *Id.*

58.    Jason Nadeau ("Mr. Nadeau") was Chief Executive Officer of SLS from 2008 through 2016. Day 3 Tr. at 15:17-22, 123:22-24 (Nadeau). After beginning his career in accounting and technology roles for Wells Fargo, Mr. Nadeau joined SLS in 1996 as Vice President of Technology, managing SLS's software operations. *Id.* at 7:4-8:18 (Nadeau). Shortly thereafter, he became Chief Technology Officer for SISCO, the publicly traded company that ultimately owns SLS. *Id.* at 8:20-9:3 (Nadeau). In 1999, Mr. Nadeau left SISCO and co-founded RealEC Technologies, which created an exchange software platform for the mortgage services industry. Mr. Nadeau ultimately rejoined the Stewart family of companies and, in 2008, he became CEO of SLS. *Id.* at 12:3-13:7 (Nadeau). Today, he is the Chief Digital Officer for Fidelity National Financial. *Id.* at 125:6-7 (Nadeau).

59.    Laurie Pyle ("Ms. Pyle") was the Chief Operating Officer and Chief Technology Officer of SLS from 2008 through 2016. *Id.* at 319:13-322:11, 356:6-7 (Pyle). Ms. Pyle began her career in the U.S. Army. *Id.* at 314:5-21 (Pyle). After three years in the Army, Ms. Pyle attended Methodist University, graduating with a degree in international business and economics. *Id.* at 315:1-9 (Pyle). She started working in the mortgage industry in 1999, when she joined RealEC Technologies, ultimately becoming its Senior Vice President of Technology Solutions. *Id.* at 315:10-317:6 (Pyle). Ms. Pyle later joined SLS with Mr. Nadeau, where she managed the design and sales of the first electronic closing application introduced to the mortgage industry. *Id.* at 318:11-319:12 (Pyle). She also transitioned with Mr. Nadeau to SLS in 2008. *Id.* at 319:13-19, 321:4-6 (Pyle). Today, Ms. Pyle is the Chief Operating Officer of Factom, Inc., a block chain technology

company. *Id.* at 357:11-358:4 (Pyle).

60.    Scott Gillen ("Mr. Gillen"), is the Senior Vice President Industry Relations and Marketplace Strategy for Stewart Title, managing the company's digital strategy. Gillen Decl. ¶¶ 1, 5. He joined Stewart Title in August 2016 after ten years in various leadership roles within SLS. *Id.* ¶¶ 2, 5, 6. He first joined SLS in 2006 as Senior Vice President, National Sales, and transitioned in 2009 to Senior Vice President, Strategic Initiatives, where he largely focused on expanding SLS's presence in the default space, working closely with the GSEs and lender clients to provide support for their default management needs. *Id.* ¶ 5. Between 2012 and 2016, Mr. Gillen served as Executive Vice President, Origination and Servicing Executive, reporting directly to Mr. Nadeau, where he was the executive advisor for all mortgage origination and servicing related services that SLS provided. *Id.* ¶ 6. Within that role, he managed some of SLS's larger relationships, including its GSE relationships and major lender relationships, in addition to overseeing sales and marketing activity for SLS. *Id.* For more than twenty years before joining SLS in 2006, Mr. Gillen held numerous positions in the mortgage services industry. *Id.* ¶ 4.[9]

### 2.    SLS's Acquisition Strategy

61.    As the economy continued to improve in the years following the financial crisis, Mr. Nadeau recognized that the default market would not thrive forever. *Id.* at 22:10-23:16 (Nadeau). Accordingly, in 2012, SLS embarked on an acquisition strategy in order to diversify its product offerings. *Id.* By 2012, Mr. Nadeau believed that SLS needed

to focus on the "recovery market" – the opportunities that would be available as loan originations increased. *Id.* at 22:10- 23:16, 25:7-26:19, 84:19-86:7 (Nadeau). Mr. Nadeau hoped that increased originations would bring back private label securitization.

62.     Allonhill appeared to be an attractive acquisition target for SLS. *Id.* at 23:17-24:21 (Nadeau). Mr. Nadeau first learned that Allonhill might be interested in a deal shortly after its second round of layoffs in December 2012. *Id.*; JX26. The layoffs, widely reported in the Denver press, caught the attention of Ken Blevins, head of another Stewart company, PMH Financial, which SLS had acquired in 2011 from Mr. Allon. Day 3 Tr. at 23:17- 24:21 (Nadeau); Gillen Decl. ¶ 8. Mr. Blevins brought Allonhill to Mr. Nadeau's attention. Day 3 Tr. at 23:17-24:21 (Nadeau). Mr. Nadeau understood Allonhill to be focused on due diligence for securitizations, and with his desire to position SLS for the return of that market, he saw a potential business opportunity. *Id.* at 24:22-25:13 (Nadeau). SLS connected with Mr. Abbe and sale discussions began.

## IX.    Allonhill's Discussions in 2012 and 2013 with Potential Buyers or Investors

63.     In early 2012, Allonhill received inquiries about whether it was looking for an investor or a buyer. (Day 1 Tr. (S. Allon) at 80:13-24.) In response, Allonhill had retained an investment banker, Mr. Abbe from JMP Securities. (*Id.*, 81:4-6.)

64.     Over the course of 2012, Mr. Abbe suggested several companies he believed would be good candidates to invest in or purchase Allonhill. (*Id.*, 81:15-17.) This list included accounting firms like PriceWaterhouseCoopers ("PwC") as well as other companies in the mortgage industry, including SLS. (*Id.*, 81:21-82:3; see also JX 27,

AH00127170 (identifying SLS in December 2012 as one of the "Tier 1 potential buyers").)

65.    A number of potential investors and buyers signed non-disclosure agreements or engaged in negotiations with Allonhill, including PwC, which engaged in preliminary negotiations with Allonhill in April 2012. Allonhill provided PwC with financial projections, as of April 2012 (see JX 12), but those same projections were not used in later negotiations with SLS because they had become outdated. (See, e.g., JX 49; JX 50.)

## X.    Negotiations between SLS and Allonhill Leading Up to Letter of Intent, December 2012 Through June 2013

### A.    Information Provided by Allonhill and SLS's Valuation in March 2013

66.    The acquisition discussions between Allonhill and SLS began in December 2012.  During the period from December 2012 through mid-March 2013, Allonhill sent SLS information about the company, including its financial information and projections. (See JX 29 (December 2012); JX 38 (January 2013); JX 49 and JX 50 (March 2013).)

67.    In the January 2013 projections, Allonhill believed (based on "market indications") that the return of the private label securitization market was "imminent" and it projected $9 million in revenue for the conduit business in 2013. (JX 38, SLS144351, SLS144369.) The same projections forecasted total revenue in 2013 of approximately $42 million. (*Id.*, SLS144369.) In the March 2013 projections, however, Allonhill lowered the 2013 revenue for conduit to $1 million and, correspondingly, the total revenue to $34 million. (See JX 50, JMP-Allonhill0009951, page 4.)

68.     Allonhill explained to SLS that, after further review, it did not believe the conduit market would recover sufficiently in 2013. (JX 49, JMP-Allonhill0009948.) Allonhill's projections for the conduit market in 2014 were slightly higher, $1.2 million. (JX 50, JMP- Allonhill0009951, page 7.) Therefore, as of March 2013, the Allonhill total revenue projections for 2013 and 2014 (which were $34 million and $52 million, respectively) were not dependent on a return of private label securitizations. (*See* JX 49; JX 50.) Instead, they forecasted growth over a range of business lines, with the highest being flow and SPM. (*See Id.*)

69.     In early February 2013, SLS visited Allonhill's offices and participated in a discussion regarding several aspects of the company, including its operations, financials, business model and technology. (*See* JX 83.) One of SLS's employees, Chad Berreth ("Mr. Berreth"), had worked at Murrayhill and Clayton previously and had experience with their technology. Mr. Berreth reported to Mr. Nadeau and others at SLS that, in his prior review of the Allonhill technology, he found it to be superior: "I had never seen anything that detailed and comprehensive integrated within an actual operations platform." (JX 41.)

70.     In mid-March 2013, based on the information provided by Allonhill, SLS prepared a valuation that ranged from $42 to $86 million. (*See* JX 52.) These calculations assumed an earnout payment of between $25 and $52 million. (*See Id.*)

**B.    Further Exchange of Information, Offer and Letter of Intent**

71.    In early April 2013, Allonhill decided to focus on pursuing a transaction with SLS (even though a few companies did continue to engage in discussions with Allonhill after April 2013). (See JX 54; Day 1 Tr. (S. Allon) at 85:9-86:8; JX 59.) In April 2013, Allonhill also sent SLS additional financial information. (See, e.g., JX 58.)

72.    In late May 2013, SLS made an offer to acquire Allonhill. (Day 1 Tr. (S. Allon) at 90:2-4; see also JX 68; JX 69.) The SLS offer contemplated both an upfront payment of $15 million and an earnout component. (Undisputed Facts, ¶ 12.) SLS's offer contained a chart that estimated that the total consideration paid by SLS, including earnout, could range from $27 million to $119 million. (JX 68; JX 69.)

73.    In June 2013, Allonhill and SLS signed a letter of intent (the "LOI"), after which Allonhill could not "directly or indirectly, solicit and/or initiate any discussions or engage in negotiations with, or sell or offer to sell to anyone other than, Stewart . . . ." (JX 80, AH00120709; see also Day 1 Tr. (S. Allon) at 91:13-16.) Leading up to the signing of the LOI (and, as described above), Allonhill provided SLS with a variety of financial and other information about its business. (Day 2 Tr. (R. Abbe) at 527:4-528:10.)

**XI.    Post-LOI Due Diligence by SLS in July and August 2013**

**A.    Information Provided by Allonhill**

74.    Beginning in July 2013, immediately after the signing of the LOI, SLS engaged in several weeks of additional due diligence on the Allonhill business. (Day 3 Tr. (J. Nadeau) at 194:19-22, 195:12-14.) SLS was assisted in that effort by two financial advisors, Harbor View Advisors ("HVA") and Deloitte & Touche ("D&T"). (Id., 195:18-

26

20.)

75.      During the diligence meetings, Allonhill and SLS discussed the financial statements for Allonhill, which showed that the Allons had made capital contributions in the past to support the business. (JX 82, JMP-Allonhill0013746; see also (Day 1 Tr. (S. Allon) at 315:9-15 (noting that the Allonhill was capital intensive and that Allonhill relayed such information to SLS).) The parties also discussed, among other things, Allonhill's technology, flexible business model, and need for the ability to hire staff quickly. (Day 1 Tr. (S. Allon) at 92:12-17, 96:11-15; JX 82.) Ms. Allon also had a one-on-one meeting with Mr. Nadeau, during which they discussed Allonhill's pricing methodology and the need to retain key employees, especially senior leaders. (Day 1 Tr. (S. Allon) at 93:10-95:14; JX 106.)

76.      In addition, Allonhill described its pricing model for deals and SLS did not raise any concerns. (See, e.g., JX 82, JMP-Allonhill0013745; JX 86, JMP-Allonhill0013989.) SLS instead indicated that the pricing models of the two companies were similar. (JX 86.)

**B.      SLS's Focus on Costs in July/August 2013**

77.      In 2013, SISCO, began to come under substantial pressure from activist shareholders to reduce costs.  (Day 3 Tr. (J. Nadeau) at 138:9-139:15.)

78.      As of this time period, the compensation of Mr. Nadeau and Ms. Pyle (the two SLS executives in charge of the Allonhill business post-closing) was partially — but significantly — tied to their cost-cutting performance, including the reduction of employee costs. (See JX 5, 22-27; Day 3 Tr. (L. Pyle) at 361:21-362:15.)

79.     SLS's overall concern about costs is also reflected in the documents from July 2013 on diligence for the Allonhill transaction. See, e.g., JX 84, JX 85, JX 90.

## XII.    Board Presentations in July and August 2013

80.     On or around July 30, 2013, prior to the completion of due diligence, Mr. Nadeau presented a "deal book" to the SISCO Board (the "July 2013 Deal Book") regarding the Allonhill transaction. (JX 100-1.)

81.     In the July 2013 Deal Book, Mr. Nadeau compared Allonhill to the SLS screening criteria and he found (among other things) that Allonhill had: (1) "Premiere pricing, strong expertise & specialization"; (2) an "[e]stablished leader [Ms. Allon] & strong client base"; and (3) a "[v]eteran in Sue Allon, strong but new operations staff." (*Id.*, SLS139424.) Mr. Nadeau also praised Allonhill as "proactive" in the due diligence process. (*Id.*)

82.     Elsewhere in the July 2013 Deal Book, Mr. Nadeau listed some of Allonhill's other attributes:

- "Established core customer base — Top lenders, GSEs, FDIC"

- "Experienced & seasoned management team"; and

- "Solid brand and reputation for quality."

(*Id.*, SLS139425.)

83.     The July 2013 Deal Book noted Allonhill's financial history and then set forth three scenarios showing a total purchase consideration of between $24 and $50 million (i.e., with the earnout ranging from $9 million to $35 million). (See *Id.*, SLS139427,

SLS139429.) These scenarios were the product of discussions involving Mr. Nadeau, his team and HVA as well as several models that they developed. (See JX 91; JX 92; JX 93; JX 94; JX 97; JX 98.)

84.    It is apparent that the potential total consideration in the July 2013 Deal Book — i.e., between $24 and $50 million — was too high for SLS and its management. In early August 2013, shortly after the July 2013 Deal Book was presented to the Board, SLS and HVA began to discuss the "breakeven" point for the Allonhill transaction.

85.    The reference to "breakeven" meant the requirement at the Stewart companies that an investment must pay for itself within five years.  (See JX 112 (noting "the requirements to be 5 year cash flow positive for deals"); Morris Dep. Tr., 106:19-21.)) Mr. Nadeau assured Mr. Morris that he would adhere to the requirement; Mr. Nadeau promised that he would "get AH [the Allonhill transaction] to cash neutral or bust the deal."  (JX 112.)

86.    In order to get the deal to "cash neutral," the SLS team continued over the next few weeks to run models with lower revenue numbers and earnout amounts.  By August 22, 2013, SLS had developed a model with four new scenarios that resulted in potential total consideration of $16 to $37 million (i.e., with earnouts of $1 to $22 million), which was considerably lower than the figures in the July 2013 Deal Book.  (JX 310.)

87.    Mr. Nadeau prepared a revised deal book, dated August 23, 2013 (the "August 2013 Deal Book"), for the SISCO Board.  (JX 125.)  The August 2013 Deal Book included the four scenarios from the latest model, which projected total consideration

ranging from $16 to $37 million.  (JX 125, HV001185.)  The August 2013 Deal Book (like the model) ascribed probabilities to each one of the scenarios, with the "Medium Growth" having a 50% likelihood, the "High Growth" having a 20% likelihood, the "GSE 50% Decline" having a 10% likelihood, and the "Lightning Bolt Issue" having a 5% likelihood. (*Id.*)

88.     Thus, as of late August 2013, SLS projected that there was a 60% likelihood that it would have to pay an earnout amount to Allonhill (under the "Medium Growth" scenario) of approximately $11.5 million.

89.     At trial, SLS argued that there was no incentive for it to achieve anything other than the "Medium Growth" and "High Growth" scenarios because those two scenarios would bring in the highest revenue (which, it claimed, would be to the benefit of SLS).

**XIII.   Additional Pre-Closing Disclosures Made by Allonhill in August 2013**

90.     In August 2013, Mr. Nadeau expressed to Ms. Allon that he was concerned about Allonhill's reputation after the OCC termination and the Aurora Litigation.  (Day 1 Tr. (S. Allon) at 98:14-17.)  In response, Ms. Allon provided a description of the status of Allonhill's relationship with each of its clients.  (See *Id.*, 98:17-20; JX 111.)

91.     Ms. Allon also made additional disclosures about Allonhill's relationship with Bank of America.  (Day 1 Tr. (S. Allon) at 99:10-22; JX 111.)

92.     Allonhill further disclosed substantial detail regarding the Aurora project and the Aurora Litigation.  (Day 1 Tr. (S. Allon) at 72:11-73:22; Undisputed Facts, ¶ 25.)

**XIV.  Pre-Closing Representations Made to the Allons in July and August 2013**

93.    In July 2013, it was important to Allonhill that SLS agree to operate the business after the closing of the transaction in the same manner that Allonhill had operated it before the closing.  (Day 1 Tr. (S. Allon) at 97:4-17.)  Allonhill wanted that representation "[b]ecause the business couldn't grow and develop in [the] market if it weren't run the same. . . .  [I]f [SLS] changed the model, [Allonhill] wouldn't be able to hit the hurdles that [Allonhill] was agreeing to."  (*Id.*, 97:13-17.)  No one at SLS objected to Allonhill's request for that representation (*Id.*, 97:18-21), and Allonhill included such protections regarding the operation of the business in the draft Asset Purchase Agreement ("APA") that was sent to SLS in late July 2013.

94.    In late July 2013, Ms. Allon still had doubts about the transaction based on Mr. Nadeau's changes in attitude and approach toward Allonhill.  (*Id.*, 103:19-104:3.)  In response, Mr. Nadeau and Mr. Morris met with Ms. Allon in Denver.  (*Id.*, 104:4-18.)  Ms. Allon explained Allonhill's business and potential, and in response, Mr. Morris expressed enthusiasm.  (*Id.*, at 104:18-24.)

95.    In August 2013, Ms. Allon again questioned whether SLS had the present resources and commitment necessary to operate the Allonhill business post-closing as it had been run pre-closing.  (*Id.*, 105:1-20.)  When Ms. Allon expressed her concerns, SLS arranged for Mr. Nadeau and Mr. J. Davis to have a dinner with Ms. Allon on August 21, 2013 to reassure her.  (*Id.*, 105:21-106:12; Undisputed Facts, ¶ 7.)  Messrs. Nadeau and J. Davis told David Kaplan ("Mr. Kaplan") that the purpose of the dinner with Ms. Allon

was "to show her the love." (JX 123; see also Day 1 Tr. (S. Allon) at 105:23-106:1

(describing Mr. Nadeau as "pouring on the charm")).)

### A.    Dinners in Denver

96.    At the dinner, they were joined by Mr. J. Davis, then SLS's vice chairman.

*Id.* at 51:4-15, 68:16-69:11 (Nadeau).   The participants discussed SLS's commitment to

retain Allonhill's key employees, the SLS labor pool (in Costa Rica and elsewhere) that

would be available to assist with the Allonhill business post-closing and would help to

reduce the operational costs of the post-closing business, Ms. Allon's continued

prominent role after the closing and SLS's present intent to invest in the business.  The

parties discussed Ms. Allon's role going forward and how they wanted to market the deal

immediately upon closing.  Day 3 Tr. at 68:16-69:11 (Nadeau).  Ms. Allon testified that at

the dinner, Mr. Nadeau "made a series of promises to me."  Day 1 Tr. at 105:21-106:12 (S.

Allon).  Ms. Allon claims that Mr. Nadeau:

> promised that I would remain in a central role running the business, that
> nothing would change, that he would retain my key employees, our key
> employees.  He promised to make this Costa Rican MBA outsourcing staff
> available to me.  He again committed to helping smooth things over with
> Cheryl Glory and getting us back into good graces with Bank of America.
> And he repeated that nothing was going to change.

Day 1 Tr. at 105:21-106:12 (S. Allon)

97.    A second dinner occurred in late August 2013, days before the APA closed,

and was attended by the same SLS representatives and the Allons.  (*Id.*, 106:13-107:5.)

Among other things, Mr. Nadeau and Mr. Allon discussed the Costa Rican labor pool,

which SLS represented would be an available resource for the business, and the status of the Aurora Litigation.  (Day 1 Tr. (H. Allon) at 343:8-24.)

98.     Ms. Allon's testimony that Mr. Nadeau promised she "would remain in a central role running the business" is undercut by other aspects of her own testimony and the documentary record.  Both Ms. Allon and Mr. Nadeau testified that before the Sale, they agreed that Ms. Allon would instead serve in a client-facing role, where she would market the business, attend conferences, and provide thought leadership, rather than be significantly involved in day-to-day operations.  Day 1 Tr. at 252:24-254:16 (S. Allon); Day 3 Tr. at 69:12-20 (Nadeau).  In fact, she testified unequivocally that she understood she would not be involved in day-to-day operations.  Day 1 Tr. at 253:5-15 (S. Allon) (Q: "You weren't going to be in the day-to-day operation of business, right?"  A: "Yes.").

99.     As for Costa Rica, Ms. Allon testified that Mr. Nadeau told her that SLS's Costa Rican operation was "a large staff of English-speaking MBAs."  *Id.* at 96:20-97:3 (S. Allon).  Mr. Nadeau recalls telling her that most of SLS's Costa Rican workforce had "advanced degrees," and that he believed they could be used for "back office work or the indexing, the imaging and some of the types of tasks that would help underwriters be able to process more loans."  Day 3 Tr. at 70:1-21 (Nadeau).  Mr. Allon testified that, at a second dinner meeting, he was told that the employees in Costa Rica were "college educated."  Day 1 Tr. at 374:14-22 (H. Allon).

100.     Whether the Costa Rican workforce had MBAs or not, Ms. Allon admitted that MBAs would not be required for the type of work she envisioned sending to Costa

33

Rica. *Id.* at 256:2-24 (S. Allon). She acknowledged that they would perform "lower-level tasks" that would not even require a college degree in the United States. *Id.* Therefore, Ms. Allon conceded that "the fact that they had MBAs wouldn't be critical to the type of work" that she thought "they could potentially do for the Allonhill business going forward." *Id.*

**XV.   Terms of the APA and Related Agreements**

101.   Allonhill and SLS entered into the APA as of August 28, 2013. (Undisputed Facts, ¶ 9; JX 135.) The APA was later amended effective as of September 30, 2013.

102.   The APA structured the transaction between Allonhill and SLS as a sale of the assets (the "Target Assets") used by Allonhill in connection with the Business. (JX 135 at § 1.1.) The parties agreed on the asset-sale structure because Allonhill and SLS did not want SLS to incur any liability as a result of the Aurora Litigation and Allonhill did not want to share any recovery from the Aurora Litigation with SLS. (Day 1 Tr. (H. Allon) at 340:12-19.)

103.   The parties also carved out the Aurora Litigation from the APA transaction (see JX 135 at §§ 1.2, 1.4), and Allonhill agreed to indemnify SLS for losses that might result from any successor liability claims. (See *Id.*, §§ 7.6, 7.7.)

104.   The purchase price for the APA consisted of (1) a payment of $15 million in cash at closing; and (2) an earnout payment (the "Earnout") tied to the achievement of hurdles (the "Earnout Hurdles") over a defined three-year period (which the Court will refer to as "Year 1," Year 2" and "Year 3"). (See *Id.*, §§ 2.1, 2.2.)

105.    The APA also contained the following relevant provisions:

a.    It required that "[SLS] shall use commercially reasonable efforts to operate the Business and use the Target Assets in a manner consistent in all material respects with [Allonhill's] ordinary course operation of the Business and use of the Target Assets." (*Id.*, § 2.2(e).) SLS's commitment that it would operate the Business post-APA as Allonhill had operated it pre-APA was critically important to Ms. Allon. (Day 1 Tr. (S. Allon) at 97:4-17.)

b.    Under Section 2.2(c), the parties agreed to:

> cooperate in good faith to adjust the Earnout Hurdles, if necessary, to take into account the effect of any change in the recognition of revenues, the occurrence of acquisitions, divestitures or other Business Material Adverse Effect, that results in an adverse change to the Revenue or the Earnout Revenue Multiple for any portion of the Earnout Period. (JX 135 at § 2.2(e).)

c.    The APA imposed a $1.5 million limit on damages that SLS could recover for any breach of certain representations and warranties in the APA (*Id.*, § 7.2(c)) and limited consequential damages. (*Id.*, § 7.4(d).)

d.    SLS disclaimed reliance on pre-APA representations by Allonhill, and the APA integrated all claims by SLS into the representations, warranties and covenants made by Allonhill in the APA. (See *Id.*, §§ 5.7(b), 10.10 and 10.15.) The APA did not contain provisions that limit Allonhill to breach of contract claims. Nor does the APA impose a damages limitation on Allonhill's claims against SLS.

e.      In Schedule C to the APA, Allonhill made disclosures that, together with the information SLS gained from its diligence, related to all of the facts upon which SLS bases its counterclaim.

106.    Upon execution of the APA, Ms. Allon went to work for SLS pursuant to a three-year employment contract.  (Day 1 Tr. (S. Allon) at 111:21-112:6.)  Ms. Allon also agreed to non-competition provisions in the APA.  (JX 135 at § 9.2.)

107.    The Target Assets transferred in the APA included Allonhill's contracts, unless excluded (the "Assumed Contracts") and customer receivables.  (See *Id.*, § 1.1; Undisputed Facts, ¶ 11.)  The parties were aware that certain of the Assumed Contracts would need to be assigned post-APA.  (See, e.g., JX 135 at § 6.6; Day 3 Tr. (J. Nadeau) at 119:19-120:3.)

108.    At the same time as the APA, the parties also entered into the Employee Leasing Agreement, effective September 1, 2013 and terminating September 30, 2013 (the "ELA"), so that in the post-APA period former Allonhill employees could continue performing work under Assumed Contracts that had not been transferred.  (See D.I. 671-2; Undisputed Facts, ¶ 10; Day 3 Tr. (J. Nadeau) at 119:14-120:17.)  SLS received lease payments in exchange.  (D.I. 671-2 at § 9.)

109.    The ELA expressly states that there was an independent relationship between the parties:  "[SLS] shall provide the services of the Leased Employees as an independent contractor and not as an agent, joint venturer, nor partner of [Allonhill], and nothing in this Agreement shall be construed as creating any other relationship between

[SLS] and [Allonhill], or between any employee or agent of [SLS] and [Allonhill]." (*Id.*, § 5.)

110.    The APA provided that, during the term of the ELA, Allonhill had the right to retain the cash collected from customers, but, after the termination date of the ELA, the cash would be retained by SLS.  (JX 135 at § 6.12.)

111.    When there was a delay in the transfer of certain Assumed Contracts, the parties entered into the First Amendment to the ELA (the "ELA Amendment"), which was effective as of September 30, 2013 and extended the term of the ELA to October 31, 2013.  (JX 186.)

112.    In connection with the ELA Amendment, the parties also entered into the First Amendment to the APA (the "APA Amendment"), which was effective from September 30, 2013.  (JX 199.)  The APA Amendment amends Section 6.12 of the APA and provides that SLS would receive cash collections, net of Allonhill's operating expenses that it paid in connection with the work certain Assumed Contracts under the ELA and ELA Amendment (collectively, the "ELAs").  (See *Id.*)  Thus, Allonhill continued to provide services for customer contracts and ultimately remitted to SLS the payments that Allonhill received, less the costs relating to the leased employees.

113.    In addition, APA Amendment adjusted the dates for the three annual earnout calculations by delaying the start of these years to November 1, 2013 for Year 1, November 1, 2014 for Year 2, and November 1, 2015 for Year 3.

114.    Although the ELAs terminated on October 31, 2013, Allonhill continued well past that termination date to collect payments from customers for work that it performed with employees leased from SLS.  (JX 174; JX 197.)  Customers direct-deposited their payments to Allonhill, rather than to SLS, from the date of the APA until March of 2014 (long after the expiration of the relevant provisions of the ELAs).  (See Undisputed Facts, ¶¶ 15-16.)  These payments totaled $7,834,686.  (Undisputed Facts, ¶ 16.)

115.    The APA Amendment was not executed until January 2014 because SLS told Allonhill on January 10, 2014 that "[o]nce payment is received, the amendment will be signed according to Stewart."  (JX 197.)

116.    In exchange for SLS signing the APA Amendment in January 2014 (past the termination date of the ELAs) and after the APA and ELAs no longer obligated Allonhill to make payments to SLS in connection with ELAs, Allonhill made certain transfers to SLS in January and February 2014 (the "Cash Transfers").  (Undisputed Facts, ¶¶ 17-18.) The Cash Transfers totaled $6,608,309.15.  (Undisputed Facts, ¶ 17.)

117.    The Cash Transfers came from Allonhill's collections under certain Assumed Contracts and allowed SLS to obtain possession of $6,608,309 from Allonhill within 90 days of the Petition Date.  In exchange, Allonhill received the benefit of the ELA Amendment and APA Amendment, which was a cash neutral result for Allonhill given that it recouped amounts previously paid in respect of leased employees.  (See JX 174; Day 3 Tr. (J. Nadeau) at 120:18-20.)

38

118.    Other collections from clients, totaling $675,474.75, were in Allonhill's operating account as of the Petition Date, and were later transferred to the disbursing agent appointed by the Plan, per the terms of the Plan.  (Undisputed Facts, ¶ 19.)

119.    On January 15, 2015, SLS filed a proof of claim against Allonhill seeking $675,474.75, plus certain contingent, unliquidated claims.  (Undisputed Facts, ¶ 20.)

## XVI.    The Earnout

120.    Allonhill was selling the business based on what it could do in the future. In April 2013, SLS proposed an earnout as a component of the total consideration.  JX55; Day 3 Tr. at 39:13-40:2 (Nadeau).  Allonhill agreed that an earnout, which would base a portion of the purchase price on Allonhill's future performance and increase the cash payment to Allonhill if the business performed as it projected, made sense under the circumstances.  Day 1 Tr. at 193:18-23 (S. Allon).  In fact, as noted above, in Mr. Abbe's April 2012 valuation presentation to the Allons, he suggested an earnout as a potential way to structure a transaction.  JX15 at JMP-Allonhill0001628.[5]

121.    Substantial negotiations between the parties occurred in the late spring and early summer of 2013, primarily over calculation of the Earnout.  These negotiations culminated in a letter of intent executed on June 27, 2013 (the "LOI").  Day 3 Tr. at 42:20-44:9 (Nadeau); Day 1 Tr. at 236:11-19 (S. Allon); Day 2 Tr. at 526:8-21 (Abbe); JX80. Pursuant to the LOI, SLS would agree to pay Allonhill $15 million in up-front consideration plus a three year earnout that would be triggered if the business met certain

---

[5] The Allons were no strangers to earnout provisions, having sold PMH Financial to SLS in 2011 for cash up front and an earnout.  Day 1 Tr. at 372:2-374:1 (H. Allon).

revenue thresholds.  JX80.  The deal was contingent upon "final approval of [SLS's] board of directors or its executive committee," which could be withheld "for any reason whatsoever at the sole discretion of the board of directors or executive committee."  JX80 at AH00120708.

## XVII.  Early Evidence of Issues with the Business and the Termination of Ms. Allon

122.    In the first weeks after closing, SLS struggled to operate the Business as Allonhill had operated it pre-closing.  Ms. Allon was physically isolated in her office. (Day 1 Tr. (S. Allon) at 112:11-14.)  Ms. Allon did not receive information about projects, hiring and firing of employees, and financial data, such as project margins and revenues. (Day 1 Tr. (S. Allon) at 112:20-23.)

123.    In December 2013, Mr. Nadeau provided to Ms. Allon a calculation, which indicated that SLS assumed that the Earnout Hurdle for Year 1 would not be reached.  (JX 190.)

124.    In response, the Allons wrote a letter to SLS on January 10, 2014 (the "January 2014 Letter"), raising issues with the performance and operation of the Business. The January 2014 Letter also detailed possible solutions for further discussion between the parties.  (*See* JX 196.)

125.    The January 2014 Letter specifically mentioned an adjustment to the Earnout Hurdles under Section 2.2(c) (*Id.*)  The reference to Section 2.2(c) was included in the January 2014 Letter "to remind [SLS] that they had an obligation to adjust hurdles if they were making changes to the business."  (Day 1 Tr. (S. Allon) at 124:7-11.)

126.    Mr. Nadeau scheduled a meeting with Ms. Allon on the following Tuesday and then fired her that day.  (*Id.*, 124:22-125:19.)

127.    Mr. Nadeau did not discuss the contents of the January 2014 Letter with Ms. Allon during the termination meeting.  (*Id.*, 125:23-126:2.)  There is no evidence that any SLS representative ever addressed with the Allons the issues raised in the January 2014 Letter prior to the commencement of this proceeding.

128.    Ms. Allon asked why she was being terminated, but Mr. Nadeau gave Ms. Allon no reason whatsoever for her termination.  (*Id.*, 125:15-22.)  At no point prior to her termination was Ms. Allon told of any issues with her performance.  (*Id.*, 126:3-7; Day 3 Tr. (J. Nadeau) at 270:17-271:15.)

129.    SLS claims that it reached the decision based on the dysfunction within the legacy Allonhill business for which Ms. Allon was largely responsible, and the toll that the events of 2012 had taken on her industry reputation.  (Day 3 Tr. at 100:1-20 (Nadeau)).  Also, SLS claims that Ms. Allon hindered SLS's ability to grow the Business.  *Id.*  Further, SLS claims that Mr. Nadeau made the decision to terminate Ms. Allon in conjunction with Mr. Morris (SISCO's CEO) and Jim Pyle (then-SLS's General Counsel) before he received the January 2014 Letter.

130.    Mr. Nadeau believed that no response to the January 2014 Letter was necessary because it was not factually accurate.  *Id.* at 101:20-102:2 (Nadeau).  According to Mr. Nadeau, there were inaccuracies, or overstatements, in the letter.  Now, among other things, Ms. Allon claimed that she was not consulted when additional permanent

41

staff were hired, but contemporaneous emails show she was not only consulted, but she approved.  JX161.  Ms. Allon also complained in the letter about delay in extending an offer to "Jim [sic] Kilpatrick" to be head of securitization of the Business.  JX196.  The contemporaneous emails show, however, that Mr. Kilpatrick was interviewed and deemed to be unqualified by legacy Allonhill employees in Denver.  JX184 at SLS055617; Day 3 Tr. 103:13-104:22 (Nadeau).  Ms. Allon also claimed in the letter that she was isolated from the Business, a claim which, as noted above, is contradicted by the evidence.

## XVIII. Allonhill's Claim that SLS Failed to Operate the Business in a Manner Consistent with the APA

131.    Allonhill claims that both before Ms. Allon's termination in January 2014 and after, SLS failed to run the Business in a manner consistent with Section 2.2(e) in the APA and the other representations that it made to the Allons pre-closing.  According to Allonhill, SLS breached Section 2.2(e) in five key areas by failing to:

     a.  provide adequate leadership;

     b.  retain or replace key employees;

     c.  provide adequate financial and human resources;

     d.  provide adequate services to existing clients; and

     e.  pursue business related to securitizations and abandonment of the business line (including agency securitizations).

These allegations are answered below.  *See* pages 97-108, *infra*.

A.    **Adequate Leadership**

132.    Ms. Pyle, as Chief Technology Officer and Chief Operating Officer of SLS, directly supervised the Business and reported to Mr. Nadeau.  (Day 3 Tr. (J. Nadeau) at 20:23-21:5, 86:22-87:3; Day 3 Tr. (L. Pyle) at 322:9-11, 322:21-323:10.)

133.    Ms. Pyle lacked the requisite knowledge and experience. She had no prior experience with loan file review or securitizations, which were key components of the Business.  (Day 3 Tr. (L. Pyle) at 369:20-370:3; JX 196.)  Both Mr. Kaplan and Mr. Gallery, two former Allonhill employees who worked at SLS in the post-APA period, testified that Ms. Pyle did not appear to understand the Business.  Mr. Kaplan testified that Ms. Pyle's "inability or unwillingness to grasp or even understand what it was that Allonhill was doing" had a detrimental impact on the Business.  (Kaplan Dep. Tr., 190:11-15.)

134.    Both Mr. Nadeau and Ms. Pyle were terminated for cause in March 2016. Mr. Nadeau was terminated for violating the morals clause of his employment agreement.  (Day 3 Tr. (J. Nadeau) at 130:12-19.)  This clause provided that SLS could terminate Mr. Nadeau for a "[w]illful violation of any material provision of the Company's code of conduct."  (JX 5 at § 4.3(e).)  Mr. Nadeau did not self-report the violation of the code of conduct.  (Day 3 Tr. (J. Nadeau) at 133:11-14.)  As a result of his termination for cause, Mr. Nadeau was not paid his bonus, which was several hundreds of thousands of dollars.  (Day 3 Tr. (J. Nadeau) at 133:19-134:16.)  Ms. Pyle was also terminated for cause.  (*Id.*, (L. Pyle) at 356:6-15, 359:20-22.)

135.    Ms. Pyle's leadership appears to have been inadequate.

43

## XIX.    The Aurora Litigation

136.    The status of the Aurora Litigation is significant in determining Allonhill's solvency.  As of the date of the APA, Aurora had filed a counterclaim against Allonhill in the Aurora Litigation in the amount of approximately $26 million.  (Undisputed Facts, ¶¶ 23-24.)

137.    The outcome was uncertain in late August 2013 and Allonhill faced a potential crippling liability as a result of the Aurora counterclaim.

138.    On March 6, 2014, the Colorado court issued a judgment against Allonhill in the Aurora Litigation in the amount of $25,845,329.00, along with statutory prejudgment interest (the "Aurora Judgment").  (Undisputed Facts, ¶ 28.)

139.    Allonhill appealed the decision to the Colorado Court of Appeals.  (Undisputed Facts, ¶ 29.)   In October 2016, the Colorado appellate court held that Aurora's damages were limited to $2 million and it remanded the case to the trial court for further proceedings.  (*Id.*, ¶ 30.)  In November 2017, the trial court entered a judgment in the amount of $2 million.  (*Id.*, ¶ 31.)  That judgment was not final, however, because Aurora and Allonhill filed an appeal in January 2018.  (*Id.*, ¶ 32.)

140.    On June 6, 2018, while the Aurora appeal from the November 2017 judgment was still pending, the parties settled the Aurora Litigation (the "June 2018 Settlement").  (Undisputed Facts, ¶ 33; JX 260.)  In that settlement, Allonhill agreed to allow Aurora's claim in the bankruptcy in the amount of $2,050,000.  (JX 265.)

141.    In the Declaration of Margaret Sue Allon in Support of Chapter 11 Petition and First Day Motions dated March 26, 2014, Ms. Allon discussed the Aurora Litigation and stated that Allonhill was filing the Petition as a result of the Aurora Judgment.  (See D.I. No. 3, ¶¶ 21-23.)  Ms. Allon testified to the same effect at trial.  (Day 1 Tr. (S. Allon) at 128:17-21.)  Through its expert, Guy Davis (Mr. G. Davis), SLS provided testimony at trial regarding the value of the assets of Allonhill as of the dates of the Cash Transfers (totaling $6,608,309.15, Undisputed Facts, ¶ 17) that are at issue in this proceeding (the "Measurement Dates").  Mr. G. Davis opined that the value of those assets was between $9.3 and $9.6 million.  (Day 1 Tr. (G. Davis) at 226:21-24.)  This testimony is undisputed by Allonhill.  Mr. G Davis also testified that the value of the Allonhill liabilities that are unrelated to the Aurora Litigation was $3.583 million.  (Day 4 Tr. (G. Davis) at 224:14-19, 227:1-228:3.)  Again, Allonhill does not dispute this testimony.

142.    The parties, however, disagree as to the value of the liabilities associated with the Aurora Litigation.  SLS argues that the value of such liability is $2.05 million, which is the amount of the allowed Aurora claim under the June 2018 Settlement. Allonhill, on the other hand, argues that the value of Aurora Litigation liability is the same as the amount of the Aurora Judgment, which is approximately $26 million.

143.    Allonhill also provided expert testimony from Seth Fliegler (Mr. Fliegler") that, even if the Court were to accept the June 2018 Settlement amount of $2.05 million as the value of the Aurora Judgment, Allonhill expended legal fees to achieve the settlement.

45

Those fees should be included in the Aurora Litigation liability, (Day 4 Tr. (S. Fliegler), in the amount of $4.98 million.

144.     Under SLS's theory, Allonhill was solvent as of the Petition Date.  Under Allonhill's theory (either as to the use of the Aurora Judgment as the amount of Aurora Litigation liability or the inclusion of the Allonhill legal fees of $4.98 million in that liability calculation), Allonhill was insolvent as of the Petition.

145.     The Court finds that the cost of achieving the June 2018 Settlement, namely the $4.98 million in legal fees, must not be included in the value of the Aurora Litigation liability.

146.     Accordingly, the Court finds that Allonhill was solvent when Allonhill transferred funds to SLS.

**XX.     SLS Due Diligence and Closing of the Sale**

147.     SLS's due diligence on Allonhill's business began in earnest following execution of the LOI.  JX81; Day 3 Tr. at 45:15-18 (Nadeau).

148.     During this diligence, SLS discovered a number of expenses – not apparent from the materials they had already reviewed – that would increase SLS's costs to operate the business post-acquisition.  Day 3 Tr. at 47:21-49:7, 65:18-67:16 (Nadeau); JX113.

149.     SLS also discovered, through interviews with Allonhill's management team, that having Ms. Allon directly involved in day-to-day management of operations would pose challenges.  Day 3 Tr. at 47:23-48:18 (Nadeau).  The team believed that Ms. Allon was better suited in a customer-facing role.  *Id.*  SLS also learned of employee

defections to a competitor, which was actively poaching Allonhill personnel. *Id.* at 48:19-49:7 (Nadeau); Day 1 Tr. at 183:20-184:14 (S. Allon).  In an effort to stem the employee losses, Allonhill "dramatically raised salaries" of key managers and other employees in the spring of 2013 even though the business was in the midst of a fifteen-month stretch of negative earnings. *Id.*

150.    In early August 2013, Mr. Nadeau made a presentation to the Board of SISCO regarding the potential Allonhill transaction.  Day 3 Tr. at 50:24-60:5, 61:13-62:8 (Nadeau).  Mr. Nadeau received three principal pieces of feedback.

151.    First, during the meeting, the Board chairman Tom Apel ("Mr. Apel"), expressed concerns about the effect that the Aurora litigation might have on Allonhill's reputation. Day 3 Tr. at 61:13-20 (Nadeau).  When Mr. Nadeau subsequently raised with Ms. Allon the concern expressed by Mr. Apel, she assured him that "our reputation is sterling."  JX111 at SLS070299; Day 3 Tr. at 62:11-64:8 (Nadeau).  In fact, Allonhill has stipulated here that during the APA negotiations, Ms. Allon "affirmatively represented to SLS that she had a strong reputation in the industry, had great customer relationships, and was well positioned to grow the Allonhill business."  Stip. Facts ¶ 8.

152.    Second, shortly after the meeting, Mr. Morris – SISCO's CEO – asked Mr. Nadeau to be more conservative with revenue growth in future projections.  Day 3 Tr. at 61:21-62:8 (Nadeau).

153.    Third, Mr. Morris asked Mr. Nadeau to prepare a cash flow analysis and indicated that the Executive Committee would not approve acquisitions that were not

cash flow positive after five years. *Id.* at 64:15-65:17 (Nadeau). Mr. Nadeau told Mr. Morris that he would figure out a way to "get [Allonhill] to cash neutral or bust the deal." JX112; Day 3 Tr. at 65:5-14 (Nadeau). In other words, if the new cash flow modeling showed that the business was not cash flow positive, Mr. Nadeau would try to renegotiate the deal with Allonhill and, if negotiations failed, SLS would walk away from the deal, as was SLS's express right under the LOI. *Id.*; JX80 at AH00120708.

154.    In light of the additional Allonhill expenses that SLS uncovered in due diligence, Mr. Nadeau looked for ways to adjust the deal's total consideration. Day 3 Tr. at 65:18-68:15 (Nadeau). SLS explored with Allonhill reducing the upfront cash payment or changing the multiples. Allonhill ultimately agreed to raise the revenue hurdle in the earnout from $15 million to $17 million. *Id.*; JX135.

155.    Around this time – on August 2, 2013 – Deloitte, which SLS used to perform due diligence on Allonhill's financials, issued a report to SLS. Among other issues, Deloitte reported that Allonhill's revenue projections for 2012-2013 were significantly overstated "considering the current market conditions and declining customer base." JX105 at SLS181768. Deloitte recommended that SLS develop a "more conservative baseline forecast assumption" for post-acquisition purposes. *Id.*

156.    Roughly three weeks after their first meeting, and following renegotiation of the earnout hurdle, in late August 2013, Mr. Nadeau again made a presentation to SISCO's Board. Day 3 Tr. at 71:24-72:19 (Nadeau). He presented a revised set of projections that showed a cash flow model and lower revenue projections, as Mr. Morris

had requested.  *Id.* at 72:20-73:3 (Nadeau); JX125.  The projections reflected less aggressive growth rates, but not a fundamental change to the manner in which SLS intended to operate the Business post-Sale. Day 3 Tr. at 73:4-75:13 (Nadeau).  The Executive Committee ultimately approved the deal.  *Id.* at 77:10-15 (Nadeau).

### A.    Allonhill Fails to Disclose the Loss of Little Bear

157.    One day before the closing, on August 27, 2013, Allonhill learned from Fannie Mae that it would lose the Little Bear project, a significant revenue generator for Allonhill.  JX133; Day 2 Tr. at 449:5-24 (Margolf).  In an email dated August 27, Mr. Margolf, a key Allonhill executive responsible for its GSE relationships, told Mr. Gallery that he and Ms. Allon had learned on a call with Fannie Mae that the project would be "going away."  JX133 at SLS067122; Day 2 Tr. at 449:14-451:16 (Margolf).  He instructed Mr. Gallery that the Little Bear news was "[n]ot to be discussed widely."  JX133 at SLS067122.  As Mr. Margolf noted in his email, the loss of Little Bear "certainly makes the hurdle tougher."  *Id.*; Day 2 Tr. at 449:14-451:16 (Margolf).  By that he meant, as Mr. Margolf testified, that Little Bear was a "large revenue contract," and that its loss would make it harder to reach the earnout hurdles in the APA.  Day 2 Tr. at 449:19-451:16 (Margolf).  In the last full month of Allonhill's operation, Little Bear accounted for almost fifteen percent of Allonhill's revenues, and had the highest gross margin of any project except Allonhill's two small licensing agreements.  JX126 at AH00130198 (Gross Margin Report).

49

### B.    The Closing of the Sale

158.    The final terms are memorialized in the APA and various related agreements. JX135-138. The following are key aspects:

a. SLS agreed to purchase substantially all of the assets of the Allonhill business (the "Business") (including all customer contracts and accounts receivable other than the disputed receivable due from Aurora). JX135 at p. 1.

b. As consideration, SLS paid Allonhill $15 million at the closing, assumed Allonhill's go forward liabilities (other than those associated with the Aurora litigation), and agreed to the earnout. JX135 at p. 5.

c. The primary term of the Earnout lasted three years. In order to be eligible for the Earnout, the Business had to meet certain revenue hurdles each year of the Earnout. If the revenue hurdles were met, the APA provided that Allonhill would be paid a percentage of the revenue earned above the hurdle calculated by taking into account, among other things, the "Gross Margin" associated with the revenues. JX135 at pp. 5-6.

d. Specifically excluded from the purchased assets were Allonhill's claims in the pending Aurora litigation. SLS also did not assume any liabilities associated with the Aurora litigation. To further insulate SLS from any adverse judgment in the Aurora litigation, SLS and Allonhill executed separate Indemnity and Escrow Agreements. JX136; JX137.

e. The deal contemplated that certain of Allonhill's customer contracts would only be assigned to SLS after the closing. SLS also gave offers of employment to substantially all of Allonhill's operational staff employees. So that Allonhill could service the contracts in its name post-closing until they were assigned to SLS, the parties entered into an Employee Leasing Agreement (the "ELA"), pursuant to which SLS would "lease" back to Allonhill certain of its employees. The parties agreed that the arrangement would be cash neutral to Allonhill and that all receivables collected by Allonhill would be turned over to SLS net of any actual costs incurred by Allonhill. Day 1 Tr. at 310:18-311:15 (S. Allon); Day 3 Tr. at 80:10-81:1 (Nadeau).

f. At the time of the closing, SLS and Sue Allon agreed to an employment agreement, pursuant to which she would serve as a Senior Vice President of SLS. JX138.

159.    The net effect of the transaction was that substantially all of Allonhill's assets, business relationships, employees, accounts receivable, and contracts were transferred to SLS, with the intent that SLS would continue to operate the Business as a going concern – what would come to be known as the "Capital Markets" division of SLS. JX135; Stip. Facts ¶ 11; Day 3 Tr. at 93:21-94:3 (Nadeau), 327:6-11 (Pyle).  Allonhill received the $15 million in up-front cash consideration and the agreement to the Earnout, and was left with (1) the claims and liabilities associated with the Aurora litigation, and (2) some limited obligations under the ELA that were intended to be cash flow neutral to Allonhill. JX135; JX136; JX137; JX199; Stip. Facts ¶ 12.  Post-transaction, Allonhill had no business to operate – it existed solely to fulfill the few obligations it had under the transaction documents, to continue its pursuit of the Aurora litigation, and to collect any potential earnout.

160.    Mr. Nadeau testified that he discussed with Ms. Allon and Mr. Kaplan that the retention bonuses would be paid if the employees stayed with SLS for a year.  Day 3 Tr. at 78:18-80:7 (Nadeau).  The documents support Mr. Nadeau's testimony.  The retention bonus list (JX311) includes two employees with the notation:  "Not on offer letter, need to be paid initially and repayment agreement."  JX311 (Ms. Helms and Joseph Sueper ("Mr. Sueper")).  As Mr. Nadeau testified, Ms. Helms and Mr. Sueper had taken out large loans against their 401(k)s prior to the transaction, and as a result of the transaction, those loans would become due.  Day 3 Tr. at 80:8-20 (Nadeau).  SLS paid their bonuses up front instead of having them wait a year, so that Ms. Helms and Mr. Sueper

could repay their 401(k) loans. *Id.* at 80:21-81:1 (Nadeau). The notations on JX311 of "need to be paid initially" reflect this arrangement, and would not be necessary if the agreement was that all employees would receive bonuses up front. JX311; Day 3 Tr. at 82:3-13 (Nadeau).

161.    There is no credible evidence that SLS agreed to pay any amounts other than retention bonuses to employees upon closing. *Id.* at 83:11-14 (Nadeau). Certain employees held junior equity interests in Allonhill (referred to as an 83(b) plan), but the evidence is undisputed that SLS and Allonhill agreed that SLS would not make any payments in connection with the 83(b) plan. JX141; Day 1 Tr. at 247:9-249:14 (S. Allon). In an email from Mr. Kaplan to Ms. Allon just before closing, Mr. Kaplan explained that he agreed with Mr. Nadeau that it made sense for any 83(b) obligations to remain with Allonhill post-closing, and as Ms. Allon testified at trial, there was a "meeting of the minds" that SLS would not make any 83(b) payments. JX141; Day 1 Tr. at 247:9-249:14 (S. Allon). Because the Sale was an asset deal, Allonhill's equity, and any obligations associated with that equity, remained with Allonhill after the Sale. JX141; Day 1 Tr. at 247:9-249:14 (S. Allon).

162.    Allonhill also had a 409A profit sharing plan. The Allons ultimately paid a total of $75,000 to various employees in connection with that plan. Day 1 Tr. at 251:22-252:5 (S. Allon). Mr. Nadeau testified that he did not promise to pay any amounts to employees other than the retention bonuses. Day 3 Tr. at 83:11-14 (Nadeau). In a post-closing email, Ms. Allon confirmed Mr. Nadeau's testimony by writing that the 409A

payments did "not concern SLS." JX170; Day 1 Tr. at 246:24-247:8, 250:23-252:13 (S. Allon).

### C.    SLS's Use of Costa Rica

163.    Post-closing, SLS did seek opportunities to move aspects of the legacy Allonhill business to Costa Rica. As Ms. Pyle testified, this was a phased and specifically planned out process. *Id.* at 352:5-354:11 (Pyle). First, SLS identified low-level tasks that could be outsourced. *Id.* Second, before moving those tasks to Costa Rica, SLS performed test runs with its personnel in Houston. *Id.* It was in 2015, only after the Business reached a comfort level with outsourcing these tasks, and after certain necessary technology changes were made, that SLS started to move work to Costa Rica. *Id.* Even then, there were certain customers that would not permit work to be performed offshore. Gillen Decl. ¶ 59.

### D.    Market Factors Affect the Business Shortly After the Sale

164.    Due to market factors beyond SLS's control, the Business lost significant revenue from its three largest customers – Flagstar, Fannie Mae and Freddie Mac – shortly after the Sale. JX133; Day 4 Tr. at 191:19-193:9 (G. Davis); Day 2 Tr. at 452:5-453:2 (Margolf); Day 1 Tr. at 295:17-296:7 (S. Allon); Day 3 Tr. at 89:17-91:3 (Nadeau). One day before closing, Allonhill learned that Fannie Mae would end the Little Bear project. Mr. Margolf was "not surprise[d]" by the news, given the steady decline in mortgage delinquencies. JX133; Day 2 Tr. at 450:13-21 (Margolf). The loss of the Little Bear work had nothing to do with SLS. Day 2 Tr. at 451:10-16 (Margolf).

165.    In addition, on September 13, less than two weeks after the Sale, Flagstar gave notice that, due to low volumes, it would be moving the default-related work that Allonhill had been doing in-house.  JX156 at SLS207118.  Other work was lost in late 2013 and early 2014 as the country's largest banks agreed to settlements that resolved claims against them arising out of the financial crisis and as defaults slowed.  Day 3 Tr. at 89:17-91:3 (Nadeau).  For example, another Fannie Mae contract – referred to by Allonhill as the Massive project (a "big project," Mr. Margolf testified) – wound down in the months following the Sale for reasons unrelated to SLS.  JX193; Day 2 Tr. at 452:5-455:8 (Margolf); Day 1 Tr. at 295:17-296:7 (S. Allon).

166.    In total, by the spring of 2014, the Business lost four projects for Fannie Mae and Freddie Mac – Little Bear, Massive, Huckleberry and Half Peak – that together accounted for 40 percent of the most recent year's revenue.  Day 4 Tr. at 192:1-193:3 (G. Davis).  The Business also lost the Flagstar work not long after closing, which when combined with the loss of the four Fannie and Freddie projects, accounted for over 50 percent of trailing twelve-month revenue.  Id. at 192:9-15, 197:5-198:4 (G. Davis); JX102.

167.    The loss of projects for these customers reflected a broader trend, one that Allonhill itself had predicted:  the decline of foreclosure and default related work as the market moved farther away from the 2008 financial crisis.  JX10 at AH00126213; Day 2 Tr. at 445:11-17 (Margolf); Day 3 Tr. at 89:17-91:3 (Nadeau).  By late 2013, it became clear that obtaining GSE work, as Mr. Margolf described it, was "tough sledding."   JX191 at SLS178039; Day 2 Tr. at 457:9-459:19 (Margolf).  In November 2013, three months after

closing, when Mr. Gallery questioned why Mr. Margolf projected only "$2 million in new revenue from the agencies next year," Mr. Margolf explained that "with GSE's retrenching, delinquencies falling, GSE's consolidating existing vendors, and origination slowing, we're going to be picking up a series of smaller pieces this year." JX179 at SLS056434. By "retrenching," the GSEs were pulling work in-house due to low volumes and budgetary constraints imposed by their receiverships. Day 2 Tr. at 454:13-459:5 (Margolf); JX191. Thus, in the post-Sale period, these "market conditions" made it "difficult to get work from the GSEs at that time." *Id.* at 457:15-16, 458:10-22 (Margolf). As Mr. Margolf acknowledged at trial, these broader market issues that held the Business back from obtaining GSE work "had nothing to do with the Stewart transaction." *Id.* at 458:23-459:5 (Margolf).

### E.    SLS Discovers that Ms. Allon's Poor Reputation Impedes the Business

168.    Issues with Ms. Allon's reputation, not disclosed to SLS prior to the Sale, also hampered the Business. Shortly after the Sale, Mr. Nadeau learned of the damage that Ms. Allon's 2012 decision to exit the capital markets business had on Allonhill's reputation. Day 3 Tr. at 91:4-21, 94:19-96:9 (Nadeau). He learned that customers and potential customers, including Bank of America and Citibank, would not do business with Ms. Allon again. *Id.* at 62:15-64:8, 91:4-96:9 (Nadeau). At trade shows and conferences, industry members congratulated Mr. Nadeau on the Allonhill acquisition, but spoke poorly of Ms. Allon. *Id.* at 94:23-96:9 (Nadeau). In September 2013, when Ms. Allon reached out to arrange a meeting with Citibank, it refused to meet, informing Ms.

Allon that "we would not work with your team on any diligence matters, given the history we had with the conduit operation."  DX11 at AH0012356; Day 1 Tr. at 281:16-282:4 (S. Allon).

169.    In November, Mr. Nadeau and Mr. Gillen met with Bank of America to discuss the new acquisition and prospects for doing business in the future.  JX176; Day 3 Tr. at 410:16-413:12 (Gillen).  The Bank of America representatives expressed "extreme displeasure in the way the shutdown of the business line at Allonhill was handled."  JX176 at SLS162041.  Mr. Nadeau reported that "they shared that the Allonhill organization and principals (Sue) are not welcome to ever do business with Bank of America across any business lines."  *Id.*  A Bank of America representative later wrote that the Bank might be willing to work with SLS in the future provided that "she [Ms. Allon] is not involved."  JX178 at SLS161834.  SLS continued to pursue work with Bank of America (as well as Citibank and other former Allonhill clients).  Gillen Decl. ¶ 39.

170.    Mr. Margolf testified that the OCC termination and events that followed "absolutely" harmed Ms. Allon's reputation in the market.  Day 2 Tr. at 438:1-5 (Margolf).  He personally heard Bank of America speak negatively of Ms. Allon, including that they would not work with her again.  *Id.* at 438:6-21, 473:23-474:9 (Margolf).

### F.    SLS Terminates Mr. Kaplan and Ms. Allon

171.    Mr. Kaplan's inexperience and ineffective management style came to a head not long after closing.  On September 23, 2013, Ms. Allon wrote to Mr. Nadeau that Mr. Kaplan was "in over his head, and he's making bad decisions and burning relationships

faster than anyone can keep count . . . it's going to cost us important clients, salesman, and money." JX161 at SLS062667.  When SLS learned of the dysfunctional environment he fostered, and that he faced real challenges working with the sales team, Mr. Nadeau felt SLS had no choice but to terminate him.  Day 3 Tr. at 92:8-24 (Nadeau).

**G.    SLS Repeats Allonhill's Decision to Exit Capital Markets**

172.    In the post-Sale period, SLS had reconsidered Allonhill's decision to withdraw from transactional work, and took on limited transactional engagements. Gillen Decl. ¶ 45.  But by late 2014, it became clear to SLS that transactional work was too expensive given available volume.  SLS could not justify continuing to perform the work. *Id.*

173.    Accordingly, in the fall of 2014, SLS made the identical decision that Allonhill had made at the end of 2012 – it decided to pull back from securitization work, both transactional and conduit.  Day 3 Tr. at 105:19-106:2 (Nadeau); Gillen Decl. ¶ 44. Without enough volume in the market "to pay for the employees that are going to be doing the work," SLS could no longer justify investing the resources required to maintain an active presence in the securitization market.  *Id.* at 106:8-13 (Nadeau); Gillen Decl. ¶ 44.  Moreover, amendments to the SEC's Regulation AB made the securitization business "much less appealing."  Day 3 Tr. at 106:17-108:2 (Nadeau).

174.    SLS studied whether to withdraw from its securitization business lines.  In indicating that SLS would likely not hit forecasts, Mr. Nadeau referenced a "strategic

change to the business," which was the contemplated withdrawal from securitization work.  *Id.* at SLS131562.

### H. Activist Investors Join the SISCO Board, But Do Not Impact the Capital Markets Division

175.    There is evidence that in 2013 and 2014, activist shareholders joined the Board of SISCO.  One of the initiatives they pursued was improving SISCO's performance through, among other things, reducing expenses.  Morris Depo. Tr. at 42:14-50:17.  There is no evidence, however, that SLS made cuts to the Capital Markets division as the result of any demands by the activists.   Mr. Morris, SISCO's then-CEO, testified at his deposition that the cost cutting initiative pursued by the activists focused on the corporate level (corporate IT, HR, Finance, and Accounting) and not on the operating business units.  Morris Depo. Tr. at 170:13-171:13

## XXI.  The Private Label Securitization Market Does Not Return

176.    The private label securitization market has not returned since the financial crisis.  JX262 at p. 13; JX10 at AH00126227; JX245; Day 3 Tr. at 85:21-86:7 (Nadeau); Day 1 Tr. at 369:5-10 (H. Allon).   In 2006, the private label securitization market comprised 56 percent of total mortgage-backed securities issuances, but that figure fell to one percent in the post-crisis years, and never exceeded five percent through 2017.  JX262 at p. 13.

177.    Allonhill sought to emphasize at trial that, in the absence of a robust private label securitization market, credit risk transfer programs introduced by the GSEs in 2013 presented new loan due diligence opportunities.  (Finkel Report ¶¶ 212, 213).  Allonhill

presented no evidence, however, to quantify the size of this opportunity.  Day 3 Tr. at 455:7-457:1 (Finkel).

178.    Freddie Mac introduced the Structured Agency Credit Risk ("STACR") program, while Fannie Mae introduced the Connecticut Avenue Securities ("Connecticut Avenue") programs.  Finkel Report ¶¶ 212, 213.  In 2013 and 2014, these programs were brand new, offered very limited opportunities for diligence work, and it was unclear if they would be successful.  Gillen Decl. ¶¶ 50-51 (credit risk transfer programs generated a "small volume of transactions"); Day 3 Tr. at 407:15-408:23 (Gillen).  For example, through March 2018, Freddie Mac issued just thirty-four STACR transactions in more than five years.  Finkel Report ¶ 213.

179.    The STACR and Connecticut Avenue programs were transactional in nature.  Each was a one-time opportunity for a low volume of work that required a quick turnaround.  Gillen Decl. ¶¶ 50-51; Day 3 Tr. at 408:3-11 (Gillen).  As set forth above, much like Allonhill had done at the end of 2012, SLS decided in the fall of 2014 to exit these type of transactional reviews because the low volume, and correspondingly low revenues, could not support the costs needed to keep resources at the ready to service such deals. *Id.*

180.    Allonhill had damaged its relationships with Wall Street banks which impacted SLS's ability to pitch for the credit risk management programs.  Each of these transactions involved an outside private investor, typically a large bank.  JX198.  In January 2014, SLS learned that Fannie Mae would be working with Bank of America on

what would become the Connecticut Avenue Security Program.  JX198; Day 2 Tr. at 472:12-474:9 (Margolf).  Bank of America had no desire to work with Ms. Allon.  JX198 at SLS159388.

## XXII.  The Business Did Not Perform Well Enough to Trigger the Earnout

181.    Post-Sale, the Business did not generate sufficient revenue to exceed the revenue hurdles in the APA necessary to meet the Earnout Hurdle.  Stip. Facts ¶ 13.

182.    On November 10, 2014, SLS delivered to Allonhill the first Earnout statement required by the APA.  JX233 (the "Year One Earnout Statement").  It showed gross revenue for the Business for the first year of the earnout of $13.1 million, nearly $4 million below the $17 million Earnout Hurdle.  *Id.*  It also showed that the Business lost in excess of $4.3 million during the first earnout year, meaning that capital from other parts of the SLS business had to be invested into the Business to support its operations.  *Id.*; Day 3 Tr. at 115:21-117:10 (Nadeau).

183.    On November 16, 2015, SLS delivered to Allonhill the second Earnout Statement (the "Year Two Earnout Statement").  JX244.  This showed revenue for the legacy Allonhill business of approximately $9.7 million for the second year of the earnout, again well below the $17 million Earnout Hurdle.  *Id.*  The Year Two Earnout Statement shows additional customers contributing revenue to the Business than contributed in the first year.  *Id.*  Mr. Nadeau testified that this was due to SLS's acquisition of another business, Wetzel Trott, that did servicer oversight work similar to Allonhill's SPM line of

business.  Day 3 Tr. at 118:3-119:4 (Nadeau).  Due to this similarity, SLS decided to credit the Allonhill business with revenue generated by Wetzel Trott in this area.  *Id.*

184.    On November 15, 2016, SLS delivered to Allonhill the earnout statement for year three, which showed the Business generated approximately $7.3 million in revenue and operating losses in excess of $1.1 million.  JX253.

185.    After three years of mounting losses, in December 2016, SLS sold the Business and other assets to AMC for less than $2 million.  JX254 at SLS213798, 213816.

## XXIII. Customer Collections Turned Over to SLS Post-Sale

186.    Pursuant to the APA, SLS acquired "all accounts and other amounts receivable of the Business" and "Contracts to which [Allonhill] is a party."  JX135 at p. 2.  To allow for the assignment and transition of contracts post-closing, the parties entered into the ELA, pursuant to which SLS would "lease" back to Allonhill certain of its employees, so that Allonhill could continue to service those contracts.  Day 1 Tr. at 310:18-311:15 (S. Allon); Day 3 Tr. at 80:10-81:1 (Nadeau).

187.    The parties intended that the arrangement would be cash neutral to Allonhill and that all receivables collected by Allonhill would be turned over to SLS net of any actual costs incurred by Allonhill.  Day 1 Tr. at 308:10-311:19 (S. Allon); Day 3 Tr. at 119:14-120:20 (Nadeau); JX199; JX201.

188.    Following the closing, between September 2013 and March 2014, Allonhill continued to collect payments from certain customers of the Business, whose contracts SLS acquired from Allonhill, in the amount of $7,834,686 (the "Customer Collections"),

but it did not immediately remit those payments to SLS.  See Stip. Facts ¶¶ 16-17; Day 3 Tr. at 121:7-20 (Nadeau).

189.    In November 2014, Allonhill raised the possibility of amending the APA to shift the start date for the Earnout period from September 1 to November 1, believing that the later start date would benefit Allonhill in calculating the Earnout because of the interim collections arrangement under the ELA.  JX201; Day 1 Tr. at 308:10-310:22 (S. Allon).

190.    SLS agreed to the amendment conditioned on payments by Allonhill of the outstanding Customer Collections.  JX201 at SLS177095.  The parties ultimately agreed on a reconciliation of the amounts collected by Allonhill and of the expenses Allonhill would be permitted to deduct.  JX201.  Upon reaching that agreement, SLS executed the amendment to the APA.  *Id.*; JX199.  Only then did Allonhill begin remitting Customer Collections to SLS, transferring funds of $5,649,281.36 on January 13, 2014 (in two payments of $5,018,464.11 and $630,817.28).  JX201.

191.    In total, Allonhill remitted $6,608,309.15 (the "Turned Over Funds") in Customer Collections (payments collected on receivables either generated or purchased by SLS) in the following amounts on the dates indicated:

- January 13, 2014 - $5,018,464.11 for payments received from September through November 2013

- January 13, 2014 - $630,817.28 for payments received in December 2013

- January 24, 2014 - $11,932.07 for a payment received in December 2013

- February, 18, 2014 - $947,095.69 for payments received from January 1 through February 6, 2014

Stip. Facts ¶ 17.

192.    Collections on customer contracts, receivables and/or rights to payment purchased by SLS pursuant to the APA and totaling $675,474.75 (the "Outstanding Amount") continued to be held in Allonhill's operating account until the effective date of the Third Amended Plan of Reorganization of Allonhill LLC (the "Plan"), and were thereafter transferred to, and continue to be held by, the disbursing agent (Alfred Giuliano) appointed by the Plan.  Stip. Facts ¶ 19.

## XXIV. Procedural History in Bankruptcy

193.    SLS timely delivered to Allonhill the Year One Earnout Statement. Allonhill and SLS thereafter entered into a tolling agreement, extending Allonhill's time to dispute the Year One Earnout Statement to February 13, 2015.  Main Case D.I. 366-1, at 1 (Agreement to Bankruptcy Court Jurisdiction).

194.    Subsequently, the parties entered into their Agreement to Bankruptcy Court Jurisdiction, which was so ordered by the Court on March 3, 2015.  Main Case D.I. 366.  This agreement and order provided that the Court would have exclusive jurisdiction over the resolution and determination of any action between the parties "arising out of or relating to the APA" including any actions relating to any "Earnout Statement" as that term is defined in the APA, and any claims asserted by SLS, including pursuant to its proof of claim.  *Id.*  Accordingly, this agreement and order supplanted the procedures contained in the APA governing disputes in connection with the Earnout Statements.

195.    Pursuant to the Plan Stipulation, the parties authorized the Escrow Agent under the Escrow Agreement executed in connection with the APA to release $2 million then held in escrow to the Disbursing Agent under the Plan.  Among other things, the Plan Stipulation operated to terminate SLS's rights to indemnification under the APA and related agreements other than certain expressly reserved rights.  Plan Stipulation, § 5.08 at ¶ 4 (Main Case D.I. 593-1).    Among SLS's rights that were preserved was indemnification for losses that are entitled to indemnification pursuant to either the SLS Indemnity Agreement and/or the APA that result from a breach of section 4.17 of the SLS APA.  *Id.*  The Plan Stipulation further provides that if SLS establishes that it is the holder of an Allowed Claim for indemnification rights that are preserved under the Plan Stipulation, such claim shall be treated as a secured claim up to the $2 million value of the escrow.  *Id.*

## XXV.  Facts Relevant to Damages, Valuation and Solvency

### A.    Facts Regarding Value Exchanged at the Time of the Sale

196.    The Sale was an asset sale.  As noted above, SLS did not purchase all of the assets and liabilities of Allonhill.  Certain assets and liabilities, primarily those associated with the Aurora litigation, were left with the Allonhill business.

197.    No evidence was presented at the trial as to the value of the specific assets and liabilities that were transferred to SLS as part of the Sale.  While Allonhill's expert, Mr. Fliegler, offered his opinion as to the enterprise value of Allonhill, he admitted that

this valuation is not the same as a value of the specific assets and liabilities that were transferred to SLS.  Day 4 Tr. at 68:2-69:21 (Fliegler).

198.    As to the other side of the transaction, the consideration paid by SLS consisted primarily of the $15 million in up front consideration and the promise to pay the earnout if the Allonhill business hit the Earnouts going forward.

199.    The evidence at trial established that the SLS consideration was the product of a robust marketing process and good faith, arm's length negotiations between SLS and Allonhill.  *See supra* ¶¶ 41, 51-54, 72-74.

200.    Regardless of how one values the Earnout as of the date of the Sale, the SLS consideration constitutes market value for the Business.  It is the consideration that the market produced, and the Allons agreed to it with full knowledge of its terms and with various protections built into the APA regarding the earnout.

201.    In connection with his breach of contract damages analysis, Mr. Fliegler valued the promise to pay the Earnout, based upon facts that were available as of the Sale Date, at $13.2 million.  Day 4 Tr. at 60:12-61:23 (Fliegler).  Combining this value with the $15 million in up front consideration, Mr. Fliegler's analysis suggests that the value of the SLS consideration as of the Sale Date was $28.2 million.  *Id.*

### B.    Facts Relevant to Valuation

202.    Mr. Fliegler served as Allonhill's valuation expert.  SLS put forward the testimony of Mr. G. Davis to rebut the testimony of Mr. Fliegler.  Mr. G. Davis is a forensic

accountant and corporate restructuring advisor. *Id.* at 181:7-182:5 (G. Davis). He is certified in the valuation of distressed businesses. *Id.* at 183:3-15 (G. Davis).

203.    Mr. Fliegler opined that Allonhill's enterprise value as a stand-alone business as of August 28, 2013, the Sale Date, was $42 million. *Id.* at 9:5-25 (Fliegler). Mr. G. Davis opined that Mr. Fliegler's valuation was not reliable. Based upon the facts established at trial and set forth in more detail below, Mr. Fliegler's $42 million valuation is not reliable in establishing Allonhill's fair market value.

### 1.    Mr. Fliegler's Valuation Is Inconsistent with Contemporaneous Evidence of Market Value

204.    The Sale was the product of a robust marketing process and arm's length negotiations. Following that process, Allonhill agreed to the APA. As noted above, Mr. Fliegler valued the consideration SLS paid in the APA at $28.2 million, and offers no explanation as to why Allonhill as a whole was worth over $13 million more than his own valuation of the consideration that the market produced. At the time of the Sale, the Allons expressed their belief that the Sale represented a good financial deal for Allonhill. JX146. At trial, the Allons' investment banker, Mr. Abbe, testified that the Sale was a "terrific result." Day 2 Tr. at 528:11-16 (Abbe).

205.    Mr. Fliegler's valuation is also at odds with the following contemporaneous evidence of value in the record:

> As Mr. Davis testified, each of the projected scenarios prepared by SLS of what it would ultimately pay for the Allonhill business is significantly less than the $42 million valuation prepared by Mr. Fliegler. Day 4 Tr. at 200:10-202:14 (G. Davis). Even in its most aggressive "High Growth" case, the total

consideration that SLS estimated it would pay was slightly more than $37 million.  JX125 at HV001185.[6]

There are two valuations of Allonhill in the record that were prepared before the Sale.  For purposes of tax reporting, Mr. Allon attributed a value to Allonhill of $17.7 million in late 2011.  Day 1 Tr. at 369:21-371:7 (H. Allon); JX300.  A second valuation, commissioned by potential purchaser Flexpoint Ford and prepared for Allonhill by Shareholder Insite, an independent business valuation firm specializing in valuing emerging companies,[7] concluded that as of June 30, 2012, Allonhill was worth $11.96 million.  JX21 at AH00120001; Day 1 Tr. at 170:24-171:4; 231:6-232:15 (S. Allon).

Finally, in his own valuation, Mr. Fliegler used Adfitech as a comparable company to Allonhill.  Adfitech, which was in a similar business to Allonhill, had revenues of $41 million in the twelve months preceding the Sale Date (almost twice as high as Allonhill's $25 million in revenue during that time).  Despite its higher revenues, Adfitech had a known market value as of August 2013 of only $23 million.[8]  Day 4 Tr. at 154:11-21 (Fliegler).

## 2.    Mr. Fliegler's DCF Analysis Contains Significant Errors.

206.    Mr. Fliegler's DCF Analysis contains numerous errors and improper assumptions.  When Mr. G. Davis corrected for just some of these errors, it produced a valuation well below what SLS paid for Allonhill.

207.    <u>Use of SLS Revenue Projections</u>.  To prepare his valuation of Allonhill as a stand-alone entity, Mr. Fliegler used revenue projections that were prepared by SLS for

---

[6] The total undiscounted consideration paid in the medium growth scenario, which is based upon the projections that Mr. Fliegler used to perform his valuation, is only $26 million. JX125.  This is particularly true when one considers that SLS only ascribed a 25 percent chance to the "High Growth" scenario.  JX149; Day 3 Tr. at 290:24-292:6 (Nadeau).

[7] JX21 at AH120015.

[8] Mr. Fliegler also included Ellie Mae as a comparable company in his market analysis, but admitted at trial that Adfitech was more comparable to Allonhill.  Day 4 Tr. at 153:20-157:10 (Flieger).  Ellie Mae was nearly eighteen times larger than Allonhill with a market valuation of $737 million.  Its yearly revenues were $122 million, nearly five times higher than Allonhill's.  *Id.* Mr. Nadeau described Ellie Mae as not comparable to Allonhill at all. Day 3 Tr. at 126:13-127:7 (Nadeau).

the Allonhill business as a division *of SLS*.  Day 4 Tr. at 13:17-15:13 (Fliegler); JX125.[9]  As

Mr. G. Davis testified, this produces an unreliable result because SLS's projections would

necessarily be reflective of revenue synergies unique to SLS, including SLS's access to

capital, customer relationships, and other resources.  Day 4 Tr. at 203:9-204:15 (G. Davis).

Mr. Nadeau, who prepared the SLS projections used by Mr. Fliegler, indicated that the

model contemplated revenue synergies, including the ability to capitalize on Stewart's

relationships with existing clients.  Day 3 Tr. at 55:2-56:6 (Nadeau).  Mr. Abbe, Allonhill's

own investment banker, testified that there would be "revenue synergies that could help

Allonhill's business" in a combination with Stewart.  Day 2 Tr. at 529:2-24 (Abbe).

208.    <u>Failure to Account for Aurora Litigation Risk</u>.  As a stand-alone entity in

August 2013, Allonhill was burdened with the Aurora litigation and the potential $25

million liability that this claim represented.  Mr. Fliegler admitted that any buyer of the

Allonhill business as a whole would need to factor the risk of this litigation into their

analysis of the business.  Day 4 Tr. at 93:6-94:11 (Fliegler).  SLS's revenue projections do

not account for the Aurora litigation because it purchased the Allonhill business free of

that liability.  Nonetheless, Mr. Fliegler did not risk adjust the revenue projections when

he used them in his valuation.  He believed that the risk of the Aurora litigation was

factored into his cost assumptions because they were partially based on a set of Allonhill

two-year projections.  *Id.* at 93:21-96:10 (Fliegler).  However, the two-year projections

---

[9] Mr. Fliegler testified that he used these projections based upon his research that "GSE
securitizations" would remain "as strong as they were" – even though Allonhill was not doing
any work with respect to GSE securitizations at the time.  Day 1 Tr. at 178:5-12 (S. Allon).

used by Mr. Fliegler are attached to an email from Mr. Billat to Ms. Allon which indicates that they are projections of the potential Earnout.  JX70.  Ms. Allon's testimony confirmed that the two-year projections were projections of what the Allonhill business could do as part of Stewart and do not include Aurora litigation costs.  Day 1 Tr. at 226:6-227:7 (S. Allon).

209.   <u>Use of Allonhill's 2011 EBITDA Margin</u>.  EBITDA margin is an important part of a DCF calculation because application of the EBITDA margin determines how much of the revenue in each year of the calculation is profit that can constitute free cash flow.  The higher the EBITDA margin, the higher the company profits and the higher the valuation.  Day 4 Tr. at 102:25-104:23 (Fliegler).  For year six forward of his projections, Mr. Fliegler's model used an EBITDA Margin of 29.2 percent.  *Id.* at 104:24-106:17 (Fliegler).  This is significant because $37 million of Mr. Fliegler's $42 million valuation is based upon year six forward.  *Id.*  Mr. Fliegler used 29.2 percent because that was Allonhill's EBITDA margin in 2011, and Mr. Fliegler testified that this was a "normalized and sustainable profit margin for the business."  *Id.*  However, Allonhill's EBITDA margin in all of its other years of operation ranged from negative numbers to a high of only about 6 percent, as the following chart depicts:

|  | 2009 | 2010 | 2011 | 2012 | YTD 8/2013 |
|---|---|---|---|---|---|
| EBITDA Margin | -97.1% | 5.7% | 29.2% | 2.7% | 20.9% |

JX3; JX32; JX102; Day 4 Tr. at 107:21-108:11 (Fliegler).

210.    2011 was not a normal and sustainable year for Allonhill.  Allonhill's 2011 results were skewed by the OCC projects, one-time projects that produced significant profits for that year.  Day 1 Tr. at 144:8-145:5 (S. Allon).  Mr. Fliegler admitted that the EBITDA margin in 2011 was a "spike" attributable to the OCC projects.  Day 4 Tr. at 109:10-17 (Fliegler).  In fact, Allonhill's own investment banker, Mr. Abbe, called the financial results that Allonhill achieved in 2011-2012 as a result of the OCC projects and other default related work, an "anomaly" and indicated that Allonhill would not have a "normalized period" of financial results until 2013, when that work subsided.  Day 2 Tr. at 496:9-497:17 (Abbe); JX14 at AH00126726.

211.    For these reasons, Mr. G. Davis opined that Mr. Fliegler's use of the 29.2 percent EBITDA margin was not a reasonable assumption.  Day 4 Tr. at 204:16-25 (G. Davis).  He performed the sensitivity analysis set forth below that adjusted Mr. Fliegler's valuation using different EBITDA Margin assumptions, leaving everything else in Mr. Fliegler's valuation the same.  *Id.* at 205:20-207:4 (G. Davis).  Based upon this analysis, using Mr. Fliegler's model and assuming that Allonhill would grow to an EBITDA margin of 19 percent, which was the margin that Clayton had in the height of the securitization boom in 2006, that would produce a $25 million valuation.  *Id.* Using Allonhill's average EBITDA margin from 2010-2013 of 12 percent would produce a valuation around $12 million.  *Id.*

**($ millions)**

| EBITDA Margin | Impact on Calculated Value | Revised Value |
|---|---|---|
| 6% | ($42) | $0 |
| 8% | ($38) | $4 |
| 10% | ($34) | $8 |
| 12% | ($30) | $12 |
| 14% | ($26) | $16 |
| 16% | ($22) | $20 |
| 18% | ($19) | $23 |
| 19% | ($17) | $25 |
| 20% | ($15) | $27 |
| 22% | ($12) | $30 |
| 24% | ($8) | $34 |

212.   <u>Working Capital Percentage</u>.   Working capital percentage is used to calculate how much of the company's revenue is needed for working capital and, therefore, is not available as profit.  The higher the working capital percentage, the lower the valuation.   Day 4 Tr. at 113:2-15 (Fliegler).   Allonhill's highest working capital percentage was in 2011, but Mr. Fliegler did not use this in his valuation.  *Id.* at 113:21-114:10 (Fliegler).   Rather, because he described Allonhill's working capital history as "volatile" he used an average of Allonhill's working capital percentage from 2009-2012, which again reduced his valuation, particularly the inclusion of 2009, a year in which Allonhill's working capital percentage was negative.   *Id.* at 111:7-116:8 (Fliegler).

213.   <u>Size Premium</u>.   In calculating a discount rate, valuation professionals factor in a size premium that accounts for the risk associated with the company based upon its size.  The smaller the company, the higher the size premium and the lower the valuation because the risk of future cash flows is increased with a smaller company.  Day 4 Tr. at 123:22-124:9 (Fliegler).   Mr. Fliegler used a size premium from an accepted source –

71

Ibbotsons 2013 Yearbook. *Id.* at 124:10-18 (Fliegler). He used Ibbotson's 10th decile, applicable to companies sized between $1.1 million and $253 million, which calls for a 6.03 percent premium. *Id.* at 125:2-25 (Flieger). However, the same page from the same publication breaks down the 10th decile into sub-deciles. *Id.* at 126:1-12 (Fliegler). Mr. Fliegler admits that, based upon its size alone, Allonhill would fit within the 10z sub-decile, which covers companies sized between $1.1 million and $96 million and calls for a premium of 11.65 percent. *Id.* at 126:13-127:24 (Fliegler). Mr. G. Davis testified that use of the 10z decile would have decreased Mr. Fliegler's valuation by $15 million, down to approximately $27 million. *Id.* at 209:15-210:9 (G. Davis).

214.    Mr. Fliegler testified that he did not use the 10z because he believes it incorporates very large, very distressed companies. *Id.* at 127:19-24 (Fliegler). However, another page from Ibbotsons that breaks down the companies in the 10z shows that 90% of the companies in the sub-decile have a market capitalization of less than $80 million, 75% have less than 365 employees and that the most common industries represented in the 10z are financial services and technology (arguably the most applicable industries to Allonhill). *Id.* at 129:10-130:9 (Fliegler); DX19. The publication goes on to state that use of the sub-deciles for the 10th decile, including the 10z, "greatly enhance the development of cost of capital analysis for very small companies." DX19. Mr. G. Davis testified that Mr. Fliegler should have used the 10z. Day 4 Tr. at 209:15-24 (G. Davis).

215.    <u>Failure to Adjust Valuation</u>. Mr. Fliegler did not adjust his valuation to account for any financial distress because it is his opinion that Allonhill was not a

distressed entity. *Id.* at 119:9-25 (Fliegler).  Mr. Fliegler offered this opinion even though he could not testify as to whether Allonhill was able to pay its debts as they came due or whether the capital investments made by the Allon's in Allonhill were necessary for its survival. *Id.* at 120:1-14 (Fliegler).  Mr. G. Davis, an expert in distressed valuations, testified that a basic financial analysis would show that Allonhill was a distressed company, and that he would have applied a Company Specific Risk Premium ("CSRP") to the discount rate to account for this. *Id.* at 208:17-209:7 (G. Davis).

216.    As discussed above, there are numerous and varied facts supporting that Allonhill was a troubled business at the time of the Sale.  Allonhill failed to turn a profit in any of the 15-months between the loss of the OCC projects in May 2012 and the Sale.  During that period, it laid off around 450 employees, or approximately two-thirds of its workforce.  It implemented significant cost-cutting measures, exited the capital markets business, was reliant on three clients for nearly 70 percent of its revenues, and faced liability in the Aurora litigation.

217.    <u>Tax Rate</u>.  In calculating a tax rate, Mr. Fliegler used a tax rate for an S-Corporation that is based upon the analysis by the Delaware Court of Chancery in *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290 (Del. Ch. 2006).  Day 4 Tr. at 139:25-140:24 (Fliegler).  That case dealt with the valuation of a minority interest in an S-Corporation, not an enterprise value.  *Del. Open MRI Radiology*, 898 A.2d at 327-328.  Mr. G. Davis opined that use of this rate was inappropriate because this case does not involve valuing a minority interest.  Day 4 Tr. at 216:14-217:10 (G. Davis).  Mr. Fliegler testified

that a C-Corporation purchasing Allonhill would not place any value in its S-Corporation status, and that in any asset sale, Allonhill would retain its S-Corporation status (*Id.* at 141:7-143:16 (Fliegler)).

218.    <u>Working Capital</u>.  Mr. Fliegler's model assumes that Allonhill would have a working capital surplus of over $850,000 in the first year of operations after the valuation date.  *Id.* at 146:3-12 (Fliegler). This is achieved by assuming that Allonhill would collect approximately $3 million of the Aurora receivable, even though his projections do not account for any risk associated with that litigation.  *Id.* at 146:13-147:7 (Fliegler).  Looking at Allonhill's actual financials as of the closing, Mr. G. Davis calculated that Allonhill would have had a working capital deficit immediately after the closing of approximately $2.3 million, as the Allons had to make $3.2 million in capital contributions in the business earlier in 2013.  Mr. G. Davis opines that any purchaser of Allonhill would deduct this amount from its purchase price because that is an amount of cash that any purchaser would have to immediately invest in Allonhill to get it to an appropriate working capital level.  *Id.* at 210:10-212:18 (G. Davis).  Rather than doing this analysis, Mr. Fliegler's model blindly assumes a surplus.  *Id.*

219.    <u>Correcting for Mr. Fliegler's Errors</u>.  Mr. G. Davis adjusted Mr. Fliegler's valuation to account for just four of the errors discussed above (a) failure to apply a CSRP; (b) failure to use the 10z size premium; (c) failure to use the C-Corporation tax rate; and (d) adjustment for the $2.3 million day-one working capital deficit.  *Id.* at 217:2-21 (G. Davis).  As the chart shows, adjusting for just these four factors produces a valuation of

between $10.4 and $14.7 million.  *Id.* This analysis does not adjust for other improper

assumptions, including the use of SLS's revenue projections, the failure to account for the

risk associated with the Aurora litigation, or the use of the 29.2 percent EBITDA margin.

*Id.*

($ millions)

| CORRECTED DISCOUNT RATE AND TAX RATE ASSUMPTION | | | | | | |
|---|---|---|---|---|---|---|
| A.  Company Specific Risk Premium | 5.0% | 6.0% | 7.0% | 8.0% | 9.0% | 10.0% |
| B.  Increase Size Premium | 11.65% | 11.65% | 11.65% | 11.65% | 11.65% | 11.65% |
| C.  Tax Rate | 39.6% | 39.6% | 39.6% | 39.6% | 39.6% | 39.6% |
| D.  Corrected WACC | 21.3% | 22.0% | 22.7% | 23.5% | 24.2% | 25.0% |

| | CORRECTED FLIEGLER ENTERPRISE VALUE | | | | | |
|---|---|---|---|---|---|---|
| *Corrected Discount Rate* | 21.3% | 22.0% | 22.7% | 23.5% | 24.2% | 25.0% |
| A.  Calculated Enterprise Value | $17.0 | $15.8 | $14.9 | $14.1 | $13.4 | $12.7 |
| B.  Less:  Working Capital Adjustment | (2.3) | (2.3) | (2.3) | (2.3) | (2.3) | (2.3) |
| **C.  Corrected Enterprise Value** | $14.7 | $13.5 | $12.6 | $11.8 | $11.1 | $10.4 |

## C.    Allonhill Contract Damages

220.    Mr. Fliegler testified that the damages suffered by Allonhill as the result of

SLS's alleged breach of contract were $13.2 million.  Day 4 Tr. at 9:13-15 (Fliegler).  He

calculated this amount by performing a valuation of the earnout as of the Sale Date based

upon SLS's projections prepared prior to the Sale, and did not consider any events that

occurred after the Sale.  *Id.* at 45:20-46:2 (Flieger).  He offers no opinion why the Allonhill

business failed to meet these projections.

221.    The evidence shows that multiple significant revenue projects were lost

post-Sale due to no fault of SLS.  These include Little Bear, Massive and other GSE related

projects.  Overall, these lost projects were indicative of broader market forces that made

obtaining work from the GSEs "tough sledding" post-Sale, including various settlements,

the decline in mortgage delinquencies and the fact that the GSE's were in receivership and were taking work in-house. JX191; Day 2 Tr. at 457:9-459:5 (Margolf). The business also lost a large project from Flagstar bank due to no fault of SLS. JX156.

222.   Mr. G. Davis testified that four GSE projects lost within months of the Sale represented 40 percent of Allonhill's trailing twelve-month revenue. Day 4 Tr. at 192:1-193:3 (G. Davis). If you remove those projects and the Flagstar project and assume an aggressive ten percent growth rate for the Business, the Business still would not hit the Earnout Hurdles. *Id.* at 197:5-198:4 (G. Davis). Therefore, even if SLS was able to grow the Business post-Sale, that growth would not have been sufficient to make up for the loss of the GSE and Flagstar projects.

### D.   SLS Loss

223.   Mr. G. Davis testified that SLS suffered damages in the amount of $17.1 million on the investments and cash losses that SLS would have avoided had it not entered the APA. *Id.* at 218:8-11, 219:21-25 (G. Davis). Mr. G. Davis calculates SLS's negligent misrepresentation damages by taking the $15 million cash purchase price paid by SLS, adding the present value of the losses suffered by the Business in the three-years post-Sale, and adding the $675,475 representing accounts receivable generated by the Business post-Sale but not remitted to SLS (the "Outstanding Amount"). *Id.* at 219:25-223:2 (G. Davis). Mr. G. Davis then deducted the amount of receivables that SLS purchased ($2.928 million) and the discounted value of the sale proceeds from SLS's 2016 sale of the capital markets business ($1.685 million). *Id.* at 223:3-224:2 (G. Davis).

According to Mr. G. Davis, these amount to $17.1 in losses suffered by SLS.

224.    Allonhill offered no witness to rebut Mr. G. Davis's damages calculation.

## CONCLUSIONS OF LAW

The Court's findings of fact lead to the Court's formulation of its conclusions of law.  Briefly, the facts, as the Court found them, reveal that Allonhill was a fiscally troubled entity which before its sale to SLS operated in a diminishing business environment.  Therefore damages, the Earnouts, simply did not arise.  SLS amply answered Allonhill's allegations of "promises" made and ran the Business as it saw fit.  The Court is troubled by the firing of Ms. Allon but the termination of her employment did not create the so-called mischief of which Allonhill complains.  The Court will now discuss its conclusions of law which will result in no damages to Allonhill, and no avoidance recoveries.

SLS has filed its counterclaims seeking damages.  The Court finds that SLS is not entitled to recover any damages, as explained within

## I.    JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b) and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  The parties consented to the Court's jurisdiction pursuant to the Agreement to Bankruptcy Court Jurisdiction, dated as of February 12, 2015, by and between Allonhill and SLS, approved by the Court.  (D.I. 366.)  The Court has retained jurisdiction pursuant to Section 10.01 of Plan, which the

Court confirmed.   (See D.I.'s 551, 593.)   As "Estate Representative" under the Plan, Allonhill has the authority and rights to prosecute this adversary proceeding and to defend against SLS's Counterclaims.

## II.    ALLONHILL'S CLAIM THAT SLS IS LIABLE FOR ITS NEGLIGENT MISREPRESENTATIONS

### A.    Applicable Law

The APA is governed by Colorado law.   (JX 135 at § 10.2), which provides:

> [O]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for [negligent misrepresentation for] pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Colo. Visionary Acad. v. Medtronic, Inc.*, 397 F.3d 867, 870 (10th Cir. 2005).   Further, to prevail on its negligent misrepresentation claim under Colorado law, Allonhill has the burden of showing that (1) the defendant supplied false information in a business transaction; (2) the defendant failed to exercise reasonable care or competence in obtaining or communicating that information; and (3) the plaintiff justifiably relied upon the false information.   *See Campbell v. Summit Plaza Assocs.*, 192 P.3d 465, 477 (Colo. App. 2008).

It is true, of course, that SLS had the responsibility to be accurate when it represented its intentions and capabilities before the parties executed the APA.   *See Keller v. A.O. Smith Harvestore Prods., Inc.*, 819 P.2d 69, 73 (Colo. 1991) (en banc) ("[C]laims of negligent misrepresentation are based . . . on principles of duty and reasonable conduct."

78

(citation omitted)).  Colorado law enforces this duty independently of SLS's contractual

obligations.  *See Van Rees v. Unleaded Software, Inc.*, 373 P.3d 603, 605 (Colo. 2016) ("These

pre-contractual misrepresentations are distinct from the contract itself, and may form the

basis of an independent tort claim." (citing *Keller*, 819 P.2d at 72)); *U.S. Welding, Inc. v.*

*Tecsys, Inc.*, Civil Action No. 1:14-cv-00778-REB-MEH, 2016 WL 9735718, at *2 (D. Colo.

Sept. 6, 2016) ("A 'contracting party's negligent misrepresentation of material facts prior

to the execution of an agreement may provide the basis for an independent tort claim

asserted by a party detrimentally relying on such negligent misrepresentations.'"

(quoting *Keller*, 819 P.2d at 72)).

### B.    SLS's Alleged Negligent Misrepresentations

Allonhill claims that SLS made the following misrepresentations:

1.    SLS would invest in the Business and was able to run the Business as it had been run pre-APA, when instead it stripped financial and human resources from the Business and failed to provide adequate leadership (FOF, ¶¶ 134-45, 153-58);

2.    SLS had resources in Costa Rica that could be used to the Business's benefit when those resources would not be available until 2015 (*id.*, ¶¶ 96-97, 141);

3.    Ms. Allon would remain an important part of the Business, when SLS marginalized her involvement immediately and fired her without cause in January 2014, barely five months into the first year of the Earnout (*id.*, ¶¶ 125-131); and

4.    SLS would take steps to retain key employees, including paying retention bonuses, when it failed to retain numerous key employees, many of whom left to join competitors of Allonhill (*id.*, ¶¶ 146-52).

Allonhill claims that if SLS had told the truth, Allonhill would not have entered

into the APA and would have retained its valuable assets and the Business for investment

79

in or sale to another purchaser.  According to Allonhill, the value of such assets and the Business is $42 million.  Accordingly, Allonhill's damages for its negligent misrepresentation claim are $27 million, which is the $42 million valuation minus the $15 million in consideration already paid.

### C.    The APA's Integration Provision Bars Allonhill's Negligent Misrepresentation Claim.

The claim of negligent misrepresentation fails for several reasons.  First, as discussed below, the Court found that factually SLS made no misrepresentations.

Second, the APA's integration clause contains clear and specific language limiting the parties' "understanding and agreement" to that contained in the APA and related documents:

> Entire Agreement.  This Agreement (including the Schedules and Exhibits hereto) and the Ancillary Agreements represent the entire understanding and agreement between the Parties with respect to the Transactions and supersedes all prior agreements among the Parties respecting the Transactions.

JX135 §10.5.  The integration clause also expressly limits the parties' "rights, liabilities and obligations" to those exclusively in contract pursuant to the APA:

> The Parties have voluntarily agreed to define their rights, liabilities and obligations respecting the Transaction exclusively in contract pursuant to the express terms and provisions of this Agreement; and the Parties expressly disclaim that they are owed any duties or are entitled to any remedies not expressly set forth in this Agreement.

*Id.*

The first provision of the APA's integration clause is "clear and specific" and preempts a negligent misrepresentation claim under Colorado law.  *Keller v. A.O. Smith*

80

*Harvestore Prods., Inc.*, 819 P.2d 69, 72, 74 (Colo. 1991) ("A contract provision purporting to prohibit a party to the contract from asserting a claim of negligent misrepresentation must be couched in clear and specific language.") (citations omitted); *see also Student Mktg. Grp., Inc. v. Coll. P'Ship, Inc.*, 247 F. App'x 90, 99 (10th Cir. 2007*); Steak n Shake Enters., Inc. v. Globex Co., LLC*, 110 F. Supp. 3d 1057, 1082 (D. Colo. 2015). The integration clause here is nearly identical to the integration clause in *Student Marketing Group*, which the Tenth Circuit found sufficient to preempt a negligent misrepresentation claim as a matter of law. 247 F. App'x at 98-99.

The Colorado Supreme Court's decision in *Van Rees* did not overrule its prior holding in *Keller* that a "clear and specific" integration clause bars a party from asserting a negligent misrepresentation claim. *Keller*, 819 P.2d at 72, 74; *Van Rees v. Unleaded Software, Inc.*, 373 P.3d 603 (Colo. 2016). *Van Rees* does not involve an integration clause, let alone hold that an integration clause can never bar a negligent misrepresentation claim under Colorado law. 373 P.3d at 607. *Van Rees* merely described the holding in *Keller*. There the specific integration clause at issue did not preclude a negligent misrepresentation claim based upon the facts of that case. The decision did not reverse *Keller's* broader holding that integration clauses with "clear and specific" language, like the one here, can preclude negligent misrepresentation claims. *Keller*, 819 P.2d at 74; *Van Rees*, 373 P.3d at 607.

The second provision of the APA's integration clause – excluding non-contractual duties and remedies – also bars Allonhill's negligent misrepresentation claim. *See Brooks*

*v. Timberline Tours, Inc.*, 127 F.3d 1273, 1276 (10th Cir. 2007) ("A negligent misrepresentation claim can still be barred by an exculpatory agreement prohibiting such tort claims.") (applying Colorado law); *see also Student Mktg. Grp.*, 247 F. App'x at 99. The second provision of the APA's integration clause expressly restricts the parties' "rights, liabilities and obligations" to those in contract pursuant to the APA, and disclaims any duties or remedies not set forth in the APA. JX135 §10.5. In other words, the parties specifically contracted away tort liability, including negligent misrepresentation claims. *See Keller*, 819 P.2d at 73.

### D.   The APA's Indemnity Provision Also Bars Allonhill's Tort Claim.

The APA's indemnity provision, both independently and together with the integration clause, also bars Allonhill's negligent misrepresentation claim. JX135 Article VII. The indemnity provision is the "sole and exclusive remedy" for breach of any representation "relating to the subject matter" of the APA. *Id.* § 7.5. Except for claims based on intentional fraud, Allonhill has no other remedy and has waived all other causes of action for "any breach of any representation . . . set forth herein [the APA] (or otherwise relating to the subject matter of [the APA])." *Id.* (emphasis added).

When the Court ruled on the Motion to Dismiss, the Court stated that it was "leaning in the direction of Stewart's arguments about the integration clause protecting Stewart," but that "questions remain" about the effect of *Van Rees*, including "whether the integration and indemnity clauses argument survives." D.I. 36 at ¶ 3. "While the

Court is generally sensitive to Stewart's defense, the facts behind the integration and indemnity clauses will need to be established." *Id.*

No facts were adduced at trial to change the Court's inclination that the APA bars Allonhill's tort claim. *Van Rees* does not upend Colorado law on the effect of integration clauses with "clear and specific language" like the one here. Allonhill cites *Colorado Coffee Bean, LLC v. Peaberry Coffee Inc.,* 251 P.3d 9, 19 (Colo. App. 2010), as a Colorado case in which contractual language was not specific enough to bar a tort claim. Allonhill Pre-Trial Brief 28-29. However, that decision concerned whether a disclaimer of reliance on "affirmative representations outside of the transactional documents" barred tort claims based on a "failure to disclose material information." The court held that the disclaimer of claims based on affirmative misrepresentations did not bar a tort claim based on an omission. *Id.* If anything, the decision supports SLS because the inference from the court's holding is that had the tort claim concerned affirmative misrepresentations, as is the case here, the contractual disclaimers would have barred that claim. If Allonhill seeks to recharacterize its claim as one for intentional misrepresentation, the integration clause in Section 10.5 bars intentional claims as well as negligent claims.

### E.    Promises Cannot Give Rise to a Negligent Misrepresentation Claim.

A negligent misrepresentation claim cannot be based on a promise to do something in the future. It must be based on a misrepresentation of a "material past or present fact." *Lariviere, Grubman & Payne, LLP v. Phillips*, No. 17-1723, 2011 WL 650001, at *17 (D. Colo. Feb. 11, 2011) (citing *Bedard v. Martin*, 100 P.3d 584, 592 (Colo. Ct. App. 2004)). As the court stated in *Alpine Bank v. Hubbell, 555 F. 3d 1097, 1107 (10th Cir. 2009)*:

. . . a promise cannot serve as the predicate for a negligent-misrepresentation claim. This is not some obscure technical rule. It is a natural consequence of the meanings of the terms *negligent* and *misrepresentation*. A misrepresentation conveys "false information"; that is, it must be a false statement of fact. But a promise in itself contains no assertion of fact other than the implied representation that the speaker intends to perform the promise. . . . The misrepresentation must therefore be that the promisor is falsely declaring that he has the intent to perform. If the promisor intends not to perform, however, the misrepresentation (that the promisor intends to perform) is not negligent; it is, rather, knowing and intentional.

*Id.* (citations omitted) (emphasis in original).

In ruling on SLS's Motion to Dismiss, the Court raised the issue of the effect of the Colorado Supreme Court's decision in *Van Rees* and "whether the economic loss rule is relevant." D.I. 36 at ¶ 3; *Van Rees*, 373 P.3d 603. The economic loss rule is addressed below. *Van Rees*, however, did not upend the logical rule that promises cannot form the basis of a negligent misrepresentation claim. *Van Rees* dealt with a statement that was untrue when made, that the counterparty made promises "knowing that it did not have the capability" to perform them. 373 P.3d at 607-608. That is intentional fraud, not negligent misrepresentation. Colorado law is that alleged "promises" cannot form the basis of a negligent misrepresentation claim, and to the extent that Allonhill's negligent misrepresentation claim is based upon an allegedly false promise, it must fail.

### F.    The Economic Loss Rule Bars Allonhill from Asserting Fraud Claims Based Upon Promises Memorialized in Contract.

The economic loss rule further restricts Allonhill's negligent misrepresentation claim. The economic loss rule states that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a

breach absent an independent duty of care under tort law." *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000). As in *Town of Alma*, the economic loss rule often arises in the context of post-contractual conduct. *Id.* (barring negligence claim against construction company who built and maintained water system that started to leak because the parties' contract provided the duty of care to perform the work).

In *Van Rees*, the Colorado Supreme Court found that a party had an independent duty under tort law not to induce another party into a contract by making misstatements about its capabilities to perform under the agreement. 373 P.3d at 607. In that specific situation, where the party made fraudulent (not negligent)[10] statements about its ability to perform, the court found that the inducement claims survived the economic loss rule. *Id.* At least one case subsequent to *Van Rees* has clarified, however, that the economic loss post-Van Rees still operates to bar fraudulent inducement claims based upon fraudulent promises (i.e. promises that the party has no intention to keep) if the alleged false promises impose "parallel obligations" to those imposed by the ensuing contract. *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1171 (D. Colo. 2018). As the RE/MAX court stated:

> [T]o the extent that [alleged misrepresentations] are memorialized in the Agreement or Amendment, the parties allocated risk with respect to those obligations by contract, and tort claims based on those obligations are barred by the economic loss rule.

*Id.* at 1170. Accordingly, to the extent that Allonhill tries to recast its negligent

---

[10] While the plaintiff in *Van Rees* asserted fraudulent and negligent tort theories, the Colorado Supreme Court did not distinguish between the different tort theories which is what the court of appeals had done. *Id.* at 606 n.4.

misrepresentation claims based upon pre-contractual promises as claims for actual fraud, those claims are barred to the extent they are based upon promises that were subsequently incorporated into the parties' contracts.

G.    **There Is No Evidence of Any Negligent or Intentional Misrepresentation**.

As established at trial, Allonhill's negligent misrepresentation claim is based on a finite number of alleged misrepresentations. Each of those alleged misstatements cannot serve as a basis for a negligent misrepresentation claim. They were at best (or worst) promises. Even if Allonhill seeks to recharacterize its pleading to assert a claim for intentionally fraudulent misrepresentation, that claim would also fail because the alleged misrepresentations were not false, and/or are barred by the economic loss doctrine.

Most of the alleged misrepresentations concern how SLS would run the Business post-Sale. However, the APA memorializes the parties' agreement regarding how the Business was to be run post-Sale. Section 2.2(e) of the APA requires SLS to use "commercially reasonable efforts" to operate the Business in a "manner consistent in all material respects with Seller's ordinary course operation" of the business pre-Sale – the very same contractual provision at the core of Allonhill's breach of contract claim. JX135 § 2.2(e). The economic loss doctrine squarely precludes such statements as a basis for fraudulent inducement claims. For this reason, and those identified below in connection with each alleged misrepresentation, Allonhill's misrepresentation claim fails as either fraudulent or negligent.

At trial, Ms. Allon identified the following alleged "promises" made to her by Mr. Nadeau in early August 2013 that "reassured" her about the pending transaction:

> He made a series of promises . . . He promised that I would remain in a central role running the business, that nothing would change, that he would retain my key employees, our key employees. He promised to make this Costa Rican MBA outsourcing staff available to me. He again committed to helping smooth things over with Cheryl Glory and getting us back into good graces with Bank of America. And he repeated that nothing was going to change.

Day 1 Tr. at 106:1-107:12 (S. Allon). Ms. Allon also testified that SLS did not pay retention bonuses in the way she thought they were going to be paid. *Id.* at 116:13-17 (S. Allon). Each alleged misrepresentation is addressed below.

### 1. The alleged promise that Ms. Allon would "remain in a central role running the business."

As an explicit promise, Allonhill's negligent misrepresentation claim based on this alleged statement fails. A promise cannot serve as the basis of a negligent misrepresentation claim. This alleged promise fails for the independent reason that it is directly contradicted by Ms. Allon's own testimony at trial. First, Ms. Allon testified that Mr. Nadeau promised her that she would remain in a "central role running the business." Day 1 Tr. at 106:4-12 (S. Allon) (emphasis added). Later, Ms. Allon testified that she discussed with Mr. Nadeau that her role "would be less focused on operations and it would be more client faced." *Id.* at 253:5-15 (S. Allon) (Q: "You weren't going to be in the day-to-day operation of business, right?" A: "Yes.") (emphasis added); *Id.* at 272:14-22 (S. Allon); JX86. In fact, Ms. Allon testified that she had already moved away from running the business at Allonhill, and she wanted to assume the same non-operational

role post-closing.  Day 1 Tr. at 253:10-254:15 (S. Allon).  Based on this contradictory testimony, Ms. Allon's testimony that she relied on an alleged promise that she would have a central role running the business is not credible and cannot serve as a basis for a negligent misrepresentation claim (or a fraudulent representation claim).

## 2.    The alleged promise that SLS would "retain" Allonhill's "key employees."

Again, as an explicit promise, this statement cannot serve as a basis of a negligent misrepresentation claim.  It fails for the independent reason that it is not false – SLS did retain "key employees" post-transaction.  The legacy Allonhill team continued to run the Business.  All of Allonhill's operations, technology, and sales employees were offered employment at SLS.  Day 3 Tr. at 329:2-10 (Pyle); Day 2 Tr. at 558:10-559:18, 560:14-561:4 (Gallery).  Only certain redundant back office employees did not receive employment offers.  Day 3 Tr. at 329:11-330:9 (Pyle).  There is no evidence that Allonhill considered those employees "key."   In fact, SLS discussed those redundancies with Ms. Allon pre-Sale.  *Id.*; see also JX86).  There is no evidence to the contrary.

SLS's efforts to retain key employees is also evidenced by the fact that one year after the APA was executed, many of Allonhill's key employees were still employed in leadership positions at SLS.  JX225; Day 3 Tr. at 337:23-345:15 (Pyle).  The only evidence at trial of legacy Allonhill employees departing during the first year post-transaction before retention bonuses were paid concerned the departures of Ms. Allon, Mr. Kaplan, and Mr. McNulla.   As set forth above, Mr. McNulla left within weeks of the Sale for reasons unrelated to SLS, and Mr. Kaplan and Ms. Allon were terminated by SLS for

business reasons.  These three departures do not prove that any promise by Mr. Nadeau to retain key employees was false when made.

### 3.    The alleged statements regarding Costa Rica.

There are two alleged statements regarding Costa Rica that Allonhill could potentially assert to give rise to a misrepresentation claim.  There is the alleged promise that SLS would use Costa Rica in support of the legacy Allonhill business.  Also, Allonhill claims that SLS misrepresented the level of education of the Costa Rica workforce.

As to the first, a promise to use Costa Rica in the future in support of the legacy Allonhill business cannot serve as a basis of a negligent misrepresentation claim.  As an intentional fraud claim, there is no evidence that the statement was false.  The evidence shows that SLS sought opportunities to perform work in Costa Rica and ultimately moved certain tasks there in 2015 after trial runs in Houston.  There is no evidence that Ms. Allon was promised that work could be transitioned to Costa Rica immediately, and Mr. Nadeau's testimony that Costa Rica was not set up to perform legacy Allonhill work within the first few months post-Sale is wholly consistent with this deliberate process of transitioning work to Costa Rica.  Day 3 Tr. at 266:6-14 (Nadeau) (discussing JX183), 354:3-7 (Pyle).

To the extent there is any dispute as to what Ms. Allon was told about the "skills" of the Costa Rican workers, that dispute only concerns what level of advanced degrees they possessed.  Day 1 Tr. at 96:23-97:3 (S. Allon), 374:18-22 (H. Allon); Day 3 Tr. at 70:3-21 (Nadeau).  Mr. Nadeau and Ms. Pyle testified that the employees in Costa Rica were

at least college educated. Day 3 Tr. at 70:3-21 (Nadeau), 385:3-23, 394:4-15 (Pyle).  Mr. Allon testified that he was told the Costa Rica employees were "college educated."  Day 1 Tr. at 374:18-22 (H. Allon).  Only Ms. Allon heard that they had MBAs.  In the end, whether the Costa Rican workforce had MBAs, other post-graduate degrees, or only college degrees, is immaterial.  Ms. Allon did not anticipate using Costa Rican employees in management functions – she hoped the Business could use the Costa Rica workforce for "lower-level tasks" that did not require MBAs, let alone college degrees.  *Id.* at 256:2-24 (S. Allon).  Accordingly, any claim that Ms. Allon detrimentally relied upon the statement that Costa Rican employees had MBAs is not credible.

### 4. The alleged promise to help "smooth things over with Cheryl Glory and getting us back into good graces with Bank of America."

The statement cannot serve as a basis of a negligent misrepresentation claim.  Plus, the evidence shows that the statement was true.  SLS made good faith efforts to smooth things over after the Sale.  In fact, Ms. Allon testified that SLS did reach out to Bank of America post-Sale in an effort to obtain business for the legacy Allonhill business.  Day 1 Tr. at 257:1-23 (S. Allon).  Mr. Gillen testified that these efforts continued even after SLS was initially rebuffed due to Bank of America's unwillingness to work with Ms. Allon.  Gillen Decl. ¶ 39.

### 5. The alleged promise that "nothing was going to change."

Fraudulent misrepresentation claims based on this statement are barred by the economic loss doctrine – SLS's duty to run the business was memorialized in APA Section

90

2.2(e) – which is at the center of Allonhill's breach of contract claim – and no independent tort duty can exist based on this vague alleged misrepresentation.

Ms. Allon's testimony that she relied on a promise by Mr. Nadeau "that nothing would change" is implausible. Day 1 Tr. at 105:21-106:12 (S. Allon). At trial, Ms. Allon conceded that she knew that "not everything" would stay the same. *Id.* at 257:24-259:3 (S. Allon). She understood the changes that would come by Allonhill's transition from what she characterized as "a small start-up business" to a "division of a large public company." *Id.* "There would be more levels of management," "there would be more layers of red tape," Ms. Allon admitted. *Id.* In an email to Mr. Abbe in July 2013, the month before the dinner with Mr. Nadeau, Ms. Allon also acknowledged that "we can expect to see all of finance and HR wiped out" as a result of the combination, and that "they [i.e., SLS] tend to find places in the organization for good people, but they will probably not keep them all." JX86 at JMP-Allonhill0013989. Ms. Allon could therefore not have justifiably relied on a statement that nothing was going to change.

### 6. The alleged agreement to pay retention bonuses.

As set forth above, there were no misrepresentations about payment of bonuses to employees. To summarize:

- Mr. Kaplan and Mr. Nadeau agreed to a list of retention bonuses prior to the Sale and the evidence is that these bonuses were paid. JX311.

- By indicating that only two of those bonuses would be paid up-front, that list supports Mr. Nadeau's testimony that it was agreed that all of the other bonuses would be paid after one year.

- There was a "meeting of the minds" that SLS would pay nothing on the 83(b) plan.

- Post-Sale, the Allons agreed to pay $75,000 with respect to the 409(a) profit sharing plan. In fact, Ms. Allon wrote at the time that such payments did not "concern" SLS, defeating any claim that Allonhill relied on SLS's alleged promise to pay these amounts in going forward with the deal.

## H.    There Is No Evidence that Allonhill Justifiably Relied on the Alleged Misrepresentations.

Justifiable or reasonable reliance is an element of both negligent and intentional misrepresentation claims. Assuming, arguendo, that Allonhill had met its burden of establishing that SLS made a negligent or false statement that gives rise to a tort claim under Colorado law, Allonhill failed to prove that that it justifiably relied on any such statement in going forward with the transaction.

While Ms. Allon testified that she felt "reassured" by the dinner meetings at which the alleged misrepresentations were made, there is no evidence that she would not have gone through with the transaction absent those statements. Day 1 Tr. at 107:10 (S. Allon). To the contrary, the evidence establishes Allonhill was in poor financial condition and "needed to do something." DX7. The Allons thought that the deal was a "great financial deal" and were relieved when it closed. See JX146 at JMP-Allonhill0020008 (Ms. Allon wrote: "Tonight will be the first good night's sleep in 18 months . . . ."). Any suggestion that they would not have closed this deal absent any statements made by Mr. Nadeau at dinner is simply not credible.

## I.    There Is No Evidence of Negligent Misrepresentation Damages.

Under Colorado law, negligent misrepresentation damages are limited to "those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause, including (a) the difference between the value of what

he has received in the transaction and its purchase price or other value given for it; and (b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation." Restatement (Second) of Torts § 552B; *see also Whatley v. Crawford & Co.*, 15 F. App'x 625, 630 (10th Cir. 2001) ("In Colorado, damages recoverable under a claim of negligent misrepresentation include 'out-of-pocket expenses' and 'consequential damages,' but not benefit-of-the-bargain damages."); *Rosales v. AT & T Info. Sys., Inc.*, 702 F. Supp. 1489, 1501 (D. Colo. 1988) (concluding the plaintiff's "recovery for negligent misrepresentation must be limited to his out-of-pocket loss").

Allonhill has not presented any evidence of consequential damages to Allonhill. Accordingly, Allonhill's alleged damages are therefore limited to the difference between the value of the assets conveyed by Allonhill and the value it received. To demonstrate this difference in value, Allonhill offered the testimony of Mr. Fliegler, who calculated Allonhill's negligent misrepresentation damages as the difference between his $42 million enterprise valuation of Allonhill and the $15 million in up-front cash consideration received by Allonhill on the Sale Date, resulting in damages of $27 million. Day 4 Tr. at 9:5-12 (Fliegler). Both sides of Mr. Fliegler's calculation are wrong. First, as Mr. Fliegler admitted at trial, his value of Allonhill as a stand-alone entity is not the same as the value of the assets actually transferred by Allonhill to SLS, and he did nothing to value only the specific assets and liabilities that were transferred. *Id.* at 67:19-69:21 (Fliegler). Mr. Fliegler agreed that, based on his testimony, the Court cannot compare the value of the specific assets and liabilities that were transferred to SLS against the value of

the consideration received. *Id.* Under Colorado law, Mr. Fliegler's testimony is insufficient to prove damages.

Allonhill's negligent misrepresentation damages suffer from further deficiencies. Even if Allonhill's alleged negligent misrepresentation damages could be based on the value of the Allonhill business as a whole, Mr. Fliegler's $42 million enterprise valuation is inherently flawed and unreliable for the reasons discussed above and further addressed below.

First, the best evidence of Allonhill's value is the price that Allonhill and SLS negotiated after an extensive marketing process and negotiations. As this Court has previously written, a market test – reflecting the actual price a willing buyer agrees to pay – is the best determination of fair market value: "The sales process overseen by the Court was a thorough and arm's length market test, which represents the best evidence of [debtor's] fair market value at the time of the § 363 sale." *In re Champion Enters.*, No. 09-14019, 2012 WL 3778872, at *26 (Bankr. D. Del. Aug. 30, 2012); *see also Iridium IP LLC v. Motorola, Inc.* (*In re Iridium Operating LLC*), 373 B.R. 283, 293 (Bankr. S.D.N.Y. 2007) ("[T]he public trading market constitutes an impartial gauge of investor confidence and remains the best and most unbiased measure of fair market value, and when available to the Court, is the preferred standard of valuation.") (citing *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624 (3d Cir. 2007)). The evidence is that Mr. Abbe ran a thorough sales process and that the APA was the product of arm's length negotiations between sophisticated parties. The market has spoken.

Mr. Fliegler's valuation ignores this best evidence, and his after the fact valuation cannot be substituted for the parties' actual agreement on value, particularly where that agreement contains an Earnout component that would have paid additional consideration to the Allons if the revenue and profits of the Business grew in the future. The Earnout makes the consideration even more reasonable. One way to value a business is by discounting future cash flows – in fact, this is the methodology used by Mr. Fliegler. If parties to a sale transaction disagree on the ability of the business to generate cash post-sale, one way to bridge that disagreement is with an Earnout. The Earnout provides a mechanism to adjust the total consideration so that it more closely reflects the true value of the company being sold, as indicated by its future performance.

SLS's agreement to pay the Earnout in the APA has value. It is enforceable by Allonhill (in fact, Allonhill seeks to enforce it here through its breach of contract claim). No credible evidence suggests that the consideration received for the Business was less than fair market value. The consideration was inherently reasonable because it would "self-adjust" based upon the future performance of the Business.

Second, as discussed above, Mr. Fliegler's valuation is inconsistent with contemporaneous evidence of market value, including the Shareholder Insite valuation of Allonhill as of June 30, 2012 of $11.96 million (JX21); Mr. Allon's valuation of Allonhill for tax purposes of $17.7 million in late 2011 (JX300); and the $23 million value of Adfitech – a comparable company with two times the revenue of Allonhill.

Third, Mr. Fliegler's discounted cash flow analysis which he used to calculate his $42 million valuation is deeply flawed. The Court cannot rely upon it. Adjustments for just certain of the errors in his methodology indicate a value of less than the $15 million Allonhill received in up-front cash consideration, well below the $28.2 million of total consideration (as valued by Mr. Fliegler).

### III.    ALLONHILL CANNOT PREVAIL ON ITS BREACH OF CONTRACT CLAIM (COUNT XI).

To recover for breach of contract under Colorado law, Allonhill must prove "(1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff." *DTC Energy Grp., Inc. v. Hirschfeld*, No. 17-cv-01718, 2018 WL 305733, at *3 n.2 (D. Colo. Jan. 4, 2018) (citation omitted). Allonhill does not prevail on its breach of contract claim. SLS fully performed under the APA, and, in any event, Allonhill did not establish damages. Allonhill also asserts a breach of the implied covenant of good faith and fair dealing. Such a claim is only actionable where a contract lacks specific language governing an issue and a term can be applied that does not contradict other terms in the contract. *Fortis Advisors LLC v. Dialog Semiconductor PLC*, No. 9522, 2015 WL 401371, at *3 (Del. Ch. Jan. 30, 2015); *see also Bayou Land Co. v. Talley*, 924 P.2d 136, 154 (Colo. 1996). Here, there are no gaps in the APA that would permit such a claim.

A. **SLS Did Not Breach the APA.**

1. **SLS Did Not Breach Section 2.2(e) of the APA.**

Allonhill's breach of contract claim is primarily based upon Section 2.2(e) of the

APA:

> During the period after the Closing and ending on completion of the
> Lookback Period, [SLS] shall use commercially reasonable efforts to operate
> the [Allonhill business] and use the [Allonhill assets purchased by Stewart]
> in a manner consistent in all material respects with Seller's ordinary course
> operation of the [business] and the use of the [assets] prior to the Closing.
> Without in any way limiting the foregoing, [SLS] shall not, directly or
> indirectly, take or permit to be taken any actions in bad faith that could
> reasonably be expected to cause the avoidance of payment of, or reduction
> in the amount of, the Earn-Out Amount or Lookback Adjustment.

JX135 § 2.2(e).  Section 2.2(e) imposes two overlapping obligations on SLS – the

obligation to use "commercially reasonable" efforts to operate the Business "consistent

in all material respects" with Allonhill's pre-APA operation of the Business, and the

obligation to not take any actions in "bad faith" that would avoid or limit a potential

Earnout payment.  *Id.*  Allonhill has not met its burden of proving a breach of either

obligation.  The evidence at trial established that SLS operated the Business in good faith

and where it was commercially reasonable to do so, in a manner consistent in all material

respects with the way Allonhill operated the business pre-Sale.

At the time of the Sale, the Business became a stand-alone division of SLS.  Day 3

Tr. at 327:6-11 (Pyle).  All of the sales and operations staff from Allonhill were offered

positions with SLS, and day-to-day operations and sales continued to be run by the legacy

Allonhill team.  *Id.* at 329:2-10, 338:22-339:1 (Pyle).  As Ms. Pyle's testimony showed, a

year after the Sale the leadership team connected with legacy Allonhill business lines was

97

still heavily concentrated with legacy Allonhill employees.  *Id.* at 338:22-345:15 (Pyle); JX225.  While the Business ultimately reported up to the SLS executive team, including Mr. Nadeau and Ms. Pyle, day-to-day operations remained with the same individuals in the same offices in Denver.  Day 3 Tr. at 327:6-329:6, 331:19-23 (Pyle).  Over the subsequent three years, there were changes to the Business, including in response to the private label securitization market that failed to rebound.  Those changes were largely consistent with or identical to the changes Allonhill had made in the pre-Sale period.  In the end, there is no evidence that SLS's operation of the Business amounted to a failure by SLS to use commercially reasonable efforts to operate the Business consistent in all material respects with Allonhill's ordinary course operation of the Business.

### 2.      SLS's termination of Ms. Allon did not violate 2.2(e).

When SLS fired Ms. Allon it did not breach Section 2.2(e).  Significant issues with Ms. Allon's reputation in the industry and among clients became apparent in the four months after the APA closed.  Significant internal issues with Ms. Allon's management style also became apparent.  Prior to the Sale, Allonhill terminated its CEO, Diana Meade, when it became apparent that she was doing harm to the business.  The termination of Ms. Allon was no different.

To the extent that Allonhill claims breach of contract based on the role Ms. Allon played post-Sale before she was terminated, such claims have no basis.  Prior to the Sale, Ms. Allon had moved away from running the Allonhill business.  Day 1 Tr. at 253:10-254:16 (S. Allon).  Post-Sale, she wanted to assume the same non-operational role, which she discussed and agreed to with Mr. Nadeau.  *Id.* at 272:14-22 (S. Allon); JX86.  There is

98

also no credible evidence that the conditions of Ms. Allon's employment breached Section 2.2(e). While Ms. Allon testified that she was isolated and not allowed to travel, that testimony is not credible given her contradicting testimony that she, among other things, traveled to New York to meet with clients, and had discussions with Mr. Margolf and others. Day 1 Tr. at 280:23-281:10 (S. Allon); Day 2 Tr. at 467:21-468:7 (Margolf).

Allonhill cites *Amato v. Mesa Labs., Inc.*, No. 14-cv-03228, 2015 WL 5321446, at *5 (D. Colo. Sept. 14, 2015), for the proposition that terminating an executive can establish a breach of a "commercially reasonable efforts" agreement in connection with an earnout. That decision does not support a different result here. *Amato* was decided on a motion to dismiss, not a factual record. 2015 WL 5321446, at *5. Accordingly, the court did not have to consider facts, like those present here, that the key executive was doing harm to the business. Further, the terminated employee in *Amato* was alleged to be the singular employee with specialized knowledge necessary to make the acquired business succeed. There is no evidence that Ms. Allon played a similarly unique role. To the contrary, Ms. Allon had taken on a non-operational role at Allonhill, and her reputation in the industry and among clients turned out to be harming the Business.

### 3.    The Departures of "key employees" did not violate 2.2(e).

Allonhill alleges that SLS fired, failed to retain or created the circumstances that led to the departure of many key Allonhill employees. The evidence does not support this claim. To the contrary, one year after the APA was executed, many of Allonhill's key employees were still employed in leadership positions at SLS. JX225; Day 3 Tr. at 338:22-

99

345:15 (Pyle).  The only significant departures during the first year were Mr. McNulla (who left within weeks of the Sale for reasons that had nothing to do with SLS), Mr. Kaplan and Ms. Allon (who were each terminated for business reasons).

While it is true that some Allonhill employees voluntarily left after receiving their retention bonuses (Mr. Margolf, Mr. Gallery, Lorie Helms), these voluntary departures do not support a claim of breach.  Allonhill cannot reasonably assert that the APA created an absolute obligation for SLS to retain all of Allonhill's employees to eternity.  Employee departures are a normal part of any business, and the testimony shows that employee retention was a specific issue with the Business.  Day 2 Tr. at 587:24-588:5 (Gallery).  As Ms. Allon testified, in the year prior to the Sale, Allonhill lost a "significant" number of employees to its competitor, AMC.  Day 1 at 183:20-184:14 (S. Allon).  The fact that SLS lost certain employees to competitors is therefore not materially different than Allonhill's pre-APA experience, and does not establish a breach of Section 2.2(e).  The evidence shows that SLS made good faith efforts to retain key employees, including through the payment of retention bonuses and the promotion of legacy Allonhill employees such as Mr. Gallery (Day 3 Tr. at 338:10-21 (Pyle)), Mr. Spohn (*id.* at 347:10-18 (Pyle)), and Ms. Kronmueller (*id.* at 346:21-347:9 (Pyle)).  See also Day 3 Tr. at 83:15-18 (Nadeau) (testifying that every employee on the final retention bonus list who was eligible for a bonus received one).

David Schiffmayer is the only other "key employee" who Allonhill identified as a "key" departure who was the subject of trial testimony.  There is no evidence of when or

why Mr. Schiffmayer left SLS, but Mr. Margolf testified that it "might be logical" that he would leave when the Massive engagement was winding up, which was the Fannie Mae engagement for which he was specifically hired.  Day 2 at 464:12-466:19 (Margolf).

### 4.    SLS's staffing decisions did not violate 2.2(e).

SLS's approach to using temporary staffing was not materially different than the way Allonhill had used temporary staff.  SLS sought to use the same employees Allonhill preferred, but within the formal structure of a staffing agency that mitigated the legal exposure of only using a third-party as a payroll provider, as Allonhill had.  These efforts were more than commercially reasonable, and there is no evidence to the contrary.

Nor is there any credible evidence that the changes to the way temporary staff were retained had a material impact on the Business.  As noted above, while Mr. Gallery testified to alleged problems with SLS's use of temporary staff, his testimony is not credible.  Gallery Decl. ¶¶ 62-66.  For example, Mr. Gallery testified that the change in staffing resulted in not being able to staff even small deals "on a quick turnaround" – specifically identifying a 59 loan deal that the Business could not find adequate staff to perform.  *Id.* at ¶ 63.  When confronted with a contemporaneous email, JX160, Mr. Gallery conceded that the 59 deal was turned down three weeks after the Sale, and that turning the deal down had nothing to do with any staffing changes SLS had made to the Business.  Day 2 Tr. at 588:18-594:11 (Gallery).

Mr. Gallery also testified that a material change to the Business was SLS's alleged elimination of "all of the Business's regulatory compliance resources," which resulted in

the Business not being able to bid on projects that required compliance review.  Gallery

Decl. ¶¶ 67-68.  Again, Mr. Gallery's testimony is not credible.  In April 2013, just prior

to the Sale, Mr. Gallery wrote that an "alarming issue" was that Allonhill had "zero

compliance resources," which was "shocking" to him because it meant they would have

to rebuild an entire compliance team if a deal came in.  JX56; Day 2 Tr. at 594:12-596:1

(Gallery).  Any issues post-Sale with compliance staffing were therefore not materially

different than Allonhill's "shocking" lack of compliance resources pre-Sale, and cannot

give rise to a breach of Section 2.2(e).

### 5.    SLS's tightening of Allonhill's pricing did not violate 2.2(e).

SLS's adjustments to Allonhill's pricing model did not breach Section 2.2(e)

because changing pricing models to improve margins was consistent with how Allonhill

operated the business pre-Sale.  For example, in June 2013, just prior to the Sale, Allonhill

was having difficulty delivering projects at the margins it priced, leading to a change in

the pricing model and a tightening of operational metrics.  Day 1 Tr. at 267:22-268:12 (S.

Allon) (discussing JX304).  The fact that Allonhill changed its pricing models is reflected

in an email a month later, in July 2013, when Ms. Allon wrote that Allonhill hadn't been

pricing deals "this way for long."  JX86; Day 1 Tr. at 272:23-273:9 (S. Allon).

Continuing to price deals as Allonhill had would not have been commercially

reasonable.  Post-Sale, SLS learned that Allonhill's pricing model was not "fully loaded"

– it failed to take into account all expenses of the business, instead factoring in only direct

costs associated with the time spent on a particular transaction.  Day 3 Tr. at 96:12-97:12

(Nadeau); see also Gillen Decl. ¶ 55.  Allonhill's pricing did not include overhead costs

such as rent or electricity, and only included the hourly rate of the workers needed to do the review.   Day 3 Tr. at 334:19-335:23 (Pyle).   SLS worked with legacy Allonhill employees to adjust the pricing model so that it accounted for the costs of the Business, as any sustainable pricing model must.   *Id.* at 336:2-12 (Pyle).   Adjustments were necessary to ensure that projects would produce revenue necessary to cover the costs of doing those projects, a reasonable and necessary goal for any business. *Id.* at 97:13-18 (Nadeau).

### 6.   SLS's efforts to run a sustainable business did not violate 2.2(e).

Allonhill argues that cuts made by SLS to the Business, and the exit from the securitization markets post-Sale, constituted a breach of Section 2.2(e).   However, the evidence shows that SLS's actions were at least consistent with, and in many cases less drastic than, efforts that Allonhill made pre-Sale to run a sustainable business.   Allonhill's efforts included, in the wake of the OCC termination in 2012, withdrawing from securitization and transactional work and laying off two-thirds of its workforce.   Ms. Allon summarized these efforts well at the end of 2012 when she wrote that the business had to "trim staff, to save money, and focus the cuts on projects that with lower or negative margins that were a drain on the company's profitability."   Day 1 Tr. at 179:15-180:1 (S. Allon).

Post-Sale, SLS reduced staff not being utilized.   Day 3 Tr. at 149:14-17 (Nadeau), 350:23-352:4 (Pyle). These staffing decisions were consistent with Allonhill's "staff-up staff-down" staffing model.   Day 1 Tr. at 259:21-260:18 (S. Allon) (testifying that layoffs

103

were not "uncommon" at Allonhill); id. at 299:6-14 (H. Allon).  SLS's approach to layoffs predominantly affected "operational-line-level-type individuals," not revenue generating staff in sales or marketing.  Day 3 Tr. at 351:16-22 (Pyle); see also Day 2 Tr. at 462:14-463:9 (Margolf) (testifying that SLS's cost cutting measures did not impact revenues on existing projects and did not significantly impact sales or marketing).

As discussed above, in 2014, SLS made the same decision Allonhill made in 2012 by withdrawing from securitization work that was unprofitable largely due to low volumes and high costs.  SLS withdrew only after careful analysis, and SLS communicated to clients that it was maintaining its expertise and would be ready to reenter the market if and when volumes returned.  SLS also informed the only conduit customer at the time, Goldman Sachs, that it would continue performing services for as long as it took Goldman Sachs to find a new vendor.  Day 3 Tr. at 113:16-114:19 (Nadeau). Mr. Nadeau's email to Mr. Glaze (JX229) about a "strategic change" to the Business was a reference to this well thought out, coordinated exit from securitization work.  Far from a "smoking gun," as noted above, the email simply reflects a change to the revenue forecast for the Business.

> 7. **Other issues raised by Allonhill do not establish a breach of Section 2.2(e).**

Allonhill's other allegations concerning alleged material changes to the Business are without merit.  For example, Allonhill has sought to emphasize that SLS did not pursue work in connection with the GSE's loss share programs (STACR and Connecticut Avenue).  As discussed above, the loss share programs were new in 2013, and there is no

evidence that Allonhill performed such work prior to the Sale.  The limited work that was available on these deals was transactional in nature with short turnaround times and low volumes.  It was the type of work that Allonhill had exited at the end of 2012.  There is also no quantifiable evidence about what opportunity the loss share programs actually provided for a due diligence firm.  *Id.*

Allonhill has also argued that activist investors led to material changes to the Business, but there is no evidence of any quantifiable changes to the Business as a result of activist pressure.  As Mr. Morris testified, cost cutting in response to activist investors focused on the corporate level (corporate IT, HR, Finance, and Accounting) and not on the operating business units.  Morris Depo. Tr. at 170:13-171:13.  Allonhill points to JX240 as evidencing changes to the Business in response to activist investors, but as Mr. Nadeau made clear in the italicized portion of that email, the changes he was discussing in the first part of the email were not related to the Allonhill Business, and the cutting and reshaping of the Business were done for improvement.

### 8.    SLS Did Not Breach Section 2.2(c) of the APA.

Section 2.2(c) of the APA provides that:

For purposes of this Section 2.2 and the preparation of each Earnout Statement, the Parties shall cooperate in good faith to adjust the Earnout Hurdles, if necessary, to take into account the effect of any change in the recognition of revenues, the occurrence of acquisitions, divestitures or other Business Material Adverse Effect, that results in an adverse change to the Revenue or the Earnout Revenue Multiple for any portion of the Earnout Period; provided that no such adjustments shall be made without the mutually written agreement of the Parties.

JX135.  Key to the understanding of this obligation in the APA is the term "Business

Material Adverse Effect" ("BMAE") which is narrowly defined in the APA as:

> [A] material adverse effect on the business, assets, properties, financial
> condition or results of operations of the Business, taken as a whole;
> provided that no event, change, circumstance or effect (by itself or taken
> together with any and all other events changes, circumstances or effects)
> that results from or arises out of or is related to any of the following shall
> constitute or be deemed to contribute to a "Business Material Adverse
> Effect", or be taken into account in determining whether a "Business
> Material Adverse Effect" has occurred or may, would or could occur[.]

*Id.* § 11.1 (underline in the original, bold added).  The definition then goes on to list a

series of occurrences which do not give rise to a BMAE.

These broad exclusions – which are only a partial list – demonstrate how narrowly

the Parties drafted the obligation to renegotiate the Earnout Hurdles.  At trial, Allonhill

argued that Section 2.2(c) required good faith renegotiation of the Earnout Hurdles if it

"was not possible for any reason" for "SLS to run the Allonhill business in the same

manner that it had been run prior to the APA."  Day 1 Tr. at 8:13-17 (Opening Statement).

This is wrong on every level.  It misstates SLS's obligation under Section 2.2(e).  It ignores

Section 2.2(c)'s requirement that there be a BMAE before renegotiation even becomes a

possibility.  Finally, the argument improperly seeks to rewrite the APA to conflate

Sections 2.2(c) and 2.2(e).

To meet its burden of proof on its claim that SLS breached Section 2.2(c), Allonhill

would have to establish but did not that: there was a BMAE; the BMAE resulted in an

adverse change to Revenues or the Earnout Revenue Multiple (as defined in the APA);

following any adverse change caused by a BMAE, SLS, in bad faith, refused to renegotiate

the Earnout Hurdles; the hurdles would have been reset in any hypothetical renegotiation; the revenue of the Business would have exceeded the newly negotiated Earnout Hurdles; and the Earnout would have been a certain amount under such revised hurdles.

### i.   There Is No Evidence of Any Business Material Adverse Effect.

There was no evidence adduced at trial showing any adverse effect on the Business as the result of a BMAE.  SLS made no significant changes to the Business.  What Allonhill claims were adverse changes – exiting securitization work, employee layoffs, termination of Ms. Allon – do not constitute a BMAE as defined.  Any changes were made in response to either (i) issues negatively impacting the Business that were inherited by SLS (like the tightening of pricing metrics); or (ii) overall market factors (like exiting securitizations).  Other alleged changes were not BMAEs.  The termination and resignation of employees post-Sale was not a BMAE and the Business's failure to meet pre-Sale revenue projections was not a BMAE.

### ii.   There Is No Evidence that SLS Failed to Cooperate in Good Faith to Adjust the Earnout Hurdles.

Assuming, arguendo, that there was evidence of a BMAE, Allonhill's breach of contract claim fails because there is no evidence that SLS failed to "cooperate in good faith to adjust the Earnout Hurdles."  JX135 § 2.2(c).  This is because there was never an opportunity for renegotiation given Allonhill's bankruptcy.

**B. Allonhill Has Not Established Breach of Contract Damages**.

Allonhill's breach of contract claim fails for the independent reason that Allonhill

has not established breach of contract damages.

### 1.   Allonhill Cannot Meet Its Burden of Establishing Contract Damages for a Breach of APA Section 2.2(e).

To recover lost profits for breach of contract, Allonhill must prove with

"reasonable certainty" (i) that the defendant's breach caused the loss, and (ii) the amount

of the loss. *Denny Constr., Inc. v. City & Cnty. of Denver ex rel. Bd. of Water Comm'rs*, 199

P.3d 742, 746 (Colo. 2009); *Tull v. Gundersons, Inc.*, 709 P.2d 940, 943 (Colo. 1985); *Graphic*

*Directions, Inc. v. Bush*, 862 P.2d 1020, 1024 (Colo. App. 1993).

The proper measure of damages for an alleged breach of Section 2.2(e) is lost

profits – the projected future earnings over the three-year earnout period that the

Business would have earned but for the alleged breach.  See Day 4 Tr. at 191:5-14 (G.

Davis); *see also, e.g., Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 180 (S.D.N.Y.

2006) (observing that the goal of a lost profits analysis is to "to calculate damages that

were incurred over a period of time and are attributable to a specific event").  Mr. Fliegler

testified that Allonhill suffered $13.2 million in damages as a result of SLS's alleged

breach (Day 4 Tr. at 44:2-7 (Fliegler)).  But Mr. Fliegler's calculation is not a lost profits

analysis – it is a valuation of the Earnout as of the Sale Date based upon one of many

earnout scenarios created by SLS at the time of the Sale.  *Id.* at 44:2-20 (Flieger). He did

not consider any events that occurred after the Sale Date.  *Id.* at 45:24-46:2 (Fliegler).  As

the court in *Celebrity Cruises* observed, "[w]hile this exclusively forward-looking

108

methodology may be appropriate for valuing an enterprise at a single point in time . . . it

is inadequate to measure damages attributable to an event occurring after the point in

time when the projections are made." 434 F. Supp. 2d at 183. The court illustrated the

flaw in this methodology with an example that is squarely on point here.

> Assume that three percent was a reasonable projection of the future growth
> rate of Celebrity, RCCL, and Carnival immediately prior to the
> Legionnaires' incident. Suppose, however, that shortly after the incident, a
> cataclysmic event unrelated to the Legionnaires' incident halted all cruises
> for a prolonged period. That would be reflected in zero (or negative)
> earnings for all three companies. Yet if Celebrity's actual profits were
> compared to the profits that had been projected for RCCL and Carnival
> without considering their actual performance, one would reach the
> nonsensical conclusion that Celebrity had suffered continuing damage
> entirely due to the Legionnaires' incident, when in fact it was wholly
> attributable to an independent event.

*Id.*

Mr. Fliegler's damages conclusion wholly ignores causation. Mr. Fliegler stated

that he could not testify on causation because he does not believe it is possible to separate

out what projects were lost because of SLS's breach and what projects were lost to other

factors, including the market. Day 4 Tr. at 53:13-22 (Fliegler). Mr. Fliegler thus conceded

that he believes that it is impossible for Allonhill to meet its burden of proof to establish

causation. Allonhill has also failed to offer evidence, separate and apart from Mr. Fliegler,

to make a direct causal link between any of the alleged breaches that Allonhill asserts and

any lost revenue or damages.

To the contrary, the evidence is that there were multiple factors that had nothing

to do with SLS that resulted in lower revenue for the Business. The Business lost

significant revenue from three clients – Fannie Mae, Freddie Mac, and Flagstar – due to

factors beyond SLS's control.  Mr. Davis testified that the lost revenue from the Fannie Mae and Freddie Mac projects alone constituted 40 percent of Allonhill's prior year revenue.  Day 4 Tr. at 192:9-193:9 (G. Davis).  Mr. Davis also testified that it is not reasonable to assume that the Business could have hit the Earnout Hurdles after losing these projects.  That would have required 24 percent growth in a two-year period under unfavorable market conditions.  *Id.* at 194:24-195:16 (G. Davis).

Mr. Fliegler's attempt to calculate damages misses its mark.  The error is that he did not consider any evidence of post-Sale forces beyond SLS's control that impacted the Business's ability to hit the Earnout Hurdles.

### 2.    There Is No Evidence of Contract Damages for Any Alleged Breach of APA Section 2.2(c).

Allonhill has offered no evidence as to what the result of a hypothetical renegotiation of the Earnout Hurdles would have been.  *See, e.g., Fletcher Int'l, Ltd. v. Ion Geophysical Corp.*, No. 5109, 2013 WL 6327997, at *11 (Del. Ch. Dec. 4, 2013) (stating that the court would resolve the issue of damages for failure to obtain a contractual right to consent to the issuance of a note by determining the outcome of the transaction in a hypothetical negotiation over the consent).  Even if Allonhill could establish what the results of a hypothetical renegotiation of the Earnout Hurdles would be, it would still have to establish whether Allonhill would have received an Earnout payment under the new hurdles.  Without evidence supporting either of these last two steps, Allonhill cannot prove damages based on a claim for breach of Section 2.2(c).

**IV.   ALLONHILL CANNOT PREVAIL ON ITS CONSTRUCTIVE FRAUDULENT TRANSFER CLAIMS IN CONNECTION WITH THE SALE (COUNTS VI-VIII).**

Allonhill seeks to avoid the Sale as a constructive fraudulent transfer pursuant to the Bankruptcy Code and Colorado law.  To do so, Allonhill must show that it (1) received "less than a reasonably equivalent value in exchange for such transfer" and (2) "was insolvent on the date that such transfer was made . . . or became insolvent as a result of such transfer."  11 U.S.C. § 548(a)(1)(B); C.R.S.A. §§ 38-8-105 & 106; see also *In re Charys Holdings Co.*, 443 B.R. 628, 636 (Bankr. D. Del. 2010) ("The elements of an avoidable transfer under UFTA or UFCA, as adopted by the individual states, do not substantially vary from the elements set forth in Bankruptcy Code section 548(a)(1)(B).").  The claim fails because Allonhill cannot meet its burden of establishing that less than reasonably equivalent value was exchanged.

The Court assumes for purposes of the issue presented that Allonhill was insolvent at the time of the Sale.  Yet, Allonhill offered no expert opinion as to whether Allonhill received reasonably equivalent value for the assets that were actually transferred to SLS.  In response to SLS's motion for a directed verdict, Allonhill argued that it would be able to point to facts in the record to meet its burden on reasonably equivalent value.  Day 4 Tr. at 175:7-16.  There is no such evidence.  Mr. Fliegler's testimony cannot be used to measure whether reasonably equivalent value was exchanged.

Allonhill also seeks to avoid the Turned Over Funds as constructively fraudulent (Counts I-III).  Because those amounts were transferred to SLS pursuant to the APA, Allonhill cannot assert a separate fraudulent transfer claim with respect to the Turned

Over Funds.  The consideration that SLS provided to Allonhill in exchange for the Turned Over Funds was the consideration provided under the APA, which included the assumption of Allonhill's go forward trade debt.  Many of the Turned Over Funds represent revenue that was generated post-Sale, at a time when SLS was paying the expenses necessary to generate the revenue.  Allowing Allonhill to retain these amounts would constitute a windfall.  It is also double counting for Allonhill to seek the return of these amounts as a separate fraudulent transfer where the damages it seeks on its fraudulent transfer claim with respect to the Sale are based upon the value of the entire Allonhill business, which necessarily takes into account Allonhill's customer relationships and accounts receivable.

## V.    ALLONHILL CANNOT PREVAIL ON ITS PREFERENCE CLAIM (COUNT IV).

Allonhill also seeks to avoid as preferential payments the Turned Over Funds in the sum of $6,608,309.15 in Customer Collections remitted to SLS.  Allonhill's preference claim fails because Allonhill was solvent at all relevant times post-Sale, the time of the transfers, including in January and February 2014 when the amounts were remitted.  Allonhill's preference claim fails for the independent reason that SLS has established multiple defenses that serve as a bar to Allonhill's preference claim.

### A.    Allonhill Was Solvent at the Time of the Challenged Transfers.

Allonhill offered no expert testimony as to Allonhill's solvency at any time.  Day 4 Tr. at 157:24-158:5 (Fliegler).  The only solvency analysis offered at trial was that of Mr. G. Davis, who testified that the fair market value of Allonhill's assets exceeded the fair

market value of its liabilities, and that Allonhill was solvent during the preference period, and, for that matter, at all relevant times following the Sale. *Id.* at 224:3-230:17 (G. Davis). Allonhill does not challenge any aspect of Mr. G. Davis's solvency analysis except the value he places on the Aurora liability. Therefore, the only dispute in determining Allonhill's solvency is how the Aurora liability is measured.

For purposes of his solvency analysis, Mr. G. Davis values the Aurora liability at the amount of its final resolution – $2.05 million. Allonhill asserts that Mr. G. Davis should have valued the Aurora liability at the amount of the initial trial court judgment, which post-dated the alleged preferential transfers and was overturned on appeal. The weight of the case law supports Mr. G. Davis's methodology. Allonhill also asserts that if the final resolution amount is used to value the Aurora liability, Mr. G. Davis's solvency analysis should include the legal costs associated with pursuing the appeal of the trial court's errant decision. Allonhill's argument on legal fees is wrong.

### 1.   The Aurora Liability Should Be Valued at Its Ultimate Resolution – $2.05 million.

Mr. G. Davis testified that he valued the Aurora liability as of the dates of the alleged preferential transfers at $2.05 million, the amount of the ultimate settlement of the claim.[11]   Day 4 Tr. at 228:7-229:4 (G. Davis). Valuing the liability at its ultimate resolution amount, Allonhill was solvent by at least $3.6 million on the dates of the

---

[11] The relevant date for determining solvency on a preference claim is the date that the transfers took place. *See In re Winstar Commc'ns, Inc.*, 348 B.R. 234, 276 (Bankr. D. Del. 2005) ("The date of the transfer . . . is the relevant date for solvency."). As of the transfer dates, no judgment had been entered.

alleged preferential transfers.  *Id.*  Mr. G. Davis's valuation of the Aurora liability is proper.

It is first necessary to establish whether the Aurora liability is disputed or contingent.  A liability is disputed, and not contingent, where the facts giving rise to the liability have already occurred:

> The difference is that a contingent liability require a triggering event to occur before the debtor corporation has a legal duty to pay the creditor, whereas a disputed claim involves disagreement about the amount of the claim.  However, events spawning the claim have already occurred. . . Ongoing and contested lawsuits and judgments are examples of common disputed claims.

C. Ryan Stewart, Contingent Liabilities and Disputed Claims in the Context of a Bankruptcy Solvency Analysis, Bankruptcy Valuation and Solvency Insights 55 (Winter 2014) ("Contingent Liabilities and Disputed Claims") (D.I. 128-1, Ex. 2); *see also In re Imagine Fulfillment Servs., LLC*, 489 B.R. 136, 150 (Bankr. C.D. Cal. 2013) ("Thus, because the events giving rise to the Judgment occurred pre-petition and prior to each of the transfers at issue, the Judgment is not a contingent debt and was not contingent as of any of the relevant transfers.").

The Aurora liability was a disputed claim, not a contingent claim, during the preference period because all of the facts giving rise to the liability had already occurred. To establish the liability all that was necessary was resolution of the pending litigation. The Aurora trial was complete by the time of the alleged preferential transfers in January and February 2014.

Where a claim is disputed, like the Aurora claim, it can be valued at the amount at of its ultimately determination.  *See Imagine Fulfillment*, 489 B.R. at 150; *Antar*, 120 F. Supp. 2d at 443; *W.R. Grace*, 281 B.R. at 867; Contingent Liabilities and Disputed Claims 56.  If the litigation is on appeal at the time the solvency determination is made, it is permissible to value the claim at the existing judgment.  *Imagine Fulfillment*, 489 B.R. at 150; Contingent Liabilities and Disputed Claims 56.  However, if the litigation, including any appeal from an initial judgment, is fully resolved before the valuation is completed, valuation should be based on the amount of the final resolution.  *See Antar*, 120 F. Supp. 2d at 443; *W.R. Grace*, 281 B.R. at 867; Valuing Contingent or Disputed Assets and Liabilities in Solvency Opinions, Nat'l Assoc. of Certified Valuators and Analysts 5-6 (July 19, 2017) ("<u>Valuing Contingent or Disputed Assets and Liabilities</u>") (D.I. 128-1, Ex. 1), Technical Valuation Workshop: Valuation of Contingent and Disputed Liability, Am. Bankr. Inst. 6 (Feb. 20, 2013) (D.I. 128-1, Ex. 3).[12]  As the National Association of Certified Valuators and Analysts publication states:

> Some courts have allowed hindsight to be used when it is available to value . . later resolved disputed liabilities . . . the benefit of using hindsight in situations where the disputed liability has become fixed by the time that a transaction is challenged is accuracy. In the case of a disputed liability that existed at the time of the transaction—as compared to a contingent one— all the facts giving rise to the claim had already occurred. All that remained was the final resolution of that claim—by settlement, by arbitration, or by a judgment from a trial court. If a final resolution has occurred, one must

---

[12] *See also In re Turner & Cook, Inc.*, 507 B.R. 101, 109 (Bankr. D. Vt. 2014) ("When a liability was contingent at the time of the challenged transfers but is reduced to judgment before the court's insolvency determination, however, a court may permissibly use the judgment amount in valuing the contingent liability at the time of the transfers."); *In re Pilavis*, 233 B.R. 1 (Bankr. D. Mass. 1999) (court may use hindsight as a guide to valuation where a judgment is entered in the interim).

wonder what reason there might be to make an expert make a "prediction" about the amount of the claim. Allowing the use of hindsight relieves all parties, including the expert, from having to make a theoretical determination of fair value, thereby removing at least one variable of uncertainty in the overall insolvency analysis.

Valuing Contingent or Disputed Assets and Liabilities at pp. 5-6.

*Antar*, which concerned alleged fraudulent transfers by defendant Sam M. Antar ("Sam M."), is instructive. 120 F. Supp. 2d 431. Sam M. engaged in securities fraud in the 1980s. He was not found liable for securities fraud until 1998. *Id.* at 434, 443. Between those dates, in 1991 and 1997, Sam M. made a series of transfers that the SEC sought to avoid as constructively fraudulent. *Id.* at 435. The court held that Sam M. was insolvent at the time of the transfers based upon the amount of a judgment that was entered against him for securities fraud after the transfers were made. *Id.* at 443. As the court explained:

> It is now clear that the value of the SEC's unliquidated claim against Sam M. was, and is, approximately $15 million, exclusive of pre-judgment interest in the amount of approximately $42 million as ordered by this court. Because the SEC's claim was based on Sam M.'s securities fraud in the 1980s, Sam M. possessed this debt at the time of all the 1991 and 1997 transfers.

*Id.* (citations omitted).

In light of this authority, Mr. G. Davis properly valued the Aurora liability at $2.05 million, which renders Allonhill solvent during the preference period (and at all relevant times post-Sale). This $2.05 million was the ultimate resolution of the amount that Allonhill owed Aurora based upon conduct that occurred prior to the preference period. Therefore, Allonhill "possessed this debt" at the time of the alleged preferential transfers. *Antar*, 120 F. Supp. 2d at 443. Mr. G. Davis's conclusion was also supported by the

following facts known at the time of the measurement dates that he considered: (a) that the Aurora contract contained a $2 million liability cap, and (b) that Allonhill had recorded the potential liability on its December 31, 2013 balance sheet at $2.0 million.  Day 4 Tr. at 238:12-22 (G. Davis).

Allonhill previously argued that "when a liability was contingent at the time of the challenged transfers but is reduced to judgment before the court's insolvency determination, 'a court may permissibly use the judgment amount in valuing the contingent liability at the time of the transfers.'"  D.I. 27 at p. 18 (citations omitted).  At that time, Allonhill asserted that the "Aurora Litigation was a significant contingent liability that was known at the time of the transfers and ultimately resulted in a judgment against Allonhill of $25,845,329.00," which "more than zeroed out the value of the few assets Allonhill had at the time of the transfers, rendering it insolvent under the balance sheet test." *Id.* at p. 19.  Now that a subsequent and final determination has been reached, Allonhill cannot distance itself from the same argument that supports valuing the Aurora liability at $2.05 million.

Allonhill tried to draw a distinction between the initial trial court judgment of $26 million and the judgment on remand for $2 million by arguing that the $2 million amount cannot be used because "there was no judgment by the trial court on remand for the amount of $2 million."  D.I. 118-2, 18 n.9.  Allonhill has the facts wrong.  On November 17, 2017, the Colorado trial court issued its "Order on Remand," which concludes:

### V. Entry of Final Judgment

Under C.R.C.P. 58(a), the Court enters final judgment in favor of Aurora and against Allonhill in the amount of $2,000,000, inclusive of all costs, prejudgment interest, and postjudgment interest.

Order on Remand, *Allonhill, LLC v. Aurora Commercial Corp.*, No. 12-6381 (Colo. Tr. Ct. Nov. 17, 2017) (Bruhn Decl. Ex. 4). Allonhill's distinction is therefore without a difference. The ultimate resolution of a liability, be it through judgment or settlement, is the proper amount to use in valuing a disputed liability. Valuing Contingent or Disputed Assets and Liabilities in Solvency Opinions at 6 ("In the case of a disputed liability that existed at the time of the transaction—as compared to a contingent one—all the facts giving rise to the claim had already occurred. All that remained was the final resolution of that claim—by settlement, by arbitration, or by a judgment from a trial court.").[13]

### 2. Attorneys' Fees Should Not Be Included in Valuing a Disputed Claim.

Mr. Fliegler's attempt to rebut Mr. G. Davis's solvency testimony by adding legal costs identified by counsel does not meet Allonhill's burden of proof on solvency. *See* Day 4 Tr. at 35:18-38:23, 157:14-162:3 (Fliegler). Mr. Fliegler testified that he has no opinion on whether Allonhill was solvent on the preference dates (or whether Allonhill was solvent or rendered solvent by the Sale). *Id.* at 158:3-12 (Fliegler). The extent of Mr. Fliegler's testimony was that Mr. G. Davis should have included certain legal expenses identified by counsel and allegedly incurred in appealing the trial court's errant $26

---

[13] Allonhill has also attacked Mr. G. Davis's solvency opinion by arguing that it contradicts SLS's proof of claim. An assertion in a proof of claim, however, does not amount to a judicial admission. Instead, a proof of claim is treated like an allegation in a complaint. *See, e.g., In re Cerrato*, 504 B.R. 23, 38 (Bankr. E.D.N.Y. 2014) (citation omitted).

million judgment in favor of Aurora, and had Mr. G. Davis done so, his analysis would have shown that Allonhill was insolvent on the preference dates. *Id.* at 35:23-38:23, 157:14-162:3 (Fliegler). Mr. Fliegler's testimony neither rebuts Mr. G. Davis's opinion on Allonhill's solvency, nor offers any credible evidence sufficient to meet Allonhill's burden on solvency.

First, Mr. Fliegler offered no testimony that including legal fees was proper in valuing a disputed litigation claim. In fact, Mr. Fliegler testified that he does not know the difference between a disputed and contingent liability. *Id.* at 158:23-25 (Fliegler). Mr. Fliegler disagreed that his opinion amounted to nothing more than addition and subtraction, but failed to articulate why. *Id.* at 159:20-23 (Fliegler). Mr. Fliegler's opinion did not rebut Mr. G. Davis's opinion, based on his extensive experience as a valuation expert in distressed situations, that legal fees incurred in appealing an errant judgment are not factored into the value of disputed liability as of the measurement date:

> [T]hose legal fees were not obligations of the estate as of the measurement date. As of the measurement date there had been no judgment that was filed, there was no bankruptcy, there were no fees associated with the bankruptcy, there was no appeal, there were no goods and services that were provided to the debtor that would give rise to a claim, there was no party asserting a claim and the claim doesn't qualify as a disputed or contingent claim. So, for all of those factual and technical matters I did not include [legal fees] in my analysis.

*Id.* at 230:4-13 (G. Davis).

Second, even had Mr. Fliegler opined that legal fees were a necessary consideration in valuing a disputed liability, there is no credible evidence that the inclusion of legal fees would render Allonhill insolvent on the preference dates. The fees

Mr. Fliegler included in his analysis were provided by counsel and Mr. Fliegler did not perform any independent analysis to determine if those were appropriate expenses.  Id. at 161:4-10 (Fliegler).  With regard to the fees identified for him by counsel, he testified that: (1) he does not know if any of the fees were covered by insurance, and has no opinion on whether fees covered by insurance should be included in the analysis; (2) he does not know whether the fees were in support of affirmative claims against Aurora or in defense of Aurora's claims against Allonhill; and (3) he does not know if any of the fees were necessary to keep the automatic bankruptcy stay in place.  Id. at 160:5-162:3 (Fliegler).

### A.    Allonhill's Preference Claim Also Fails Because SLS Established Multiple Legal Defenses that Bar the Claim.

With the Aurora claim valued at $2.05 million, SLS shows that Allonhill was solvent during the preference period, which shifts the burden to Allonhill to prove insolvency.

First, the turnover of the Turned Over Funds did not constitute payment on account of an antecedent debt but, rather, the turnover of accounts and receivables that SLS purchased pursuant to the APA.  "[W]here property is held by the debtor as bailee, agent or trustee, the property does not become part of the debtor's estate and is not an 'interest of the debtor in property' subject to avoidance under section 547(b)."  *In re Appalachian Oil Co., Inc.*, No. 09-50259, 2012 WL 1205640, at *3 (Bankr. E.D. Tenn. Apr. 11, 2012) (*citing City of Springfield Mass. v. Ostrander* (*In re LAN Tamers, Inc.*), 329 F.3d 204, 210 (1st Cir. 2003) ("The plain text of § 541(d) excludes property from the estate where the

bankrupt entity is only a delivery vehicle and lacks any equitable interest in the property it delivers.")).

Pursuant to the contract, Allonhill continued to collect receivables from certain clients either because their contracts had yet to be assigned, or by mistake.  Those amounts were purchased by SLS pursuant to the APA, and SLS retained its equitable interest in those amounts at all times.  The parties agreed that this arrangement was to be "cash neutral" to Allonhill – requiring the turnover of all receipts purchased by SLS net of only Allonhill's direct expenses.  The Turned Over Funds amounts are not subject to avoidance.

Second, new value was provided by SLS for the Turned Over Funds in the form of the agreement to amend the start of the Earnout period.  Modification of a contract constitutes new value.  *See, e.g., In re Spada*, 903 F.2d 971, 975 (3d Cir. 1990) ("The critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an exchange.") (citation omitted).  Here, SLS's agreement to amend the earnout period was contingent on Allonhill's releasing the Customer Collections purchased by SLS pursuant to the APA.  Because the release of the Customer Collections was in exchange for modification of the Earnout period, new value was exchanged, and the Turned Over Funds cannot be avoided as preferential payments.

## VI.   ALLONHILL CANNOT PREVAIL ON ITS CLAIM FOR DECLARATORY JUDGMENT (COUNT V).

Allonhill seeks declaratory judgment that $675,474.75 in Customer Collections, the Outstanding Amount that Allonhill failed to remit to SLS, is property of the estate.  Count

V fails because the amounts collected by Allonhill in the months following the Sale on contracts acquired by SLS are not property of the Debtor.

## VII.    ALLONHILL CANNOT PREVAIL ON ITS CLAIM FOR RECOVERY OF AVOIDED TRANSFERS (COUNT IX).

Allonhill seeks, to the extent it is successful in avoiding any transfers pursuant to Section 550, recovery of those avoided transfers.  Count IX fails because, for the reasons set forth above, Allonhill cannot prevail on its avoidance claims.  The Court will therefore deny the claim.  The Court notes, however, that even were Allonhill to have prevailed on the claim, or any avoidance claim, Allonhill would not recover damages that exceed its debt.

Section 550(a) of the Bankruptcy Code provides that transfers avoided under Sections 544 and 548 may be recovered only "for the benefit of the estate."  11 U.S.C. § 550(a); *see also In re Cybergenics Corp.*, 226 F.3d 237, 243-44 (3d Cir. 2000) ("The power to avoid the debtor's prepetition transfers and obligations" are for the purpose of "maximiz[ing] the bankruptcy estate for the benefit of creditors.").  For this reason, "courts have limited a debtor's exercise of avoidance powers to circumstances in which such actions would in fact benefit the creditors, not the debtors themselves." *Id.* at 244; *see also In re Messina*, 687 F.3d 74, 82-83 (3d Cir. 2012); *In re Majestic Star Casino, LLC*, 716 F.3d 736, 761 n.26 (3d Cir. 2013) ("A debtor is not entitled to benefit from any avoidance.") (citation omitted).  To the extent Allonhill prevails on its avoidance claims, it cannot recover in excess of outstanding creditor claims.  To hold otherwise would result in a

windfall to equity (primarily the Allons) that Section 550 and Third Circuit law precludes. *See In re Majestic Star*, 716 F.3d at 761 n.26.

This Court's decision in *In re Physiotherapy, Inc.*, No. 15-51238, 2017 WL 5054308, at *7-8 (Bankr. D. Del. Nov. 1, 2017), does not dictate a different result.  That decision which in retrospect was advisory in nature was decided under unique circumstances which are not present here.

## VIII.  SLS'S COUNTERCLAIMS FAIL AS A MATTER OF LAW, ARE NOT SUPPORTED BY THE FACTS OR ARE WAIVED, BARRED OR LIMITED BY THE APA

SLS has asserted three counterclaims for breach of contract (Count I), conversion (Count II) and unjust enrichment (Count III) relating to the Cash Transfers and cash collections (the "Bankruptcy Counterclaims").   (See D.I. 40 at ¶¶ 82-119.)   The counterclaims also include two causes of action (Counts IV and V) for breach of contract and negligent misrepresentation arising out of Allonhill's alleged misstatements in the due diligence period regarding the allegations in the Aurora Litigation, the likelihood of success of the claims and defenses in the Aurora Litigation, and the strength of the Business, including Allonhill's reputation and its customer relationships (the "APA Counterclaims").  (*See id.*, ¶¶ 41-43, 66-78, 120-134.)

### A.    The APA Counterclaims Fail

The APA Counterclaims fail for two reasons.  First, they are prohibited by the unambiguous terms of the APA.  In Section 5.7, SLS expressly acknowledged that Allonhill had provided information during the due diligence process, that SLS had made its own independent inquiry and that, "making the determination to proceed with the

[APA], [SLS] relied on the results of its own independent investigation." (JX 135 at § 5.7(b).)  SLS also disclaimed any reliance on warranties, covenants and representations that were not included in the APA. (*Id.*, § 5.7(a); *see also* §§ 10.10, 10.15 (setting forth similar disclaimers regarding reliance and waiving claims for pre-contractual representations).)  Under Colorado law, such provisions bar any claim by SLS for negligent misrepresentation.  *See Steak n Shake Enters., Inc. v. Globex Co., LLC*, 110 F. Supp. 3d 1057, 1082-83 (D. Colo. 2015) (language stating that franchisees entered into agreement as "a result of their own investigation and not as a result of any representation by Plaintiffs" was sufficient to bar claim for fraudulent inducement).

Second, SLS has failed to prove its allegations.  As noted above, SLS engaged in extensive due diligence in connection with the APA transaction in July and August 2013, and it had far more than sufficient information, pre-APA, regarding the matters on which it now claims that Allonhill mislead it.  For example, the evidence shows that Allonhill made full disclosure regarding the Aurora Litigation. (*See* FOF, ¶ 92.)  SLS clearly understood the risks involved because it insisted on structuring the APA transaction to insulate it from any Aurora Litigation liability.  SLS also bargained for an indemnification from Allonhill relating to the Aurora Litigation. (*See* FOF, ¶ 100.)  Moreover, SLS's pre-APA documents refer to the risks associated with Aurora Litigation. (*See* JX 118, SLS129087.)

By the same token, SLS cannot argue that it was misled about the strength of the Business, Allonhill's reputation or its customer relationships.  SLS had the opportunity

in its due diligence efforts to discover the facts about which it complains. SLS nonetheless went forward with the APA. Having done so, SLS cannot thereafter claim that it was misled about Allonhill's customer relationships and reputation.

SLS has further complained that Allonhill did not disclose, prior to the APA, that the Little Bear project for Fannie Mae would be coming to an end sooner than Allonhill had anticipated. SLS, however, knew that the Little Bear was up for renewal and that the prospect of a non-renewal was a potential risk. (*See id.*) SLS cannot base its misrepresentation claim on omissions relating to the non-renewal of a contract because, in the APA, Allonhill provided SLS with a Disclosure Schedule informing SLS that "[m]any of [Allonhill's] contracts . . . are terminable for convenience or have terms of approximately one year or less, with no guaranty of renewal thereof." (D.I. 143, Ex. 4, § 4.17; *see also* Vol. III (J. Nadeau) at 253:16-254:13 (testifying that he was aware of the Disclosure Schedule).)

Therefore, the Court concludes that SLS cannot recover for the alleged negligent misrepresentations of Allonhill in connection with the APA, which form the basis of SLS's claim.

### B.    The Bankruptcy Counterclaims Fail

SLS's claim of unjust enrichment leading to a constructive trust claim also fails. Colorado law governs the issue of whether a trust relationship exists, *see, e.g., City of Farrell v. Sharon Steel Corp. (In re Sharon Steel Corp.)*, 41 F.3d 92, 95 (3d Cir. 1994), and such law makes it impossible for SLS to have been a beneficiary of a constructive trust as of

the Petition Date.  A constructive trust is a remedy be imposed only on a clear showing of unjust enrichment.

SLS also has not satisfied its burden of proving entitlement to a constructive trust. "A creditor cannot simply claim entitlement to a constructive trust."  *In re Quarles*, 2014 WL 29740, *9 (citing *Cousatte v. Lucas (In re Lucas)*, 300 B.R. 526 (B.A.P. 10th Cir. 2003)). Rather, a creditor must "(1) show fraud or mistake in the debtor's acquisition of the property; and (2) be able to trace the wrongfully obtained funds to the property."  *Id.* at *8 (citing *In re Lucas,* 300 B.R. at 533).

SLS has not demonstrated the requisite fraud or mistake.  *See, e.g.*, *Lawry*, 192 P.3d at 563-64 (imposing constructive trust where defendant abused the parties' contractual relationship by misadvising and failing to disclose facts in order to cause the plaintiffs to "'relax[] their vigilance due to defendant's representations" and be induced "to allow defendant to retain the permit [at issue]"); *Shepler v. Whalen*, 119 P.3d 1084, 1089 (Colo. 2005) (referring to constructive trusts as "fraud-rectifying trusts").  Constructive trusts are not imposed when the parties specifically agreed to a debtor-creditor relationship. *See, e.g.*, *Torres*, 767 F.2d at 1576 (constructive trust not recognized absent evidence that the debtor "committed any affirmative misrepresentations" or "promised that any special measures would be taken to protect [claimants'] investments.").

Here, Allonhill did not hold the $6,608,000 later transferred to SLS because of fraud or mistake.  SLS directed that payments be made to Allonhill, and the parties' agreements regarding cash collections specifically contemplate exactly the events that occurred, but

these agreements do not prioritize SLS's claims over general creditors. SLS is therefore not entitled to a constructive trust.

SLS seeks by counterclaim to recover the Outstanding Amount totaling $675,474.75. The Outstanding Amount comes from Allonhill's collections on customer contracts, receivables and/or rights to payment which SLS purchased pursuant to APA. Under Colorado law, it is SLS's burden to prove that it performed, that Allonhill did not and that SLS was thereby damaged. Accordingly, the SLS claim fails.

## IX.    MOTIONS *IN LIMINE*

The parties brought motions asking the Court to exclude some or all of the testimony of their opponent's witness(es) as follows:

A.    <u>Seth R. Fliegler</u>. SLS asked the Court to exclude the expert testimony of Mr. Fliegler as to breach of contract damages on the ground that Mr. Fliegler did not account for events that took place after the date on which SLS allegedly breached the APA. SLS argues that Mr. Fliegler failed to satisfy the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

The Court deferred decision on this motion and the other motions *in limine* and will deny the motion because although the Court rejected the substance of Mr. Fliegler's testimony, the Court found that Mr. Fliegler's testimony was helpful to the Court better understanding the evidence. The Court therefore denies the motion.

B.    <u>Guy A. Davis</u>. Allonhill asked the Court to exclude a portion of Mr. Davis's testimony regarding SLS' claim of negligent misrepresentation and Allonhill's solvency.

Allonhill claims that the testimony is unreliable and/or irrelevant. The Court will deny the motion. The testimony was helpful to the Court and both relevant and reliable.

C.    <u>Fiachra T. O'Driscoll</u>.    Allonhill sought to exclude Mr. O'Driscoll's testimony regarding reputation, securitization, Allonhill's technology and other firms. Allonhill argues that the opinion is speculative, beyond O'Driscoll's expertise and unsupported by the evidence. The Court is fully satisfied that there is no basis to Allonhill's arguments and will deny the motion.

D.    <u>Negligent Misrepresentation and Damages</u>.    Allonhill sought to exclude evidence of damages which exceed the limits permitted by the APA, the Indemnity Agreement and the Plan, and to exclude evidence related to negligent misrepresentations. The motions will be denied as they are addressed to the merits of the case and resolved in the rulings.

The parties briefed the motions *in limine* thoroughly and the Court is therefore reluctant to give them short shrift. However, having conducted trial the Court is fully convinced that it is only proper to deny the relief Allonhill and SLS seek.

## <u>CONCLUSION</u>

The Court has made its decision that neither Allonhill nor SLS is entitled to any damages.  The ruling follows a five day trial, extensive briefing, oral argument and the Court's independent review of the trial record (documents and transcript).  The result is very clear to the Court, and the facts and the law command the Court's decision.

The Court will issue an Order to follow.


Dated:  April 25, 2019

_____
KEVIN GROSS, U.S.B.J.

## GLOSSARY OF TERMS

| | |
|---|---|
| CRM | Allonhill's credit risk management service |
| DCF | Discounted cash flow analysis |
| FDIC | Federal Deposit Insurance Corporation |
| GSE | Government sponsored entity |
| LFR | Loan file review |
| MSR | Mortgage servicing rights |
| NRSRO | Nationally recognized statistical rating organization |
| QC | Allonhill's quality control service |
| RMBS | Residential mortgage-backed securities |
| SPM | Allonhill's servicer performance management service |
| U.S. Treasury | United States Department of Treasury |